

EXHIBIT A-1

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

STATE OF MINNESOTA

COUNTY OF CARVER

DISTRICT COURT

FIRST JUDICIAL DISTRICT

| | |
|---|---|
| JENNIFER SHAWGO, an individual, JENNIFER SHAWGO BC LLC, a Minnesota limited liability company, MOLLY BJORNLIE, an individual, MOLLY BJORNLIE, LLC, a Minnesota limited liability company, | Case Type: Other Civil |
| | Court File No.: _____ |
| | Judge: _____ |
| Plaintiffs, | **COMPLAINT AND JURY DEMAND** |
| v. | |
| COUNTER BRANDS, LLC d/b/a BEAUTYCOUNTER, a California limited liability company, and THE CARLYLE GROUP INC., a Delaware corporation, | |
| Defendants. | |

Plaintiffs Jennifer Shawgo, Jennifer Shawgo BC LLC, Molly Bjornlie, and Molly Bjornlie, LLC, by and through their attorneys, Fredrikson & Byron, P.A., for their Complaint against Defendants Counter Brands, LLC d/b/a Beautycounter and The Carlyle Group Inc. allege, on knowledge as to their own actions, and otherwise upon information and belief, as follows:

## PARTIES, JURISDICTION & VENUE

1.  Plaintiff Jennifer Shawgo is an individual who resides in Minnesota at 3090 Dartmouth Dr., Excelsior, Minnesota 55331. Shawgo was a Beautycounter Consultant, through Jennifer Shawgo BC LLC, from 2014 until Beautycounter terminated her in January 2023.

2.  Plaintiff Jennifer Shawgo BC LLC is a Minnesota limited liability company with a registered address of 9113 Hampshire Ave. N., Brooklyn Park, Minnesota 55445-5544. Shawgo, a citizen of the state of Minnesota, is the sole Member of Jennifer Shawgo BC LLC.

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

3.      Plaintiff Molly Bjornlie is an individual who resides in Minnesota at 2965 Jonquil Trail N, Lake Elmo, Minnesota 55042. Bjornlie was a Beautycounter Consultant, either individually or through her limited liability company, from 2015 until Beautycounter terminated her in March 2023.

4.      Plaintiff Molly Bjornlie, LLC is a Minnesota limited liability company with a registered address of 2965 Jonquil Trail N, Lake Elmo, Minnesota 55042. Bjornlie, a citizen of the state of Minnesota, is the sole Member of Molly Bjornlie, LLC.

5.      Defendant Counter Brands, LLC d/b/a Beautycounter is a Delaware limited liability company with headquarters in Santa Monica, California. Beautycounter sells skincare and cosmetic products in America and Canada through its network of about 39,000 Beautycounter Consultants and its website.

6.      Defendant The Carlyle Group Inc. is a global investment firm incorporated in Delaware with its principal place of business located at 1001 Pennsylvania Avenue, NW, Suite 220 South, Washington D.C. 20004-2505.

7.      All actions complained of herein occurred while Plaintiffs resided in and performed work on behalf of Beautycounter in the State of Minnesota.

8.      Jurisdiction is proper in this Court because the violations occurred in the State of Minnesota and arise in part under the laws of Minnesota.

9.      Venue is proper in Carver County because unlawful practices alleged herein occurred in part in Carver County in the State of Minnesota.

## FACTUAL BACKGROUND

### Introduction

10.     Plaintiffs are two women who sought an opportunity to remain at home with their young children while pursuing their entrepreneurial goals. Their entrepreneurial spirit led them to

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

join a company, Beautycounter, that promised them business partnership and a chance to advance a clean beauty mission they believed in.

11.     Plaintiffs spent nearly a decade building their businesses in partnership with Beautycounter. They leveraged their time, resources, personal networks, and connections to expand Beautycounter's reach into thousands of customers' homes. They worked tirelessly to recruit thousands of new Consultants who would, in turn, sell Beautycounter's products. Prior to 2021, Beautycounter treated Plaintiffs as business partners in accordance with its motto of "Truth & Transparency." Beautycounter gave Plaintiffs insights into the direction of the company and sought their input before making changes that would affect Plaintiffs' livelihoods.

12.     The tenor of the business relationship changed dramatically with The Carlyle Group's acquisition of Beautycounter in 2021.

13.     Less than two years later, acting at The Carlyle Group's direction, Beautycounter abruptly and unceremoniously terminated its relationship with Plaintiffs, usurped their business, and now will reap the benefits of Plaintiffs' efforts for decades to come, with little to no additional effort.

### Beautycounter's Mission and Business Model

14.     Beautycounter was founded by Susan Gregg Renfrew in 2011 and brought to market in 2013.

15.     Under the motto "Truth & Transparency," Beautycounter's goal is to offer beauty product ingredient transparency and safety to consumers and advocate for better regulation of the beauty product industry.

16.     Beautycounter is a direct-sales, multilevel marketing company which uses individual "Consultants" to market and sell makeup and skincare products directly to customers.

17.     Throughout the relevant time period, when an individual wants to sell for

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

Beautycounter, they must enroll through a website in order to become a company "Consultant."

18. During that sign up process, the individual is required to "click" through a terms and conditions sheet, which it titled the "Consultant Agreement Terms & Conditions." The "Consultant Agreement Terms & Conditions" is unliterally drafted by Beautycounter, with no opportunity for input or negotiation from the Consultant. Like the millions of similar such forms consumers have to "click" through on the internet, the Agreement is presented in small print in a small pop-up window with only a small portion of the Agreement's text visible. Beautycounter did not present the Agreement in a manner that required it be read, as the "I Agree" button is active regardless of whether the Consultant scrolled through the text. Consultants are not required to actually sign the Agreement.

19. Beautycounter's "Consultant Agreement Terms & Conditions" states that each individual who signs up to sell its products will be an "Independent Consultant" with the right to: (a) "offer for sale Beautycounter products," (b) "enroll persons as Consultants," and (c) "earn commissions" pursuant to a separate "Beautycounter career plan."

20. The "Consultant Agreement Terms & Conditions" also states that it incorporates and makes "part of" the agreement its "Beautycounter Policies and Procedures, the Beautycounter Career Plan, and the Beautycounter Business Entity Addendum." However, as the Agreement itself acknowledges, these documents were not available to the individual until *after* they "click" the "I Agree" button.

21. In the same small window of fine print in which the multi-page Agreement appears, Beautycounter states that it has the right to unilaterally change the agreement's terms at any time and, by "clicking" the "I Agree" button, the Consultant is purportedly agreeing to "abide" by any changes Beautycounter makes.

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

22.     After clicking "I Agree," the Consultant then must set up their own individual website and order their first "Enrollment Kit" to begin sales.

23.     When joining Beautycounter, a new Consultant is placed under an existing Consultant.  This person is referred to as the new Consultant's "sponsor," "mentor," or "upline." In turn, new Consultants under a particular sponsor are referred to as the sponsor's "downline." A downline sales organization can consist of several hundred Consultants.

24.     Under Beautycounter's business model, Consultants earn commissions from their product sales.  In addition to their sales to third parties, this can also include products Consultants purchase for themselves, referred to within Beautycounter as "consultant consumption." Consultants also earn commissions from the sales, including consultant consumption, of their downline. Indeed, Beautycounter encouraged Consultants to recruit their customers into their downline by pitching that it would allow *both* the Consultant *and* the customer to earn commission on their product consumption.

25.     Beautycounter tells its Consultants that they are building their own business.  On the public-facing webpage where prospective Consultants can start the process to join Beautycounter, the company advertises that its Consultants can "Build your business, your way." Consultants are led to believe they have ownership and control over the business they are building.

26.     Developing a small business takes hard work, personal sacrifice, and strategic planning. The Consultants who sign up to sell Beautycounter products are required to, and do, use their own resources, networks, and connections to build a successful sales business.

27.     Indeed, Beautycounter encourages Consultants to build their own customer base and Consultant team.  Using the acronym "FRANKS," Beautycounter's Consultant Workbook specifically instructs Consultants to target people they know: "**F**: Friends (college, high school,

childhood, church, social clubs, Facebook; **R**: Relatives; **A**: Acquaintances – people you know but aren't super close to; **N**: Neighbors – these are people you are friendly with but may have no idea about Beautycounter; **K**: Kids' friends' parents; **S**: Significant others' contacts."

28.     In its Consultant Workbook, Beautycounter explicitly recognizes that social media is a powerful sales and recruiting tool and that social media is often the primary way Consultants build their businesses: "Social media is a powerful tool for building your personal business. Use your social accounts to share content, talk about your business, grow your audience, and increase loyalty. Think of your social profile as a storefront; it's a space to find and engage with Clients and give them a glimpse of Beautycounter."

29.     Accordingly, Consultants develop and leverage their own personal social media accounts and develop connections with their personal communities. Consultants attend events and provide product demonstrations. They find outlets and places to advertise their online marketplace as a place to purchase from. They take orders for Beautycounter products at hosted events.

30.     A key element of Beautycounter's success is its 69,000+ Consultants and the mechanism to incentivize key Consultants through its multi-level compensation plan. Consultants are strongly encouraged, both as a matter of company policy and in terms of financial incentives, to spend significant energy recruiting and building up a successful downline. Often a Consultant's downline will include family, friends, and other personal connections from within their community.

31.     By achieving certain sales levels, Consultants can advance to higher levels of the Beautycounter compensation plan, which entitles Consultants to earn a greater percentage of commissions from their own product sales and sales made by Consultants in their downline.

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

## Plaintiffs Jennifer Shawgo and Jennifer Shawgo BC LLC

32.     Plaintiff Shawgo joined Beautycounter in 2014, when the company was still in its infancy. Having studied to become an entrepreneur in college, she was excited to contribute to the growth of a new company (Beautycounter), while simultaneously building her own business. On February 25, 2019, Shawgo started Jennifer Shawgo BC LLC. From that time on, her business relationship with Beautycounter was conducted through her LLC. As used herein, "Shawgo" refers to both.

33.     Shawgo joined because she was drawn to Beautycounter's motto of "Truth and Transparency" and its commitment to educating consumers about an unregulated beauty industry. She was excited to be a part of Beautycounter's larger goal of uncovering misleading marketing in the beauty industry, and she was passionate about helping consumers understand the health implications of what they put on their bodies. She was proud to be part of a company that was a leader in the clean beauty movement. Shawgo was also inspired by Beautycounter's legislative advocacy for better regulation in the beauty industry.

34.     Shawgo valued the respect and trust Beautycounter showed its Consultants. In particular, she valued how Gregg Renfrew carried out Beautycounter's Truth & Transparency motto by sharing company projections, goals, and numbers with its Consultants to ensure they could run their businesses in step with where the company was going.

35.     Over the next 8 years, Shawgo channeled everything she had into building her own business through her partnership with Beautycounter. She reached the top level of the commission structure within just 2 years by leveraging her expansive contacts, business savvy, and strategic sales efforts to grow her own business while selling Beautycounter's products. She hosted popups with her friends and family, scheduled one-on-one appointments with individuals looking to learn more about the lack of regulation in the beauty industry, dropped off and mailed product samples

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

to interested individuals, helped her downline with popups, managed a training page on Facebook where she shared tips for success with other Consultants, and held weekly calls in which she onboarded, trained, and checked in with other Consultants. She continued these efforts throughout the COVID-19 pandemic, finding new ways to connect with consumers, recruit new Consultants, and share Beautycounter's mission even when meeting in-person was not possible.

36.     Through her efforts, Shawgo achieved the level of Managing Director and amassed a downline of over 1,100 consultants.

37.     Shawgo understood that the business she developed would be her own business as long as she chose to remain a Consultant, and that Beautycounter would pay her commissions based on her sales and her downline's sales.

38.     Shawgo also understood that she could pursue opportunities with other direct-sales companies—indeed, she knew of many other Consultants who did just that while continuing to sell Beautycounter products—but she never considered it because she was all-in with Beautycounter and was satisfied with the six-figure income she was generating from her partnership with Beautycounter.

**Plaintiffs Molly Bjornlie and Molly Bjornlie, LLC**

39.     Plaintiff Bjornlie joined Beautycounter as a consultant in 2015. Like all the Consultants, Beautycounter classified Bjornlie as an independent contractor. On May 17, 2019, Bjornlie started a limited liability company named Molly Bjornlie, LLC. From that time on, her business relationship with Beautycounter was conducted through the LLC. As used herein, "Bjornlie" refers to both.

40.     Shawgo was a Beautycounter mentor to Bjornlie. Like Shawgo, Bjornlie was drawn to Beautycounter's motto of "Truth and Transparency" and its commitment to educating consumers about an unregulated beauty industry, as well as the respect Beautycounter showed its

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

Consultants and Beautycounter's investment in them.

41.    Bjornlie was proud to be an entrepreneur and she quickly began building her Beautycounter business. She developed knowledge of the products, learned about marketing, and began to develop her customer base, and she also used her own personal network and social media accounts to build Beautycounter's brand reputation, recognition, and sales. Bjornlie also had her own Beautycounter website, and she directed her customers to her website to order products. She was responsible for the service and orders of her customers.

42.    Beautycounter encourages its consultants to recruit and mentor new consultants to the business so, in addition to her own sales, Bjornlie recruited other consultants. Bjornlie acted as a mentor for her downline and helped the consultants to increase their sales of Beautycounter products. Bjornlie was compensated based upon the success of her downline, and she had the ability to monitor their sales. Bjornlie would help them when they neared levels that could result in a promotion. Bjornlie spent significant time and investment both on her own business and on the development and mentorship of her downline consultants.

43.    Through her efforts, Bjornlie achieved the level of Managing Director and amassed a downline of over 800 consultants.

44.    Bjornlie understood that the business she developed would be her own business, and that Beautycounter would pay her commissions based on her sales and her downline's sales.

45.    Bjornlie's compensation at Beautycounter was based on a percentage of her own sales, as well as a percentage of the sales of her downline. From 2015 until her termination, Bjornlie earned a six-figure income. This was an important and significant contribution to her family income.

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

46.     Bjornlie also understood that she could pursue opportunities with other direct-sales companies—indeed, she knew of many other Consultants who did just that while continuing to work for Beautycounter—but she never considered it because she was all-in with Beautycounter and was satisfied with Beautycounter's compensation.

## Defendant The Carlyle Group Acquires Beautycounter and Implements Rapid Compensation Changes that Forced Plaintiffs to Seek Supplemental Income

47.     In April 2021, Defendant The Carlyle Group, an East Coast investment firm, acquired a majority stake in Beautycounter, valuing the company at $1 billion.

48.     After The Carlyle Group's acquisition, conditions for Beautycounter's leaders and consultants deteriorated rapidly.

49.     Extreme cost-cutting measures (upon information and belief, for the purpose of inflating EBITDA and maximizing ownership profits) were implemented with little warning.

50.     On or about April 20, 2022, Beautycounter announced unilateral compensation plan changes that removed Managing Director bonuses. Beautycounter also removed compensation and reporting earned from both personal and downline consultant consumption.

51.     Both Shawgo and Bjornlie received an impact statement from Beautycounter that same day explaining that their compensation would be unilaterally reduced. Beautycounter represented the estimated cut to be 20-25% of their earnings and stated that the cuts would take effect on or about June 1, 2022—just 6 weeks later.

52.     These changes were jarring to Plaintiffs in light of Beautycounter's prior course of conduct with compensation changes. Prior to The Carlyle Group obtaining ownership, there were no unilateral compensation adjustments. Indeed, the only time Beautycounter made any material compensation adjustment prior to The Carlyle Group's acquisition, Beautycounter flew representatives to Minnesota to meet with Plaintiffs and other top Consultants to discuss the

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

change and hear concerns. In short, Plaintiffs were treated like true business partners.

53.     On or about July 8, 2022, Shawgo received her first commissions check after the compensation plan changes. This commissions check, which reflected earnings from sales made in June 2022, was $7,886.74. This represented a 66% decrease from her commissions check for the prior month, when she earned $22,537.92 for sales made in May 2022. This represented a 58% decrease from her earnings for June 2021 as reflected in her July 2021 commissions check for $13,518.57.

54.     On or about July 8, 2022, Bjornlie received her first commissions check after the compensation plan changes. This commissions check, which reflected earnings from sales made in June 2022, was $7,719.73. This represented a 66% decrease from her commissions check for the prior month, when she earned $22,836.41 for sales made in May 2022. This represented a 36% decrease from her June 2021 earnings reflected in her July 2021 commissions check for $12,109.17.

55.     Adding to their concerns, shortly after the compensation changes were implemented, Plaintiffs' upline mentor, Leah Huxtable, shared with Plaintiffs that Beautycounter would be switching to an affiliate-link-only sales model, which would eliminate downlines—a primary income generator for Consultants.

56.     Deeply troubled about the impact the compensation changes and possible business structure change would have on the businesses Plaintiffs and their teams had worked so hard to build, Plaintiffs and many other Managing Directors and Executive Directors submitted letters to Beautycounter Headquarters expressing their anger over the unilateral changes and threatening to look for alternative jobs. Executive and Managing Directors began posting resumes, joining other companies, and looking for new ways to supplement their newly reduced income. Many of these

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

women, operating at the highest levels of Beautycounter, were the primary or significant breadwinner for their families.

57. Shawgo and Bjornlie both spent a significant amount of time working with their teams to address the fallout from the commissions cuts. In addition to providing emotional and psychological support, they encouraged their team to stay positive and forward-looking, and to double-down on their business efforts in areas where compensation growth was possible.

58. Shawgo and Bjornlie took their own advice and doubled down on their recruitment efforts in an attempt to make up the difference in their income.

59. On or about July 21, 2022, there was a leadership call with Beautycounter's new CEO, Marc Rey. Unlike previous meetings and calls with top-earners and Beautycounter leadership where open dialogue was encouraged, Ray muted all responses and turned off attendees' ability to chat or ask questions.

60. Rey called the female leaders "overreactive" and said he could not share the direction of the company with them because they would "freak out." He indicated that "clean beauty" was not "sexy" anymore, and that "the environment" is sexy, and he intimated that that was the new direction the company would be going in.

61. This was extremely concerning to Plaintiffs because from Beautycounter's inception, it had been the leader of the clean beauty movement; indeed, this is what drove Plaintiffs to leverage their networks for Beautycounter in the first place.

62. Rey further informed leaders in the July 21, 2022 call that he had "gone to bat for them" and asked The Carlyle Group—which, upon information and belief was ultimately responsible for the compensation changes—to reconsider the aggressive compensation reductions. He told the leaders that he would give them until January 2023 for the new compensation plan to

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

kick in, but that he needed to "find $10 million" in the budget to justify to The Carlyle Group the delayed implementation.

63.     Until the drastic commissions cuts, Plaintiffs had never offered non-Beautycounter products to their networks or even considered it—although they had a right to do so given their purported classification as independent contractors and the fact that Beautycounter had been allowing other Consultants to do so for years without objection.

64.     Having no choice but to find an alternate means to supplement the rapid decrease in their income, Plaintiffs sought opportunities where they could use their sales acumen and passion for health and wellness.

65.     On or about July 10, 2022, Shawgo joined Green Compass. Shortly thereafter, she formed an LLC, "CBD Babe, LLC" and transitioned her Green Compass business to that LLC.

66.     On or about July 14, 2022, Bjornlie joined Green Compass.

67.     Green Compass is a wellness company that sells a variety of hemp-derived products using a direct-sales business model. Green Compass does not sell makeup.

68.     When they joined Green Compass, Plaintiffs fully intended to continue their partnership with Beautycounter at the same level and same capacity as they had been for the past 8 years. Plaintiffs understood this posed no concern to Beautycounter given Beautycounter's representation that Plaintiffs were "free" to work for other direct-sales companies, the fact that many other Consultants also worked for multiple direct-sales companies without objection from Beautycounter, and Plaintiffs' purported classification as independent contractors.

69.     On or about July 22, 2022, Beautycounter announced additional changes to the compensation plan through December 2022. Beautycounter reinstated the compensation for consultant consumption but continued to exclude it from downline reports. As a result, the

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

consultants had no ability to verify whether their compensation was being accurately paid. Beautycounter also did not retroactively credit the consumption bonuses that were lost in July 2022.

70.    On or about August 12, 2022, Beautycounter issued paychecks that were supposed to be calculated according to the prior compensation plan. Based on the information available to them, these paychecks were at least 33% short for Plaintiffs.

71.    Beautycounter provided no details about how it calculated the actual consultant sales volumes. Managing and Executive Directors—including Plaintiffs—were again, very upset. In response, Beautycounter claimed it would correct the August 2022 paychecks in September 2022. The September 2022 paychecks purported to correct the discrepancy, but Beautycounter provided no contemporaneous information explaining how it calculated the new payment amounts.

72.    Shawgo sent an email on or about August 31, 2022, questioning her paycheck discrepancy, but Beautycounter never responded.

### Beautycounter Begins Terminating High-Earning Consultants

73.    On or about July 29, 2022, Shawgo was summoned to a teleconference meeting with Tracy DeLisle, Vice President, and Gina Murphy, former vice president.

74.    When Shawgo asked if the meeting was about her significant new business volume and how many new consultants she had recruited recently, they responded, "yes."

75.    However, DeLisle and Murphy began to question Shawgo about Green Compass. They gave Shawgo three options: quit Green Compass, quit Beautycounter, or stay at Beautycounter and lose some of her Executive Director perks.

76.    Shawgo shared with them her concerns about the direction of the company, and the new CEO's leadership as reflected in the July 6, 2022 call.

77.    Following this call, Beautycounter excluded Shawgo from emails and calls about

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

the compensation plan changes, upcoming product launches, and similar topics. This made it incredibly difficult for Shawgo to lead her team of Consultants. Shawgo was also kicked out of leader calls when she logged on to find out information necessary to lead her team.

78. On or about November 30, 2022, Shawgo was suspended without notice and told it would take 30 days to investigate allegations that she had violated a Beautycounter policy.

79. Shawgo was not told exactly what prompted the investigation, nor was she provided any opportunity to participate in the investigation.

80. Shawgo was never interviewed nor was she presented with any evidence of an alleged policy violation.

81. Although she was told the investigation would take up to 30 days, that was untrue, as the investigation lagged on well past December 30, 2022.

82. Despite Shawgo's repeated requests and pleas for information, given the impact to her family of having her ability to earn a livelihood severed right before the holidays, Beautycounter provided no substantive updates.

83. From December 2022 to January 2023, several clients reached out to Shawgo wondering why they could not order from Shawgo's shopping link.

84. Apparently, Beautycounter had locked Shawgo out of her individual business page, unilaterally shut her individual business page down, and was redirecting her customers to the company's main website to purchase products.

85. As a result, Beautycounter reaped all of the benefits of sales Shawgo was responsible for bringing in during that time. Indeed, many customers who ordered were redirected to Beautycounter's main website but had no idea their purchases were not credited to Shawgo.

86. On January 27, 2023, Shawgo received an anonymous Termination Letter from

*guidelinesupport@beautycounter.com* without any further explanation.

87. Neither the letter, nor the email transmitting the letter, was signed by an individual. Instead, the letter is from "Guidelines Support Team."

88. The Termination Letter quotes from a Consultant Agreement and a Policies & Procedures document in an attempt to justify Shawgo's termination, but the letter did not provide copies of either document. Apparently, the quoted language had been unilaterally adopted by Beautycounter *after* Shawgo joined the company.

89. In November 2022, Bjornlie posted information on her social media account about a "Green Saturday" event being held by Green Compass. Just days later, on or about November 30, 2022, Bjornlie was suspended without notice.

90. According to a letter Bjornlie received, Beautycounter claimed to be investigating allegations that Bjornlie engaged in "direct or indirect" promotion of a different business. Bjornlie's Beautycounter website was unilaterally and immediately inactivated. Her customers were redirected to Beautycounter's main website, without knowing Bjornlie would not be credited with the sale. In short, Bjornlie was cut off from making any income on her business during this time. Bjornlie was also denied access to the "Behind the Counter" back-office numbers that track her sales, as well as those of her downline, and she was not permitted to attend sales events or calls.

91. Bjornlie was told an investigation would be completed within 30 days. Given the impact on her family for the sudden loss of income from her business—especially over the holidays—Bjornlie contacted Beautycounter to seek and offer information. However, Bjornlie was never told what specifically led to the investigation, nor was she asked to provide any information for the investigation. Instead, nearly 60 days later, on or about January 27, 2023,

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

Bjornlie was told without explanation that her suspension was lifted.

92.     Bjornlie was issued a paycheck following her suspension that Beautycounter reported included her backpay. However, Bjornlie was never given access to her sales information during the suspension to verify the accuracy of the payment.

93.     After her suspension was lifted, Bjornlie invested $4,000 into learning how to promote *both* her Beautycounter and Green Compass businesses in a cold market. Given her intention to continue both businesses—and Beautycounter's position that she could not post about Green Compass on social media—Bjornlie knew she had to learn a new method to promote her businesses because financially, she needed to do both. Bjornlie had no intention of leaving Beautycounter or doing anything that would harm her Beautycounter business. Indeed, she could not afford to lose her Beautycounter income, but she needed to supplement it given the rapid compensation changes Beautycounter was implementing.

94.     A little over one month later, on March 7, 2023, Bjornlie received a Termination Letter from "Guidelines Support Team," which was attached to an email from *guidelinesupport@beautycounter.com* without any further explanation. Neither the letter, nor the email transmitting the letter, was signed by an individual.

95.     The letter quoted from a Consultant Agreement and a Policies & Procedures document in an attempt to justify Bjornlie's termination, but the letter did not provide copies of either document.

96.     After their terminations, Beautycounter provided Shawgo and Bjornlie a copy of the 2022 Consultant Agreement upon which it purports to rely. Plaintiffs never reviewed or agreed to the 2022 Consultant Agreement. Nonetheless, in that "Consultant Agreement" the Company had unilaterally added the following language:

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

12. **Non-Solicitation.** During the term of this Agreement and any renewal of this Agreement and for a period of one (1) year following the termination of this Agreement, Consultant agrees to not directly or indirectly solicit any Beautycounter Consultant to (i) join, enroll or affiliate with a competitor; or (ii) terminate or alter the Consultant's business relationship with Beautycounter. In this paragraph, "solicit" is defined to include the direct or indirect, actual or attempted, solicitation, encouragement, recruitment or effort to influence another Consultant to participate in another direct selling business opportunity, even if the Consultant's actions are in response to an inquiry made by another Consultant. In this paragraph "competitor" is defined to include a network marketing, multilevel marketing, party plan or social media company that sells products or services through independent sales representatives.

97.     Beautycounter knows or should have known that this language is unlawful and unenforceable, particularly in light of its incorporation of California law into the Policies & Procedures: "This Agreement, including and procedural or substantive rights in any arbitration, shall be governed by and construed in accordance with the laws of the State of California without giving effect to principles of conflicts of laws."

98.     Based on information and belief, Beautycounter removed High-Earning Consultants at the direction of The Carlyle Group, as part of an unlawful scheme to usurp the business created by High-Earning Consultants and eliminate their commissions from the Company's budget.

99.     Removing High-Earning Consultants with significant downlines from Beautycounter allowed Carlyle Group to obtain a financial benefit at the expense of the terminated Consultants. Indeed, Plaintiffs each amassed a huge downline of Consultants and a massive customer base—with the understanding and expectation that they owned this business, which was mutually beneficial to them and Beautycounter. The Carlyle Group, however, interfered with Plaintiffs' customer and consultant relationships by usurping those relationships for itself, severing Plaintiffs from the business they created without any justification after sham investigations.

100.    Notwithstanding numerous letters, emails, and even a mediation in Los Angeles, California, Beautycounter has refused to reinstate Plaintiffs or even negotiate a resolution in good

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

faith. Beautycounter has insisted that it had the right to change the terms of the business relationship at any time, without notice, and that Plaintiffs have no right to the downline and customer base they generated. Moreover, Beautycounter has threatened Shawgo with litigation if she challenges her termination, and has even gone so far as to preemptively sue Shawgo in arbitration to silence her and keep her claims out of district court. These actions have all been taken in bad faith.

### COUNT I
**Tortious Interference with Prospective Economic Advantage (California Law)**
[As against all Defendants]

101.    Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

102.    Plaintiffs and their customers were in an economic relationship that would have resulted in an economic benefit to Plaintiffs.

103.    Plaintiffs and the consultants in their downlines were in an economic relationship that would have resulted in an economic benefit to Plaintiffs.

104.    Defendants knew of Plaintiffs' relationships with their customers and downlines, including the specific financial value of those relationships to Plaintiffs.

105.    Defendants engaged in wrongful conduct by suspending and then terminating Shawgo for discussing her compensation with another Consultant, which is protected activity under California public policy as reflected in Cal. Labor Code § 232.

106.    Defendants engaged in wrongful conduct by suspending and terminating Plaintiffs for alleged violations of a non-solicitation provision that is invalid under Cal. Bus. & Prof. Code § 16600.

107.    Defendants engaged in wrongful conduct in the form of unfair business practices in violation of Cal. Bus. & Prof. Code § 17200 by terminating Plaintiffs to avoid paying

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

commissions. Defendants' unfair business practices deprived Plaintiffs of the benefits of competitive wages in violation of the underlying policy and spirit of antitrust laws, and otherwise significantly threatened or harmed competition, when they substantially cut Plaintiffs' compensation, suspended Plaintiffs for seeking to supplement their income by joining a different direct-sales company, and then subsequently terminated them.

108. Defendants engaged in wrongful conduct because the Agreement upon which they attempt to rely is substantively and procedurally unconscionable with respect to Beautycounter's unilateral right to change the terms of the business relationship at any time.

109. By engaging in this conduct, Defendants intended to disrupt Plaintiffs' relationships with their customers and downline consultants or knew that disruption of those relationships was certain or substantially certain to occur as a result.

110. Plaintiffs' relationships with their customers were disrupted when Beautycounter suspended their individual web pages and redirected customers to Beautycounter's website when those customers attempted to purchase from Plaintiffs.

111. Plaintiffs' relationships with their customers were further disrupted when Beautycounter terminated Plaintiffs and forced customers who wanted to purchase products from Plaintiffs to instead purchase directly from Beautycounter or purchase from another consultant.

112. Plaintiffs' relationships with their downline consultants were disrupted because, as a direct result of being suspended, locked out, and eventually terminated, Plaintiffs' economic relationships with their downlines were severed, in effect causing Plaintiffs to lose their business overnight.

113. Plaintiffs were harmed because they were deprived of commissions from their own customers' purchases and their downlines' sales. Plaintiffs had already earned the commissions

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

they were deprived of by recruiting the Consultants in their downlines.

114. Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

115. As a result of Defendants' conduct, Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial.

## COUNT II

**Tortious Interference with Prospective Economic Advantage (Minnesota Law)**

[As against all Defendants]

116. Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

117. Plaintiffs had a reasonable expectation of economic advantage from their customers' purchases and from the sales generated by Consultants in their downlines.

118. Defendants knew of Plaintiffs' relationships with their customers and downlines, including the specific financial value of those relationships to Plaintiffs.

119. Defendants engaged in wrongful conduct by suspending and then terminating Shawgo for discussing her compensation with another Consultant, which is protected activity under Minnesota Statutes section 181.172.

120. Defendants engaged in wrongful conduct by terminating Plaintiffs to avoid paying commissions in violation of Minnesota Statutes section 181.145.

121. Defendants engaged in wrongful conduct by terminating Plaintiffs to usurp the relationships they had spent nearly a decade building with their customers and downline, thereby getting the benefit of Plaintiffs' years of hard work without having to pay Plaintiffs and without having to put effort into developing, establishing, or maintaining customer and downline relationships.

122. Defendants engaged in wrongful conduct because the Agreement upon which they attempt to rely for Plaintiffs' suspension and termination is substantively and procedurally

unconscionable with respect to Beautycounter's unilateral right to change the terms of the business relationship at any time.

123.    In the absence of Defendants' wrongful acts, it is reasonably probable that Plaintiffs would have realized an economic advantage—namely, commissions—from their customers' purchases and their downlines' sales.

124.    Indeed, Plaintiffs had already earned the commissions they were deprived of by recruiting the Consultants in their downlines.

125.    As a result of Defendants' conduct, Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial.

## COUNT III

**Breach of Implied Covenant of Good Faith and Fair Dealing (California Law)**

[As against all Defendants]

126.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

127.    Plaintiffs and Beautycounter had an implied contract established by the parties' course of conduct, pursuant to which Plaintiffs would sell Beautycounter's products and recruit Consultants to sell Beautycounter's products. In return, Beautycounter would pay Plaintiffs commissions for their product sales and sales made by Consultants in their downlines. Under this implied contract, Plaintiffs were explicitly permitted to engage in other direct-sales opportunities. Beautycounter would set the terms of Plaintiffs' compensation, and consistent with Beautycounter's mission of "Truth and Transparency," any changes to such terms would be communicated well in advance of implementation, and Plaintiffs would have the opportunity to ask questions and voice concerns about the impact of such changes on their business. Also consistent with Beautycounter's mission of "Truth and Transparency," Plaintiffs understood that,

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

in the event of account suspension or involuntary termination, a fair and transparent investigation would occur in which Plaintiffs would be able to view any evidence supporting Beautycounter's decision to suspend them and provide Plaintiffs an opportunity to tell their side of the story.

128.    During the entirety of their relationship with Beautycounter, Plaintiffs performed under the contract by selling Beautycounter's products and recruiting Consultants to sell Beautycounter's products.

129.    As such, all conditions required for Beautycounter's performance had occurred.

130.    Beautycounter instead unilaterally implemented substantial compensation reductions with little notice and no meaningful opportunity for Plaintiffs to ask questions or voice concerns.

131.    Upon information and belief, Beautycounter implemented these compensation reductions at the direction of The Carlyle Group.

132.    Beautycounter suspended Plaintiffs' accounts and refused to provide updates on the investigation of purported wrongdoing despite Plaintiffs' requests, preventing Plaintiffs from managing their teams or making sales during the suspension.

133.    Beautycounter terminated Shawgo and Bjornlie for engaging in another direct-sales opportunity, even though they were permitted to do so.

134.    Upon information and belief, Beautycounter's suspension and termination of Plaintiffs for reasons inconsistent with the prior course of conduct that created an implied contract between the Plaintiffs and Beautycounter, occurred at the direction of The Carlyle Group.

135.    In doing so, Defendants did not act fairly or in good faith, in part because the Agreement upon which they attempt to rely for their suspension and termination of Plaintiffs is substantively and procedurally unconscionable with respect to Beautycounter's unilateral right to

change the terms of the business relationship at any time.

136.    Plaintiffs were harmed by Defendants' conduct by losing out on commissions from their customers' purchases and their downline consultants' purchases during the suspension, the ability to recruit new consultants to grow their businesses during the suspension, and from being deprived of the future commissions they would have continued to earn but for Defendants' conduct.

137.    As a result of Defendants' conduct, Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial.

## COUNT IV

**Breach of Implied Covenant of Good Faith and Fair Dealing (Minnesota Law)**

[As against all Defendants]

138.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

139.    Plaintiffs and Beautycounter had an implied contract established by the parties' course of conduct, pursuant to which Plaintiffs would sell Beautycounter's products and recruit Consultants to sell Beautycounter's products. In return, Beautycounter would pay Plaintiffs commissions for their product sales and sales made by Consultants in their downlines. Under this implied contract, Plaintiffs were explicitly permitted to engage in other direct-sales opportunities. Beautycounter would set the terms of Plaintiffs' compensation, and consistent with Beautycounter's mission of "Truth and Transparency," any changes to such terms would be communicated well in advance of implementation, and Plaintiffs would have the opportunity to ask questions and voice concerns about the impact of such changes on their business. Also consistent with Beautycounter's mission of "Truth and Transparency," Plaintiffs understood that, in the event of account suspension or involuntary termination, a fair and transparent investigation would occur in which Plaintiffs would be able to view any evidence supporting Beautycounter's

decision to suspend them and provide Plaintiffs an opportunity to tell their side of the story.

140.    During the entirety of their relationship with Beautycounter, Plaintiffs performed under the contract by selling Beautycounter's products and recruiting Consultants to sell Beautycounter's products.

141.    As such, all conditions required for Beautycounter's performance had occurred.

142.    Beautycounter instead unilaterally implemented substantial compensation reductions with little notice and no meaningful opportunity for Plaintiffs to ask questions or voice concerns.

143.    Upon information and belief, Beautycounter implemented these compensation reductions at the direction of The Carlyle Group.

144.    Beautycounter suspended Plaintiffs' accounts and refused to provide updates on the investigation of purported wrongdoing despite Plaintiffs' requests, preventing Plaintiffs from managing their teams or making sales during the suspension.

145.    Beautycounter terminated Shawgo and Bjornlie for engaging in another direct-sales opportunity, even though they were permitted to do so.

146.    In doing so, Beautycounter unjustifiably hindered and frustrated Plaintiff's performance of the implied contract with Beautycounter.

147.    Upon information and belief, Beautycounter's suspension and termination of Plaintiffs for reasons inconsistent with the prior course of conduct that created an implied contract between the Plaintiffs and Beautycounter, occurred at the direction of The Carlyle Group.

148.    In doing so, Defendants did not act fairly or in good faith, in part because the Agreement upon which they attempt to rely for their suspension and termination of Plaintiffs is substantively and procedurally unconscionable with respect to Beautycounter's unilateral right to

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

change the terms of the business relationship at any time.

149.    Plaintiffs were harmed by Defendants' conduct by losing out on commissions from their customers' purchases and their downline Consultants' purchases during the suspension, the ability to recruit new Consultants to grow their businesses during the suspension, and from being deprived of the future commissions they would have continued to earn but for Defendants' conduct.

150.    As a result of Defendants' conduct, Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial.

## COUNT V

**Unfair Business Practices in Violation of Cal. Bus. & Prof. Code § 17200**

[As against all Defendants]

151.    Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

152.    California Business & Professions Code Section 17200 prohibits any unlawful, unfair, or fraudulent business act or practice.

153.    A business practice is unfair if it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 973 P.2d 527 (1999).

154.    The policy and spirit of antitrust laws is to prohibit anticompetitive conduct that deprives workers of the benefits of competition.

155.    Defendants' unfair business practices deprived Plaintiffs of the benefits of competitive wages in violation of the underlying policy and spirit of antitrust laws, and otherwise significantly threatened or harmed competition, when they substantially cut Plaintiffs'

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

compensation, suspended them for seeking to supplement their income by joining a different direct-sales company, and then subsequently terminated them.

156.     Defendants' termination of Plaintiff Shawgo for discussing compensation with another Consultant constitutes an unlawful business practice because Cal. Lab. Code § 232 protects discussions and disclosure of compensation and prohibits discharge or formal discipline on that basis.

157.     As a result of Defendants' conduct, Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial.

## COUNT VI

### Promissory Estoppel (California Law)

[As against all Defendants]

158.     Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

159.     When they joined Beautycounter, Beautycounter represented to Plaintiffs that they could work for other direct-sales companies while continuing to work for Beautycounter.

160.     Defendants should reasonably expect this promise to induce action or forbearance on the part of Plaintiffs, namely that Plaintiffs would seek work from other direct-sales companies.

161.     Upon information and belief, and consistent with Beautycounter's promise, several Beautycounter Consultants did in fact work for other direct-sales companies while continuing to act as Beautycounter Consultants.

162.     Beautycounter's promise did induce such action or forbearance by the Plaintiffs because, relying on Beautycounter's promise that they could work for other direct-sales companies while continuing to work for Beautycounter, Plaintiffs joined Green Compass to supplement the compensation cuts Beautycounter implemented—upon information and belief, at The Carlyle

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

Group's direction—in 2022.

163. Plaintiffs relied on Beautycounter's promise to their detriment because Beautycounter terminated Plaintiffs for conduct—working for another direct-sales company—that Beautycounter previously represented was permissible, and which Beautycounter had in fact allowed other Consultants to engage in until, upon information and belief, The Carlyle Group directed Beautycounter to use previously permissible conduct as an excuse to terminate High-Earning Consultants for its own gain and at Plaintiffs' expense.

164. Injustice can be avoided only by enforcing the promise.

165. As a result of Defendants' conduct, Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial.

## COUNT VII

### Unjust Enrichment (California Law)

[As against all Defendants]

166. Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

167. Defendants received a benefit in the form of commissions from purchases made by Plaintiffs' customers and commissions from sales made by Consultants in Plaintiffs' downlines during Plaintiffs' suspension and after their termination.

168. Defendants retained these proceeds and commissions by not paying Plaintiffs.

169. Defendants' retention of these proceeds and commissions was unjust because the basis for suspending Plaintiffs and withholding the proceeds and commissions and terminating Plaintiffs—i.e., Plaintiffs' work for another network marketing company—was grounded in a policy to which Plaintiffs never agreed, which Beautycounter was not enforcing with respect to other Consultants, and was part of a larger scheme by Beautycounter—upon information and

28

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

belief, operating at the direction of The Carlyle Group—to terminate High-Earning Consultants and reap the benefits of the businesses Plaintiffs' spent years building.

170.    Defendants retained proceeds and commissions from Plaintiffs' customers and downline Consultants at Plaintiffs' expense because Plaintiffs' suspension and subsequent termination prevented them from collecting the fruits of their labor.

171.    As a result of Defendants' conduct Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial.

<u>**COUNT VIII**</u>

**Unjust Enrichment (Minnesota law)**

[As against all Defendants]

172.    Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

173.    Defendants received a benefit in the form of commissions from purchases made by Plaintiffs' customers and commissions from sales made by Consultants in Plaintiffs' downlines during Plaintiffs' suspension and after their termination.

174.    Defendants retained these proceeds and commissions by not paying Plaintiffs.

175.    Defendants' retention of these proceeds and commissions was unjust because the basis for suspending Plaintiffs and withholding the proceeds and commissions and terminating Plaintiffs—i.e., Plaintiffs' work for another network marketing company—was grounded in a policy to which Plaintiffs never agreed, which Beautycounter was not enforcing with respect to other Consultants, and was part of a larger scheme by Beautycounter—upon information and belief, operating at the direction of The Carlyle Group—to terminate High-Earning Consultants and reap the benefits of the businesses Plaintiffs' spent years building.

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

176.    Defendants retained proceeds and commissions from Plaintiffs' customers and downline Consultants at Plaintiffs' expense because Plaintiffs' suspension and subsequent termination prevented them from collecting the fruits of their labor.

177.    In doing so, Defendants knowingly received or obtained something of value—commissions and the good will Plaintiffs established with their customers and downline consultants—for which the Defendants in equity and good conscience should pay.

178.    As a result of Defendants' conduct Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial.

## COUNT IX

**Wrongful Termination in Violation of Public Policy (in the alternative) (California law)**

[As against all Defendants]

179.    Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

180.    Beautycounter misclassified Consultants, including Plaintiffs, as independent contractors but treated them as employees.

181.    Consultants, including Plaintiffs, were not free from the control or direction of Beautycounter in the performance of their work for Beautycounter.

182.    Beautycounter had all necessary control over the manner and means of accomplishing the result desired—i.e., products sales and Consultant recruitment.

183.    Beautycounter controls the products Consultants, including Plaintiffs, sold, the prices at which the products were offered, and the commissions Consultants were paid.

184.    Beautycounter controlled the reporting and supervisory structure in which Consultants, including Plaintiffs, operated, including Consultants' sponsors/mentors and their downline membership.

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

185.    Beautycounter controlled Consultants' advancement in the compensation structure, including setting the parameters by which Consultants advance to the next compensation level.

186.    Beautycounter supervised and controlled the content Consultants, including Plaintiffs, posted about Beautycounter on their personal social media accounts, including but not limited to imposing restrictions on disclosing income they earned through Beautycounter, requiring pre-approval of marketing or training materials developed or distributed by Consultants, and restricting Consultants' ability to promote other products or direct-sales opportunities to their social media networks.

187.    Further, the manner in which Plaintiffs were terminated and had their businesses stripped from them for attempting to supplement the income Beautycounter had unilaterally and drastically reduced, demonstrates the type of control found in an at-will employment relationship.

188.    Plaintiffs did not perform work outside the usual course of Beautycounter's business.

189.    Until they started working for Beautycounter, neither Plaintiff was customarily engaged in an independently established trade, occupation, or business of the same nature as the work they performed for Beautycounter.

190.    The work performed by Consultants, including Plaintiffs, is an integral part of Beautycounter's business, which was built upon and continues to rely heavily on Consultants' sales and recruitment efforts.

191.    Plaintiffs were therefore employees of Beautycounter under California law.

192.    The payment of wages due to an employee is a fundamental public policy of the state of California.

193.    Beautycounter terminated Plaintiffs, and upon information and belief, this

31

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

termination was at the direction of The Carlyle Group.

194.    Based upon information and belief, Defendants terminated Plaintiffs, both high-earning Consultants, in order to avoid paying them commissions they earned.

195.    Based upon information and belief, terminating high-earning Consultants for the purpose of diverting sales from the connections with customers and downlines that high-earning Consultants spent years building was part of a larger cost-cutting strategy implemented at the direction of The Carlyle Group.

196.    Therefore, a violation of public policy—diverting commissions to Beautycounter to make the company more profitable at the expense of Plaintiffs—was a substantial motivating factor in Defendants' termination of Plaintiffs' employment.

197.    Likewise, Defendants' termination of Shawgo based upon her purported discussion of wages with another Consultant was in violation of California public policy as reflected in Cal. Lab. Code § 232, which protects discussions and disclosure of compensation and prohibits discharge or formal discipline on that basis.

198.    The termination caused Plaintiffs to suffer damages in excess of $50,000, with the specific amount to be determined at trial.

## COUNT X

### Declaratory Relief (California Law)

[As against all Defendants]

199.    Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

200.    Based upon the foregoing, a live controversy exists between the parties that warrants declaratory relief pursuant to the California Code of Civil Procedure § 1060.

201.    A declaration that Plaintiffs are not bound by any arbitration provision in any purported agreement with Beautycounter is necessary to effectuate the relief sought.

202.    Plaintiffs' requested declaration serves the interests of justice and equity. Defendants cannot meet their "burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecomm. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017). Even if an arbitration agreement existed, such an agreement is procedurally and substantively unconscionable and therefore unenforceable. *Yeomans v. World Fin. Group Ins. Agency, Inc.*, 485 F. Supp. 3d 1168, 1184–89 (N.D. Cal. 2020), *aff'd sub nom. Yeomans v. World Fin. Group Ins. Agency, LLC.*, No. 20-16937, 2021 WL 5356537 (9th Cir. Nov. 17, 2021) (unpublished) (finding a similar arbitration agreement was unenforceable because it was procedurally and substantively unconscionable).

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully request that the Court grant the following relief:

A.    Judgment against Defendants on all counts;

B.    A declaration that the non-solicitation provision in the 2022 Consultant Agreement is invalid as a matter of California law under Cal. Bus. & Prof. Code § 16600;

C.    A declaration that Plaintiffs are not bound by any arbitration provision in any purported agreement with Beautycounter;

D.    An award of damages, attorney's fees, costs and disbursements in excess of $50,000;

E.    Such other and further relief as the Court deems just and equitable.

Dated:  October 16, 2023

/s/ Pamela Abbate Dattilo
Pamela Abbate Dattilo (#389889)
Alethea M. Huyser (#0389270)
Claire E. Beyer (#0402592)
Megan M. Massie (#0403441)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street
Suite 1500

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

Minneapolis, MN  55402-4400
(612) 492-7000

pabbatedattilo@fredlaw.com
ahuyser@fredlaw.com
cbeyer@fredlaw.com
mmassie@fredlaw.com

*Counsel for Plaintiffs*

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

## ACKNOWLEDGMENT

Plaintiffs, through the undersigned counsel, acknowledge that sanctions may be imposed under Minn. Stat. § 549.211.

Dated: October 16, 2023

*/s/ Pamela Abbate Dattilo*
Pamela Abbate Dattilo (#389889)
Alethea M. Huyser (#0389270)
Claire E. Beyer (#0402592)
Megan M. Massie (#0403441)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street
Suite 1500
Minneapolis, MN 55402-4400
(612) 492-7000

pabbatedattilo@fredlaw.com
ahuyser@fredlaw.com
cbeyer@fredlaw.com
mmassie@fredlaw.com

***Counsel for Plaintiffs***



EXHIBIT A-2

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

STATE OF MINNESOTA

COUNTY OF CARVER

DISTRICT COURT

FIRST JUDICIAL DISTRICT

---

| | |
|---|---|
| JENNIFER SHAWGO, an individual, JENNIFER SHAWGO BC LLC, a Minnesota limited liability company, MOLLY BJORNLIE, an individual, MOLLY BJORNLIE, LLC, a Minnesota limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTER BRANDS, LLC d/b/a BEAUTYCOUNTER, a California limited liability company, and THE CARLYLE GROUP Inc., a Delaware corporation, <br><br> Defendants. | Case Type: Other Civil <br> Court File No.:_____ <br> Judge:_____ <br><br> **SUMMONS IN A CIVIL CASE** |

---

## THIS SUMMONS IS DIRECTED TO DEFENDANT THE CARLYLE GROUP INC.

1.    **YOU ARE BEING SUED.**  The Plaintiffs has started a lawsuit against you. The Plaintiffs' Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights.  You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

2.    **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this summons a written response called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

> FREDRIKSON & BYRON, P.A.
> 60 South Sixth Street, Suite 1500
> Minneapolis, MN  55402-4400
> Attn:  Pamela Abbate Dattilo

3.    **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiffs' Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiffs should not be given everything asked for in the Complaint, you must say so in your Answer.

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

4.       **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.**  If you do not Answer within 21 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiffs everything asked for in the complaint.  If you do not want to contest the claims stated in the complaint, you do not need to respond.  A default judgment can then be entered against you for the relief requested in the complaint.

5.       **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.

6.       **ALTERNATIVE DISPUTE RESOLUTION.**  The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated:  October 16, 2023

*/s/ Pamela Abbate Dattilo*
Pamela Abbate Dattilo (#389889)
Alethea M. Huyser (#0389270)
Claire E. Beyer (#0402592)
Megan M. Massie (#0403441)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street
Suite 1500
Minneapolis, MN  55402-4400
(612) 492-7000

pabbatedattilo@fredlaw.com
ahuyser@fredlaw.com
cbeyer@fredlaw.com
mmassie@fredlaw.com

***Attorneys for Plaintiffs***



EXHIBIT A-3

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

STATE OF MINNESOTA

COUNTY OF CARVER

DISTRICT COURT

FIRST JUDICIAL DISTRICT

---

JENNIFER SHAWGO, an individual, JENNIFER SHAWGO BC LLC, a Minnesota limited liability company, MOLLY BJORNLIE, an individual, MOLLY BJORNLIE, LLC, a Minnesota limited liability company,

      Plaintiffs,

  v.

COUNTER BRANDS, LLC d/b/a BEAUTYCOUNTER, a California limited liability company, and THE CARLYLE GROUP Inc., a Delaware corporation,

      Defendants.

Case Type: Other Civil
Court File No.:_____
Judge:_____

**SUMMONS IN A CIVIL CASE**

---

THIS SUMMONS IS DIRECTED TO DEFENDANT COUNTER BRANDS, LLC D/B/A

BEAUTYCOUNTER

1.    **YOU ARE BEING SUED.** The Plaintiffs has started a lawsuit against you. The Plaintiffs' Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

2.    **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this summons a written response called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

FREDRIKSON & BYRON, P.A.
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402-4400
Attn: Pamela Abbate Dattilo

3.    **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiffs' Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiffs should not be given everything asked for in the Complaint, you must say so in your Answer.

Filed in District Court
State of Minnesota
10/17/2023 1:23 PM

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 21 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiffs everything asked for in the complaint. If you do not want to contest the claims stated in the complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.

6. **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: October 16, 2023

*/s/ Pamela Abbate Dattilo*
Pamela Abbate Dattilo (#389889)
Alethea M. Huyser (#0389270)
Claire E. Beyer (#0402592)
Megan M. Massie (#0403441)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street
Suite 1500
Minneapolis, MN 55402-4400
(612) 492-7000

pabbatedattilo@fredlaw.com
ahuyser@fredlaw.com
cbeyer@fredlaw.com
mmassie@fredlaw.com

***Attorneys for Plaintiffs***


EXHIBIT A-4

Filed in District Court
State of Minnesota
10/17/2023 4:31 PM



**Fredrikson & Byron, P.A.**
Attorneys and Advisors

60 South Sixth Street, Suite 1500
Minneapolis, MN 55402-4400
Main: 612.492.7000
fredlaw.com

October 17, 2023

Carver County Justice Center                    **VIA E-FILING**
Carver County Court Administration
604 East 4th Street
Chaska, MN 55318

Re:    *Jennifer Shawgo, Jennifer Shawgo BC LLC, Molly Bjornlie, Molly Bjornlie, LLC vs*
       *Counter Brands, LLC, The Carlyle Group Inc.*
       Case No. 10-CV-23-1035

Dear Carver County Court:

Plaintiffs demand a jury trial on all counts.

Sincerely,

Pamela Abbate Dattilo
**Direct Dial:** 612.492.7437
**Email:** pabbatedattilo@fredlaw.com
PAD:lau



EXHIBIT A-5

Filed in District Court
State of Minnesota
10/23/2023 8:24 PM

STATE OF MINNESOTA                                DISTRICT COURT

COUNTY OF CARVER                                  FIRST JUDICIAL DISTRICT

---

| | |
|---|---|
| JENNIFER SHAWGO, an individual, JENNIFER SHAWGO BC LLC, a Minnesota limited liability company, MOLLY BJORNLIE, an individual, MOLLY BJORNLIE, LLC, a Minnesota limited liability company, | Case Type:  Other Civil<br>Court File No.:  10 CV 23-1035<br>Judge: _____ |
| Plaintiffs, | **CIVIL COVER SHEET**<br>**(NON-FAMILY CASE TYPE)**<br>Minn. R. Gen. Prac. 104 |
| v. | |
| COUNTER BRANDS, LLC d/b/a BEAUTYCOUNTER, a California limited liability company, and THE CARLYLE GROUP INC., a Delaware corporation, | |
| Defendants. | |

---

Date Case Filed:  October 17, 2023

This civil cover sheet must be filed by the initial filing lawyer or party, if unrepresented by legal counsel, unless the court orders all parties or their legal counsel to complete this form.  Once the initial civil cover sheet is filed, opposing lawyers or unrepresented parties who have not already been ordered to complete this form may submit their own cover sheet within ten days after being served with the initial cover sheet. See Rule 104 of the General Rules of Practice for the District Courts.

**If information is not known to the filing party at the time of filing, it shall be provided to the Court Administrator in writing by the filing party within seven (7) days of learning the information.**  Any party impleading additional parties shall provide the same information to the Court Administrator.  The Court Administrator shall, upon receipt of the completed certificate, notify all parties or their lawyers, if represented by counsel, of the date of filing the action and the file number assigned.

Filed in District Court
State of Minnesota
10/23/2023 8:24 PM

| ATTORNEY FOR PLAINTIFF | ATTORNEY FOR DEFENDANTS |
|---|---|
| Pamela Abbate Dattilo (#389889) | C. Brent Kugler |
| **Fredrikson & Byron, P.A.** | **Scheef & Stone** |
| 60 South Sixth Street | 500 North Akard Street |
| Suite 1500 | Suite 2700 |
| Minneapolis, MN  55402-4400 | Dallas, TX 75201 |
| (612) 492-7000 | 214-706-4242 |
| | |
| pabbatedattilo@fredlaw.com | Brent.Kugler@solidcounsel.com |
| | |
| | Ethan Joel Levinton |
| | **Kirkland & Ellis LLP** |
| | 4550 Travis Street |
| | Dallas, TX 75205 |
| | 214-972-1784 |
| | |
| | Ethan.levington@kirkland.com |

1. **Provide a concise statement of the case including facts and legal basis.**

Plaintiffs Jennifer Shawgo, Jennifer Shawgo BC LLC, Molly Bjornlie, and Molly Bjornlie, LLC spent nearly a decade building businesses selling beauty products, and recruiting others to sell beauty products, in partnership with direct-sales company Defendant Counter Brands, LLC d/b/a Beautycounter. Plaintiffs reasonably understood themselves to be business partners with Beautycounter and were treated as such. Plaintiffs reached the highest levels of Beautycounter's compensation structure and were earning six-figure incomes. Because they were supposed to be independent businesses, Plaintiffs understood that they could partner with other direct-sales companies in addition to Beautycounter if they chose to do so. Indeed, over the years, many other contractors at Beautycounter also worked simultaneously with other direct-sales companies.

After Beautycounter was acquired by Defendant The Carlyle Group Inc. in 2021, Beautycounter unilaterally implemented drastic compensation changes that caused high-earning Consultants like Plaintiffs to lose substantial income. As a result, Plaintiffs sought to supplement their income by partnering with another direct-sales company, Green Compass, a wellness company that does not sell beauty products. When Plaintiffs posted on their personal social media, and spoke to friends about this new work, Beautycounter suspended and ultimately terminated Plaintiffs for this permissible conduct, claiming it violated a non-solicitation policy that Plaintiffs never agreed to. This suspension and termination of high-earning Consultants was done at The Carlyle Group's direction for the purpose of enriching Defendants at Plaintiffs' expense.

In doing so, Defendants usurped the businesses Plaintiffs built, causing them to reap the rewards of Plaintiffs' years of effort with no effort of their own. Defendants violated Minnesota and California laws, including tortious interference with prospective economic advantage, breach of the implied covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, unfair business practices under Cal. Bus. & Prof. Code § 17200, et seq., and wrongful termination in violation of public policy.

2. Date Complaint was served: <u>October 23, 2023 (Counsel for Beautycounter provided a copy on October 16, 2023, and requested to accept service).</u>

3. For Expedited Litigation Track (ELT) Pilot Courts only:

   a. ☐ the parties jointly and voluntarily agree that this case shall be governed by the Special Rules for ELT Pilot.  Date of agreement: _____

   b. ☐ The court is requested to consider excluding this case from ELT for the following reasons: _____

   Note:  ELT is mandatory in certain cases, and where mandatory, exclusion may also be sought by timely motion under the Special Rules for ELT Pilot.

   c. Anticipated number of trial witnesses: _____

   d. Amount of medical expenses to date: _____

   e. Amount of lost wages to date: _____

   f. Identify any known subrogation interests: _____

4. For Complex Cases (See Minn. Gen. R. Prac. 146):

   a. Is this a "complex case" as defined in Rule 146? ☐ Yes  ☒ No

   b. State briefly the reasons for complex case treatment for this case:  N/A

   c. Have the parties filed a "CCP Election" for this case as provided in Rule 146(d)?

   ☐ Yes ☒ No

5. Estimated discovery completion within __12__ months from the date of this form.

6. Disclosure / discovery of electronically stored information discussed with other party?
   ☒ No ☐ Yes, date of discussion: _____

   If Yes, list agreements, plans, and disputes: _____

7. Proposed trial start date:_____April 21, 2025_____

8. Estimated trial time: ___5___ days _____ hours (estimates less than a day must be stated in hours).

Filed in District Court
State of Minnesota
10/23/2023 8:24 PM

9.  Jury trial is:
    □ waived by consent of _____ pursuant to Minn. R. Civ. P. 38.02.
    ☒ requested by _____Plaintiffs_____ (NOTE: Applicable fee must be enclosed)

10. Physical/mental/blood examination pursuant to Minn. R. Civ. P. 35 is requested:
    □ Yes ☒ No

11. Identify any party or witness who will require interpreter services, and describe the services needed (specifying language, and if known, particular dialect): N/A.

12. Issues in dispute: contract formation, contract validity, tortious interference with prospective economic advantage, unjust enrichment, promissory estoppel, breach of implied covenant of good faith and fair dealing, violation of California Business and Professional Code section 17200, et seq., misclassification, wrongful termination

13. Case Type / Category: <u>Other Civil_____</u>

    (NOTE: select case type from Form 23, Subject Matter Index for Civil Cases, appended to the Minnesota Rules of Civil Procedure).

14. Recommended Alternative Dispute Resolution (ADR) mechanism:_____
    (See list of ADR processes set forth in Minn. Gen. R. Prac. 114.02(a))
    Recommended ADR provider (known as a "neutral"): _____
    Recommended ADR completion date: _____

By signing below, the attorney or party submitting this form certifies that the above information is true and correct.

Dated:  October 23, 2023          <u>/s/ Pamela Abbate Dattilo</u>
                                  Pamela Abbate Dattilo (#389889)
                                  Alethea M. Huyser (#0389270)
                                  Claire E. Beyer (#0402592)
                                  Megan M. Massie (#0403441)
                                  **FREDRIKSON & BYRON, P.A.**
                                  60 South Sixth Street
                                  Suite 1500
                                  Minneapolis, MN  55402-4400
                                  (612) 492-7000
                                  pabbatedattilo@fredlaw.com
                                  ahuyser@fredlaw.com
                                  cbeyer@fredlaw.com
                                  mmassie@fredlaw.com

                                  ***Counsel for Plaintiffs***



EXHIBIT A-6

Filed in District Court
State of Minnesota
10/23/2023 8:24 PM

STATE OF MINNESOTA                                         DISTRICT COURT

COUNTY OF CARVER                                 FIRST JUDICIAL DISTRICT

---

| | |
|---|---|
| JENNIFER SHAWGO, an individual, JENNIFER SHAWGO BC LLC, a Minnesota limited liability company, MOLLY BJORNLIE, an individual, MOLLY BJORNLIE, LLC, a Minnesota limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTER BRANDS, LLC d/b/a BEAUTYCOUNTER, a California limited liability company, and THE CARLYLE GROUP INC., a Delaware corporation,<br><br>       Defendants. | Case Type:  Other Civil<br>Court File No.: 10 CV 23-1035<br>Judge: _____<br><br>**CERTIFICATE OF REPRESENTATION AND PARTIES** |

---

Date Case Filed:  <u>October 17, 2023</u>

      This certificate must be filed pursuant to Rule 104 of the General Rules of Practice for the District Courts, which states: "A party filing a civil case shall, at the time of filing, notify the court administrator in writing of the name, address, and telephone number of all counsel and unrepresented parties, if known (see form 104 appended to these rules).  If that information is not then known to the filing party, it shall be provided to the court administrator in writing by the filing party within seven days of learning it.  Any party impleading additional parties shall provide the same information to the court administrator.  The court administrator shall, upon receipt of the completed certificate, notify all parties or their lawyers, if represented by counsel, of the date of filing the action and the file number assigned."

LIST ALL LAWYERS/PRO SE PARTIES INVOLVED IN THIS CASE.

| **LAWYER FOR PLAINTIFF** | **LAWYER FOR DEFENDANTS**<br>(if not known, name party and address) |
|---|---|
| **Jennifer Shawgo, an individual, Jennifer Shawgo BC LLC, a Minnesota limited liability company, Molly Bjornlie, an individual, Molly Bjornlie, LLC, a Minnesota limited liability company,** | **Defendant Counter Brands, LLC d/b/a Beautycounter, a California limited liability company** |

Pamela Abbate Dattilo (#389889)
Althea M. Huyser (#0389270)
Claire Beyer (#0402592)
Megan M. Massie (#0403441)

**Fredrikson & Byron, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN  55402
612-492-7000

pabbatedattilo@fredlaw.com
ahuyser@fredlaw.com
cbeyer@fredlaw.com
mmassie@fredlaw.com

Counsel for Defendant Counter Brands, LLC d/b/a Beautycounter is believed to be the following; however, they have not responded to requests to accept service of process.

C. Brent Kugler
**Scheef & Stone**
500 North Akard Street, Suite 2700
Dallas, TX 75201
214-706-4242

Brent.Kugler@solidcounsel.com

Ethan Joel Levinton
**Kirkland & Ellis LLP**
4550 Travis Street
Dallas, TX 75205
214-972-1784

ethan.levinton@kirkland.com

**Defendant The Carlyle Group Inc., a Delaware corporation**

Counsel for Defendant The Carlyle Group Inc. is unknown. Its registered agent information is as follows:

The Corporation Trust Company
Corporation Trust Center
1029 Orange Street
Wilmington, DE 19801
302-658-7581

Dated:  October 23, 2023

/s/ Pamela Abbate Dattilo
Pamela Abbate Dattilo (#389889)
Alethea M. Huyser (#0389270)
Claire E. Beyer (#0402592)
Megan M. Massie (#0403441)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street
Suite 1500

2

Filed in District Court
State of Minnesota
10/23/2023 8:24 PM

Minneapolis, MN  55402-4400
(612) 492-7000

pabbatedattilo@fredlaw.com
ahuyser@fredlaw.com
cbeyer@fredlaw.com
mmassie@fredlaw.com

*Counsel for Plaintiffs*





EXHIBIT A-7

# Affidavit of Process Server

## IN THE FIRST JUDICIAL DISTRICT COURT, CARVER COUNTY, MINNESOTA

| JENNIFER SHAWGO, ET AL. | VS | COUNTER BRANDS, LLC d/b/a BEAUTYCOUNTER, ET AL. | 10-CV-23-1035 |
|---|---|---|---|
| PLAINTIFF/PETITIONER | | DEFENDANT/RESPONDENT | CASE NUMBER |

¡ GILBERT DEL VALLE _____ being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service.   RECEIVED 10/24/2023

**Service:** I served

COUNTER BRANDS, LLC d/b/a BEAUTYCOUNTER
NAME OF PERSON / ENTITY BEING SERVED

with (list documents) SUMMONS IN A CIVIL CASE; COMPLAINT AND JURY DEMAND; CIVIL COVER SHEET; CERTIFICATE OF REPRESENTATION AND PARTIES; LETTER DATED OCTOBER 17, 2023;

by leaving with ROBIN HUTT-BANKS (MANAGING AGENT
NAME                                          RELATIONSHIP

- ☐ **Residence** _____ At _____
ADDRESS                          CITY / STATE

- ☒ **Business** C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE ST., WILMINGTON, DE 19801
ADDRESS                          CITY / STATE

On _____ 10/25/2023 _____ AT _____ 10:30 AM _____
DATE                                          TIME

Thereafter copies of the documents were mailed by prepaid, first class mail on _____
DATE

from _____
CITY        STATE        ZIP

**Manner of Service:**
- ☒ **CORPORATE**
- ☐ **Personal:** By personally delivering copies to the person being served.
- ☐ **Substituted at Residence:** By leaving copies at the dwelling house or usual place of abode of the person being served with a member of the household over the age of _____ and explaining the general nature of the papers.
- ☐ **Substituted at Business:** By leaving, during office hours, copies at the office of the person/entity being served with the person apparently in charge thereof.
- ☐ **Posting:** By posting copies in a conspicuous manner to the front door of the person/entity being served.

☐ **Non-Service:** After due search, careful inquiry and diligent attempts at the address (es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):

- ☐ Unknown at Address    ☐ Moved, Left no Forwarding    ☐ Service Cancelled by Litigant    ☐ Unable to Serve in Timely Fashion
- ☐ Address Does Not Exist    ☐ Other _____

**Service Attempts:** Service was attempted on: (1) _____ (2) _____
DATE        TIME                          DATE        TIME

(3) _____ (4) _____ (5) _____
DATE        TIME                    DATE        TIME                    DATE        TIME

AGE 55    Sex FEMALE Race BLACK Height 5'5    Weight 150    HAIR BLACK

GILBERT DEL VALLE

SUBSCRIBED AND SWORN to before me this 25TH _____ day of OCTOBER _____ ,2023.

SIGNATURE OF NOTARY PUBLIC

| KEVIN DUNN |
| NOTARY PUBLIC |
| STATE OF DELAWARE |
| My Commission Expires on July 26, 2026 |

NOTARY PUBLIC for the state of   DELAWARE

# Affidavit of Process Server

### IN THE FIRST JUDICIAL DISTRICT COURT, CARVER COUNTY, MINNESOTA

| JENNIFER SHAWGO, ET AL. | VS | COUNTER BRANDS, LLC d/b/a BEAUTYCOUNTER, ET AL. | 10-CV-23-1035 |
|---|---|---|---|
| PLAINTIFF/PETITIONER | | DEFENDANT/RESPONDENT | CASE NUMBER |

| GILBERT DEL VALLE _____ being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service.   RECEIVED 10/24/2023

**Service:** I served ___THE CARLYLE GROUP, INC.___
NAME OF PERSON / ENTITY BEING SERVED

with (list documents) SUMMONS IN A CIVIL CASE; COMPLAINT AND JURY DEMAND; CIVIL COVER SHEET; CERTIFICATE OF REPRESENTATION AND PARTIES; LETTER DATED OCTOBER 17, 2023;

by leaving with ROBIN HUTT-BANKS (MANAGING AGENT                                          AT
NAME                                                    RELATIONSHIP

- [ ] **Residence** _____    _____
ADDRESS                                        CITY / STATE
- [x] **Business** C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE ST., WILMINGTON, DE 19801
ADDRESS                                        CITY / STATE

On ___10/25/2023___        AT ___10:30 AM___
DATE                                   TIME

Thereafter copies of the documents were mailed by prepaid, first class mail on _____
DATE

from _____
CITY          STATE              ZIP

**Manner of Service:**
- [x] **CORPORATE**
- [ ] **Personal:** By personally delivering copies to the person being served.
- [ ] **Substituted at Residence:** By leaving copies at the dwelling house or usual place of abode of the person being served with a member of the household over the age of _____ and explaining the general nature of the papers.
- [ ] **Substituted at Business:** By leaving, during office hours, copies at the office of the person/entity being served with the person apparently in charge thereof.
- [ ] **Posting:** By posting copies in a conspicuous manner to the front door of the person/entity being served.

- [ ] **Non-Service:** After due search, careful inquiry and diligent attempts at the address (es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):

- [ ] **Unknown at Address**   - [ ] **Moved, Left no Forwarding**   - [ ] **Service Cancelled by Litigant**   - [ ] **Unable to Serve in Timely Fashion**
- [ ] **Address Does Not Exist**   - [ ] **Other** _____

**Service Attempts:** Service was attempted on: (1) _____    (2) _____
DATE     TIME              DATE     TIME
(3) _____          (4) _____          (5) _____
DATE     TIME              DATE     TIME              DATE     TIME

AGE ___55___  Sex FEMALE  Race BLACK  Height 5'5  Weight 150   HAIR BLACK

SUBSCRIBED AND SWORN to before me this 25TH day of OCTOBER ,2023.

GILBERT DEL VALLE

KEVIN DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires on July 26, 2026

SIGNATURE OF NOTARY PUBLIC

NOTARY PUBLIC for the state of  DELAWARE