# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| JENNIFER SHAWGO, an individual, JENNIFER SHAWGO BC LLC, a Minnesota limited liability company, MOLLY BJORNLIE, an individual, MOLLY BJORNLIE, LLC, a Minnesota limited liability company, AYESHA DAWLEY, an individual, DAWLEY, LLC,  a Minnesota limited liability company, CAITY PIKE, an individual, on behalf of themselves and all others similarly situated, | Case No. 24-cv-00556 (PJS/TNL) |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| vs. | |
| COUNTER BRANDS, LLC d/b/a BEAUTYCOUNTER, a Delaware limited liability company, THE CARLYLE GROUP INC., a Delaware corporation, COUNTER BRANDS, INC. d/b/a BEAUTYCOUNTER, a Delaware corporation, G2G NEWCO, INC. d/b/a BEAUTYCOUNTER, a Delaware corporation, and SUSAN GREGG RENFREW, an individual, | |
| Defendants. | |

## PRELIMINARY STATEMENT

1.      Gregg Renfrew was a trailblazer. She founded Beautycounter with the vision of making safe, healthy skin care and cosmetics accessible to everyone. Renfrew was right. The "clean beauty" movement has disrupted the industry.

2.      Beautycounter quickly grew from a startup to an industry-leading company worth more than $1 billion in 2021. While "clean beauty" inspired its products, Beautycounter's growth was driven by another inspiration. Renfrew believed that instead of just selling products to women, Beautycounter should inspire women to demand better for themselves and promote women's entrepreneurship.

3.      Rather than hire employees to sell its products, Beautycounter created a network of business partnerships with women across the country. These women sold direct to customers and further recruited and mentored other entrepreneurial women who had a desire to partner with Beautycounter.

4.      Renfrew's vision inspired women across the United States with diverse backgrounds and motivations—including the Plaintiffs in this case. Beautycounter flourished because of the efforts of stay-at-home moms who leveraged their expansive social networks, career women who wanted to build their own business after working in the corporate world for years, and women looking to re-enter the workforce after a divorce, among countless others. Whatever their background, these women believed in Beautycounter's products. They also believed in Beautycounter's promises that they would build their own businesses in partnership with Beautycounter.

5.     Beautycounter's products hit the market in 2013. Most of the named Plaintiffs joined Beautycounter when it was still a start-up. These Plaintiffs, together with hundreds of other women, were instrumental to Beautycounter's rapid growth. They recruited and mentored thousands of consultants to sell under them and amassed thousands of loyal Beautycounter customers.

6.     Collectively, the named Plaintiffs generated $50 million in revenue for Beautycounter. For eight years they operated as entrepreneurs and flourished in their business partnerships with Beautycounter. By 2021, Renfrew's vision and these women's efforts resulted in Beautycounter's $1 billion valuation. To realize this gain, Renfrew sold a majority of her company to global private equity firm, The Carlyle Group Inc. ("Carlyle").

7.     For the Plaintiffs and the other entrepreneurs who built Beautycounter, everything changed when Carlyle assumed control. Carlyle wanted to increase its profits. Unfortunately, its efforts to increase its profits violated the law.

8.     Beautycounter (at Carlyle's direction) implemented a scheme designed to remove many of the highest-ranked and highest-paid women from the company and convert their businesses to Beautycounter.

9.     Beautycounter stole the named Plaintiffs' entire businesses practically overnight.

10.    While there is nothing illegal about seeking to maximize profits, by usurping Plaintiffs' businesses, Carlyle and Beautycounter engaged in unfair competition, deceptive

trade practices, tortious interference, and fraud. They acted unlawfully in at least three ways.

11.     First, they implemented an up to 70% cut in commissions – unilaterally. Minimal notice. No negotiation. No contract agreeing to these new commission rates. Women who were making $100,000 a year found themselves making $30,000 practically overnight.

12.     Second, Defendants concocted bogus and unlawful reasons to freeze, suspend, and terminate their business partnerships with women at the highest levels of the organization (Executive Directors, Managing Directors, and Senior Directors), including the Plaintiffs. Each of the named Plaintiffs was abruptly suspended and/or terminated under false pretenses. These suspensions and terminations allowed Beautycounter to transfer Plaintiffs' businesses, including their downlines and customer sales, to the company. In other words, Beautycounter continued to enjoy the revenues and profits generated by Plaintiffs' businesses, but the suspensions and terminations conveniently allowed Beautycounter to avoid paying six-figure commissions to Plaintiffs.

13.     Third, the Defendants implemented and aggressively enforced a non-solicitation policy that is unlawful under California law (the law chosen by Beautycounter to govern the business relationship between it and Plaintiffs)—knowing full well that this restriction is illegal. Nevertheless, they used this non-solicitation policy as justification for terminating Plaintiffs when they sought alternative sources of income to compensate for the drastic commission cuts. Then, Defendants threatened the terminated Plaintiffs with enforcement of a post-termination non-solicitation policy, preventing them from recruiting

from their own networks to their new businesses. The Defendants committed fraud when they implemented, enforced, and threatened to enforce these illegal non-solicitation policies. These actions prevented Plaintiffs from taking the businesses *they* developed and ran, and bringing them to another company.

14.   The Plaintiffs in this case were not employees, nor were they disposable. They were business partners. Plaintiffs join together to bring this action on behalf of themselves and all similarly situated individuals to seek relief accordingly.

15.   The original Complaint in this action was initially amended due to the number of additional women seeking to join this lawsuit after it was filed. This second amendment was made necessary, in part, by the sudden actions taken by Beautycounter, Carlyle, and the newly-named Defendants to shield assets from the Plaintiffs and deprive Plaintiffs of a remedy for the unlawful actions described herein.

## CLASS ACTION COMPLAINT

Plaintiffs Jennifer Shawgo, Jennifer Shawgo BC LLC, Molly Bjornlie, Molly Bjornlie, LLC, Ayesha Dawley, Dawley, LLC, and Caity Pike (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, state and allege as follows:

## PARTIES, JURISDICTION & VENUE

1.   Plaintiff Jennifer Shawgo is an individual who resides in Excelsior, Minnesota.

2.   Shawgo was a Beautycounter Brand Advocate (hereinafter, "Consultant"), through Jennifer Shawgo BC LLC, from 2014 until Beautycounter terminated her in January 2023.

3.     Plaintiff Jennifer Shawgo BC LLC is a Minnesota limited liability company with a registered address in Brooklyn Park, Minnesota. Shawgo, a citizen of the state of Minnesota, is the sole Member of Jennifer Shawgo BC LLC.

4.     Plaintiff Molly Bjornlie is an individual who resides in Lake Elmo, Minnesota.

5.     Bjornlie was a Beautycounter Consultant, either individually or through her limited liability company, from 2015 until Beautycounter terminated her in March 2023.

6.     Plaintiff Molly Bjornlie, LLC is a Minnesota limited liability company with a registered address in Lake Elmo, Minnesota. Bjornlie, a citizen of the state of Minnesota, is the sole Member of Molly Bjornlie, LLC.

7.     Plaintiff Ayesha Dawley is an individual who resides in Eden Prairie, Minnesota.

8.     Dawley was a Beautycounter Consultant, either individually or through her limited liability company, from June 2014 until she was forced to end her consultancy in August 2022.

9.     Plaintiff Dawley, LLC is a Minnesota limited liability company with a registered address in Eden Prairie, Minnesota. Dawley, a citizen of the state of Minnesota, is a member of Dawley, LLC.

10.     Plaintiff Caity Pike is an individual who resides in Lindstrom, Minnesota.

11.     Pike was a Beautycounter Consultant, either individually or through a limited liability company, from April 2017 until Beautycounter terminated her in November 2022.

12.     Defendant Counter Brands, LLC d/b/a Beautycounter is a Delaware limited liability company with its headquarters located at 1733 Ocean Avenue #325, Santa Monica, California. It was recently "terminated" with the California Secretary of State.

13.     Defendant Counter Brands, Inc. d/b/a Beautycounter is a Delaware corporation with its headquarters located at 1733 Ocean Avenue #325, Santa Monica, California. It is currently active with the California Secretary of State.

14.     Defendants Counter Brands, LLC and Counter Brands, Inc. operated as one seamless business for over a decade. Therefore, they are referred to collectively in this Second Amended Complaint as "Beautycounter."

15.     Beautycounter sold skincare and cosmetic products in the United States and Canada through its network of about 40,000 Beautycounter Consultants, on its website, and, recently, in Ulta Beauty stores.

16.     Defendant The Carlyle Group Inc. ("Carlyle") is a global private equity firm incorporated in Delaware with its principal place of business located at 1001 Pennsylvania Avenue, NW, Suite 220 South, Washington, D.C. 20004.

17.     Carlyle is one of the largest private equity firms in the world. It has extensive holdings worldwide and nationwide, including owning businesses and other assets in Minnesota.

18.      From 2020 until it dissolved the company in 2023, Carlyle owned Eden Prairie-based Victory Innovations Co.

19.     In 2021, Carlyle acquired Involta, LLC. Carlyle still owns the company (which does business as Ark Data Centers), including its 26,000 square-foot data center in Duluth, Minnesota.

20.     In December 2015, Carlyle acquired Eden Prairie-based KLDiscovery (formerly known as LDiscovery, LLC, Kroll Ontrack, and KrolLDiscovery). Carlyle still owns the company, which provides e-discovery and related solutions in Minnesota and around the world.

21.     Numerous other companies owned by Carlyle operate, own property, and/or engage in substantial business in Minnesota.

22.     In just the last five years, Carlyle has undertaken significant business transactions in Minnesota, including at least the following:

  a.  Leading and participating in the acquisition of Minneapolis-based Advanced Web Technologies, Inc.

  b.  Co-underwriting $710 million in financing to support the buy-out of Tank Holding Corp., with corporate offices in Minnesota; and

  c.  Attempting to purchase the Minnesota Timberwolves and Minnesota Lynx.

23.     Upon information and belief, Carlyle has undertaken and participated in other significant business transactions and acquisitions involving business and assets in Minnesota, both on its own and through its subsidiary and partner entities and firms.

24.     Carlyle regularly transacts business and actively seeks to transact business in Minnesota, it owns companies and significant assets in the state, and it has purposefully availed itself of the privilege of doing business in Minnesota.

25.     Defendant Susan Gregg Renfrew ("Renfrew") is the founder of Beautycounter and was the CEO for most of the company's existence.

26.     After Carlyle acquired Beautycounter, it replaced Renfrew with a new CEO. However, Carlyle reinstated Renfrew as CEO in early 2024.

27.     As its CEO (twice) and founder, Renfrew is not only the individual with the most influence and control over Beautycounter, but she is also the face of the brand and the company. Renfrew has represented Beautycounter in countless interviews, testified before Congress on Beautycounter's behalf, leads routine leadership calls with the highest-earning consultants, presents at national sales conferences, attends incentive trips with Consultants, and "signs" public messages from the company.

28.     In late 2023 or early 2024, Carlyle and Renfrew began discussing a sale of Beautycounter back to Renfrew. However, this lawsuit—and a related lawsuit in California—threw a wrench in those plans.

29.     In or about March 2024, Renfrew and Carlyle devised a scheme to sell Beautycounter back to Renfrew as part of or after a foreclosure, and to fraudulently transfer Beautycounter's assets to Renfrew in a manner that they believed would leave Plaintiffs without a remedy, as the original entity (Counter Brands, LLC) would be insolvent and Carlyle/Renfrew would be insulated from liability by transferring assets to an assignee, who would then sell the assets to Renfrew and her new company.

30.     Renfrew and Carlyle did so, in whole or in part, because of this lawsuit and a related lawsuit pending in Los Angeles County, California (the "California lawsuit").

31.     Renfrew incorporated a new company on April 15, 2024, which is a mere continuation of Beautycounter. That company is G2G NewCo, Inc. d/b/a Beautycounter (referred to individually herein as "G2G (d/b/a Beautycounter)" and collectively with Counter Brands, LLC and Counter Brands, Inc. as "Beautycounter").

32.     All actions complained of herein occurred while Plaintiffs resided and performed work as independent contractors of Beautycounter in the State of Minnesota, or while Plaintiffs were parties to this lawsuit venued in the United States District of Minnesota.

33.     Jurisdiction is proper in this Court because the violations occurred in the State of Minnesota and arise in part under the laws of Minnesota.

## FACTUAL BACKGROUND

34.     Plaintiffs are successful entrepreneurs who spent years building their businesses in partnership with Beautycounter, a company that promised them a chance to own their own businesses and advance the clean beauty mission while being present to their families and young children.

35.     Plaintiffs and their teams generated over $50 million dollars in revenue for Beautycounter.

36.     Plaintiffs poured nearly a decade of their talent into their Beautycounter businesses and became wildly successful.

37.     Plaintiffs leveraged their skills, time, resources, personal networks, and connections to expand Beautycounter's reach into thousands of clients' homes.

38.     Plaintiffs worked tirelessly to recruit thousands of new Consultants to sell Beautycounter's products.

39.     From the beginning, Beautycounter treated Plaintiffs as business partners in accordance with its motto of "Truth & Transparency." During most of this time, Beautycounter gave them insights into the direction of the company and sought their input before making changes that would affect Plaintiffs' livelihoods.

40.     The tenor of the relationship changed dramatically with Carlyle's acquisition of a majority interest in Beautycounter in 2021.

41.     Beginning just one year later, acting at Carlyle's direction, Beautycounter took a series of actions to abruptly usurp Plaintiffs' businesses and to position itself to reap the benefits of Plaintiffs' labor for decades to come.

## BEAUTYCOUNTER'S MISSION AND BUSINESS MODEL

42.     Beautycounter was founded by Susan Gregg Renfrew ("Gregg Renfrew" or "Renfrew") and its products were brought to market in 2013.

43.     Beautycounter's public mission was to offer beauty product ingredient transparency and safety to consumers and to advocate for better regulation of the beauty product industry.

44.     Beautycounter is a direct-sales, multilevel marketing company that uses independent contractors (known as "Brand Advocates" to Beautycounter but referred to as "Consultants" in this Complaint) to market and sell cosmetics and skincare products directly to customers.

45.     The bedrock of Beautycounter's business model was the use of entrepreneurial women who wanted to develop and grow their own businesses as Beautycounter Consultants.

46.     Throughout the relevant time period, Beautycounter did not have employee sales representatives. Rather, Beautycounter recruited women who wanted to start a business and be a "business partner" with Beautycounter to promote and sell Beautycounter's products.

47.     Throughout the relevant time period, when a person wanted to become a Consultant for Beautycounter, they could enroll through Beautycounter's website.

48.     In that process, the individual was required to "click" through a page presenting the "Consultant Agreement Terms & Conditions."

49.     The "Consultant Agreement Terms & Conditions" is unliterally drafted by Beautycounter, with no opportunity for input or negotiation from the Consultant.

50.     Like the millions of similar such forms consumers have to "click" through on the internet, the Agreement is presented in small print in a small pop-up window with only a small portion of the Agreement's text visible.

51.     Beautycounter did not present the agreement in a manner that required it be read, as the "I Agree" button is active regardless of whether the Consultant scrolled through the text.

52.     Beautycounter's "Consultant Agreement" at the time Plaintiffs enrolled stated each individual who signs up to sell its products will be an "Independent Consultant" with the right to: (a) "offer for sale Beautycounter products," (b) "enroll persons as

Consultants," and (c) "earn commissions" pursuant to a separate "Beautycounter career plan."

53.     The Consultant Agreement also stated that it incorporated and made "part of" the agreement its "Beautycounter Policies and Procedures, the Beautycounter Career Plan, and the Beautycounter Business Entity Addendum."

54.     However, as the agreement itself acknowledges, these documents were not available to the individual until *after* they had clicked "I Agree."

55.     The Consultant Agreement also stated: "I understand that the Agreement may be amended at the sole discretion of Beautycounter, and I agree to abide by all such amendments."

56.     The Consultant Agreement did not contain a term against soliciting other Consultants for another business opportunity or soliciting customers to purchase another company's products.

57.     The Consultant Agreement had a term of one year.

58.     After clicking "I Agree," the Consultant may set up their own personal shopping link website, order an "Enrollment Kit," and begin making sales.

59.     Only after enrolling can a Consultant view the Policies and Procedures, but Consultants are not required to do so.

60.     Beautycounter's Policies and Procedures were updated unilaterally by Beautycounter at various times after Plaintiffs' enrollment.

61.     Consultants are required to pay an annual fee to renew their relationship as Consultants with Beautycounter but are not required to expressly agree to any contract, policy, or written terms and conditions after their initial enrollment.

62.     When Shawgo, Bjornlie, and Dawley enrolled, the Beautycounter Policies and Procedures contained a non-solicitation provision, which stated:

> Beautycounter Consultants are free to participate in other network marketing programs. However, Consultants who participate in other network marketing programs are not eligible to receive recognition at any Beautycounter function or event. During the term of this Agreement and any renewal of the Agreement, *with the exception of a Consultant's personally Mentored Consultants*, a Consultant may not directly or indirectly Recruit other Beautycounter Consultants for any other network marketing business.

(emphasis added)

63.     When Pike enrolled, the Beautycounter Policies and Procedures had been changed, and the non-solicitation provision removed the exception allowing recruitment of "Mentored Consultants" for other businesses.

64.     At some point after Plaintiffs enrolled, Beautycounter unilaterally revised its form Consultant Agreement to add a provision stating Consultants were forbidden from soliciting other Consultants to join another direct selling business or any other business. Plaintiffs never agreed to this amendment.

65.     The non-solicitation provisions in the form Consultant Agreement and the Policies and Procedures, hereinafter collectively referred to as the "Non-Solicitation Policy," took various and evolving forms over the years.

66.     After joining Beautycounter, a new Consultant is placed on a team under an existing Consultant. This Consultant directly above the new Consultant is referred to as the new Consultant's "sponsor," "mentor," or "upline."

67.     In turn, new Consultants under a particular sponsor are referred to as part of the sponsor's "downline," which builds upon itself as the Consultants in the downline in turn recruit more Consultants.

68.     A downline sales organization can consist of several thousand Consultants.

69.     Consultants are strongly encouraged, both by company advice and training policy by financial incentives, to spend significant energy recruiting and building up a successful downline.

70.     Under Beautycounter's business model, Consultants earn commissions from product sales.

71.     In addition to sales to clients, commissionable sales volume can also include products Consultants in the downline purchase for themselves.

72.     Beautycounter advertises that its Consultants can "Build your business, your way."

73.     Consultants are led to believe they have ownership and control over the business they are building, and, in truth, Consultants control their hours, tasks, strategy, recruitment efforts, marketing, communication with clients, team trainings, and sales goals.

74.     Developing a small business takes hard work, personal sacrifice, and strategic planning. The Consultants who sign up to sell Beautycounter products are

required to, and do, use their own resources, networks, and connections to make their sales business successful.

75.     Beautycounter encourages Consultants to build their own customer base and Consultant team from their own personal networks.

76.     Using the acronym "FRANKS," Beautycounter's Consultant Workbook specifically suggests Consultants target people they know: "**F**: Friends (college, high school, childhood, church, social clubs, Facebook); **R**: Relatives; **A**: Acquaintances – people you know but aren't super close to; **N**: Neighbors – these are people you are friendly with but may have no idea about Beautycounter; **K**: Kids' friends' parents; **S**: Significant others' contacts."

77.     In its Consultant Workbook, Beautycounter explicitly recognizes that social media is a powerful sales and recruiting tool and that social media is often the primary way Consultants build their businesses: "Social media is a powerful tool for building your personal business. Use your social accounts to share content, talk about your business, grow your audience, and increase loyalty. Think of your social profile as a storefront; it's a space to find and engage with Clients and give them a glimpse of Beautycounter."

78.     Successful Consultants typically share Beautycounter content on their own personal social media accounts and leverage connections with their communities. Consultants attend events and provide product demonstrations. They find outlets and places to market their online marketplace as a place to purchase from. They take orders for Beautycounter products at hosted events.

79.    By achieving certain sales levels in their direct and downline sales volumes, Consultants can advance to higher levels of the Beautycounter compensation plan.

80.    Higher levels entitle Consultants to earn a greater percentage of commissions from their own product sales and sales made by Consultants in their downline.

81.    There are eight sales levels, with "Managing Director" as the highest. The second highest level is the "Executive Director" level. The third highest level is "Senior Director."

82.    Compared to the tens of thousands of Consultants with Beautycounter, very few reach the level of Executive Director and even fewer climb to the Managing Director level.

83.    Beautycounter owes its success to its army of Consultants, which in 2022 numbered over 70,000, and especially to its Consultants with larger downlines, who were incentivized to grow their teams by Beautycounter's multi-level compensation plan.

### **Plaintiffs Jennifer Shawgo and Jennifer Shawgo BC, LLC**

84.    Shawgo joined Beautycounter in 2014 when the company was still in its infancy.

85.    Shawgo has a bachelor's degree in entrepreneurship from the University of St. Thomas and she was excited to contribute to the growth of a new company (Beautycounter) while simultaneously building her own business.

86.    On February 25, 2019, Shawgo started Jennifer Shawgo BC, LLC. From that time on, her business relationship with Beautycounter was conducted through her LLC. As used herein, "Shawgo" refers to both.

87.     Shawgo joined because she was drawn to Beautycounter's motto of "Truth and Transparency" and its commitment to educating consumers about an unregulated beauty industry.

88.     Shawgo was excited to be a part of Beautycounter's larger goal of uncovering misleading marketing in the beauty industry, and she was passionate about helping consumers understand the health implications of what they put on their bodies.

89.     She was proud to be part of the company leading the clean beauty movement and was inspired by Beautycounter's legislative advocacy for better regulation in the beauty industry.

90.     Shawgo valued the respect and trust Beautycounter showed its Consultants.

91.     In particular, she valued how Gregg Renfrew carried out Beautycounter's Truth & Transparency motto by sharing company projections, goals, and numbers with its Consultants to ensure they could run their businesses in step with where the company was going.

92.     Over 8 years, Shawgo channeled her work ethic, skills, and passion into building her own business through her partnership with Beautycounter.

93.     Shawgo reached the top level of the commission structure within just 2 years by leveraging her expansive contacts, business savvy, and strategic sales efforts to grow her own business while selling Beautycounter's products.

94.     She hosted popups with her friends and family, scheduled one-on-one appointments with individuals looking to learn more about the lack of regulation in the beauty industry, dropped off and mailed product samples to interested individuals, helped

her downline with popups, managed a training page on Facebook where she shared tips for success with other Consultants, and held weekly calls in which she onboarded, trained, and checked in with other Consultants.

95.    Shawgo continued these efforts throughout the COVID-19 pandemic, finding new ways to connect with consumers, recruit new Consultants, and share Beautycounter's mission even when meeting in-person was not possible.

96.    Through her efforts, Shawgo achieved the level of Managing Director and amassed a downline of over 1,100 consultants.

97.    Shawgo and her downline generated $35 million in revenue for Beautycounter.

98.    Shawgo understood that the business she developed was under her control and that Beautycounter would pay her commissions based on her sales and her downline's sales.

99.    Shawgo also understood that she could pursue opportunities with other direct-sales companies—indeed, she knew many other Consultants who did just that while continuing to sell Beautycounter products.

100.    Shawgo never considered other sales opportunities before 2022 because she was "all-in" with Beautycounter and was satisfied with the six-figure income she generated from her partnership with Beautycounter.

### Plaintiffs Molly Bjornlie and Molly Bjornlie, LLC

101.    Plaintiff Bjornlie joined Beautycounter as a Consultant in 2015.

102.   Like all Consultants, Beautycounter classified Bjornlie as an independent contractor.

103.   On May 17, 2019, Bjornlie started a limited liability company named Molly Bjornlie, LLC. From that time on, her business relationship with Beautycounter was conducted through the LLC. As used herein, "Bjornlie" refers to both.

104.   Shawgo was a Beautycounter mentor to Bjornlie.

105.   Like Shawgo, Bjornlie was drawn to Beautycounter's motto of "Truth and Transparency."

106.   With a bachelor's degree in kinesiology from the University of Wisconsin, she also connected to Beautycounter's commitment to educating consumers about making the beauty industry safer.

107.   Bjornlie also valued the respect Beautycounter showed its Consultants and Beautycounter's investment in them.

108.   Bjornlie was proud to be an entrepreneur and she quickly began building her Beautycounter business.

109.   Bjornlie developed knowledge of the products, learned about marketing, began to develop her customer base, and used her own personal network and social media accounts to build Beautycounter's brand reputation, recognition, and sales.

110.   In addition to her own sales, Bjornlie recruited other Consultants.

111.   Bjornlie acted as a mentor for her downline and helped the Consultants to increase their sales of Beautycounter products.

112.    Bjornlie was compensated based upon the success of her downline and monitored their success through internal Beautycounter reporting tools.

113.    Bjornlie would help her downline Consultants when they were close to promotion to new management levels.

114.    Bjornlie spent significant time and finances investing both in her own business and in the development and mentorship of her downline Consultants.

115.    Through her efforts, Bjornlie achieved the level of Managing Director and amassed a downline of over 800 Consultants.

116.    Bjornlie and her downline amassed over $25 million in business volume for Beautycounter over 8 years.

117.    Bjornlie understood that the business she developed was her own business and that Beautycounter would pay her commissions based on her sales and her downline's sales.

118.    Bjornlie's total compensation at Beautycounter was based on a percentage of her own sales as well as a percentage of the sales of her downline.

119.    From 2015 until her termination, Bjornlie earned a six-figure income.

120.    Bjornlie's income was an important and significant contribution to her family's finances.

121.    Bjornlie also knew of many other Consultants who sold other direct-sales products while continuing to work for Beautycounter.

122.    Regardless, Bjornlie never considered taking other sales roles because she was dedicated to her Beautycounter business and was satisfied with her compensation.

**Plaintiffs Ayesha Dawley and Dawley, LLC**

123.   Plaintiff Dawley was recruited to join Beautycounter as an independent consultant in 2014.

124.   In 2016, Dawley, LLC was formed. After the LLC formation, Dawley's business relationship with Beautycounter was conducted through the LLC. As used herein, "Dawley" refers to both.

125.   As a recent melanoma skin cancer survivor, Dawley was drawn to Beautycounter's clean cosmetics and skincare mission.

126.   Dawley had learned how many products contained ingredients linked to cancer and was passionate about advocating for clean beauty.

127.   Dawley was also drawn to Beautycounter's motto of "Truth and Transparency."

128.   Dawley has bachelor's degrees in business administration and psychology from the University of St. Thomas and, when she was recruited, was deep into a successful, nearly 20-year long career in media sales.

129.   Over the next several years after joining forces with Beautycounter, Dawley continued her media sales work full-time while selling Beautycounter products and recruiting new Consultants to Beautycounter.

130.   Like Shawgo and Bjornlie, Dawley invested heavily into her Beautycounter business.

131.    Dawley leveraged a personal website, in-person sales and recruitment events, training for her growing downline, and social media engagement to advance through the ranks of Beautycounter sales.

132.    Within two years, Dawley grew her business enough to become an Executive Director.

133.    One year later, in mid-2017, she achieved the Managing Director sales level while maintaining her full-time media sales position.

134.    What started as a side passion project thus rapidly grew into a highly successful business. In 2018, this allowed Dawley to make enough income as a Beautycounter Consultant to leave her corporate career and run her Beautycounter business full time.

135.    Dawley's family had consistently relied on her income, and she only left her full-time work after her income from her Beautycounter business seemed reliable enough to support her family's needs.

136.    Dawley promoted Beautycounter in her own social media accounts and was also featured on other third-party media channels including YouTube videos, podcasts, and blogs.

137.    When Dawley resigned her media sales position in 2018, she made a video describing how her Beautycounter business's success enabled her to quit her full-time job and become a stay-at-home mom. Her video received tens of thousands of views and inspired other women to pursue Beautycounter businesses.

138.   Dawley and her success story became a major source of publicity and promotion for Beautycounter, and Beautycounter itself began to promote her as a face of the company.

139.   In May 2018, Beautycounter held a Leadership Summit in Minneapolis, MN.

140.   Beautycounter leadership asked Dawley to be the keynote speaker at the Summit, Beautycounter's largest national conference ever.

141.   Prior to the Summit, Beautycounter flew Dawley to Santa Monica to meet with Beautycounter leadership to present and work on her address.

142.   Dawley then gave her over 20-minute address live to thousands of Beautycounter Consultants in Minneapolis, Minnesota.

143.   In the address, Dawley used her passion and story to encourage the other consultants to work hard for their Beautycounter businesses.

144.   Beautycounter also featured Dawley in a promotional video for the Summit.

145.   Again, Dawley's personal and professional story inspired other women to grow their Beautycounter business in the hope it could replace their careers.

146.   Dawley also invested her time into advancing Beautycounter's clean beauty mission.

147.   While Beautycounter was gaining national attention with its advocacy for clean beauty in Washington, D.C., Dawley led the charge in Minnesota, meeting with United States Senator Tina Smith's office to promote Beautycounter's mission.

148.   Dawley was also featured on a Minnesota television program in 2020, creating over 45 minutes of media content for Beautycounter.

149.    Like other Consultants, Dawley's compensation at Beautycounter was based on a percentage of her own sales, as well as a percentage of the sales and personal purchases of her downline.

150.    Dawley's clients and downline generated over $15 million in Beautycounter business volume.

151.    From 2017 until she was forced out of Beautycounter, Dawley earned a six-figure income from her Beautycounter commissions.

152.    Like Shawgo and Bjornlie, Dawley also understood that she could pursue opportunities with other direct-sales companies—indeed, she knew of many other Consultants who did just that while continuing to work for Beautycounter—but she never considered it because she was all-in with Beautycounter and was satisfied with Beautycounter's compensation.

**Plaintiff Caity Pike**

153.    Plaintiff Caity Pike joined Beautycounter as a consultant in 2017.

154.    Pike was attracted to the clean beauty mission of Beautycounter after a close family member struggled with skin sensitivities.

155.    Pike also was drawn to the promise of building a business for herself while supplementing her husband's income for their growing family.

156.    When Pike joined, she had a full-time career as a Marketing Director for a promotional products company, along with a part time graphic design freelance career.

157.    Pike recruited other Consultants and signed-up hundreds of customers from 2017 through the end of 2022 when she was abruptly terminated.

158.   Pike was a strong leader of her close-knit team of Consultants, with whom she communicated nearly every day.

159.   Pike's leadership skills were recognized by Beautycounter when she earned a lead position to represent Minnesota in a District Meeting to educate members of Congress on the need for better beauty laws, though the meeting was cancelled due to the COVID pandemic.

160.   In October 2020, Pike was promoted to Senior Director due to her sales volume.

161.   Around that time, Pike quit her full-time job while pregnant to pursue healthier conditions for herself and her unborn child, and she did so with the confidence that she could focus on her Beautycounter business to provide her full-time income.

162.   Pike's business continued to grow and she achieved the Executive Director level in October 2021.

163.   Over her five and half years as a Consultant, Pike invested a significant amount of money into her business.

164.   Pike was one of just 200 Consultants who sold enough to earn the Beautycounter sales incentive trip in October 2022.

165.   In 2022, she was at the Senior Director level again, and on the verge of advancing back to Executive Director due to her sales volume.

166.   However, Pike was never promoted because she was abruptly frozen and then terminated in November 2022.

**Carlyle, Beautycounter, and Renfrew's Unlawful Scheme To
Defraud Consultants and Unlawfully Interfere with Their Business Relationships**

167.   In or about April 2021, Carlyle entered into a "strategic partnership" with Beautycounter and purchased a majority interest in the company, allowing Carlyle to control the company. Carlyle valued Beautycounter at $1 billion in this transaction.

168.   Carlyle, Beautycounter, and Renfrew knew they would financially benefit if Beautycounter was able to continue to sell to customers through Plaintiffs and other Consultants after this transaction.

169.   To induce Plaintiffs and other Consultants to stay and to continue to sell Beautycounter products to their customers, Carlyle, Beautycounter, and Renfrew crafted communications through which they promised that Consultants' business relationship with Beautycounter would continue, uninterrupted, after the sale and that Carlyle's partnership and control would benefit Consultants, as well as the company.

170.   Carlyle, Beautycounter, and Renfrew's communication to Consultants regarding the transaction explained that:

> Today, we're announcing a new strategic partnership with The Carlyle Group, a global investment firm with a demonstrated 40-year track record of taking industry-leading brands to the next level....
>
> They will become a majority stakeholder in Beautycounter, and they'll be helping us to accelerate our business as we enter into our next phase of growth.
>
> Just eight years ago, we started this company with a dream of creating a healthier, safer world and this is an exciting and important milestone in our journey to achieving that.
>
> This strategic investment is a huge win for all of Beautycounter, including each of you, and for the beauty

industry at-large. I am deeply proud to have such a highly respected financial partner on board.

I wanted to share the news and to take a moment to thank you. We would not be where we are today without your collective passion or your tireless efforts. Carlyle sees this community that we've built together and recognizes that you've allowed us to build not only a movement to advance the beauty industry, but also a viable business. They are excited about the potential for our continued growth, and make no mistake: this incredible milestone simply would not be possible without all of you.

As I said throughout LEAD: The future favors the bold. And we will continue toward our bold vision by working hard, remaining focused on running the business, and on continuing toward our mission of getting safer products into the hands of everyone.

171.    Plaintiffs and other Consultants were concerned that Carlyle's purchase and influence would negatively affect their businesses. Plaintiffs and other Consultants had personally invested substantial time and resources in Beautycounter's success. Plaintiffs and other Consultants had been fairly compensated for their efforts. They needed to decide whether they should continue to invest the same effort and resources in Beautycounter's success after Carlyle owned and controlled the company, or whether they should pursue other business ventures.

172.    Carlyle, Beautycounter, and Renfrew jointly crafted and delivered communications to Plaintiffs and other Consultants promising that the effect of the transaction on their businesses and business relationships would be positive.

173.    For example, a communication delivered to Plaintiffs and other Consultants by Beautycounter was titled "The Carlyle Group FAQS." Among other information, it

28

promised that Carlyle's ownership and control would have a positive effect on Plaintiffs' and other Consultants' businesses, stating:

> This is a great thing for all of Beautycounter, for our Field [referring to Consultants], our HQ associates, for our customers, and for the beauty industry at-large. *The Carlyle Group recognizes that our Consultants have played an integral role* as we work toward getting clean products into the hands of everyone, and understands that this community is what's allowed us to build both a movement and a viable business. *They are looking forward to helping our Consultant channel continue to innovate and grow*.

(emphasis added).

174.    "The Carlyle Group FAQS" communication also promised Consultants that the transaction would not "change anything in terms of your day-to-day. … [T]his partnership will instead opens [*sic*] up a new world of possibilities around building and expanding brand awareness as we work toward our mission of getting safer products into the hands of everyone."

175.    Renfrew also made oral promises on behalf of Carlyle through online meetings with Plaintiffs and other Consultants during which she explained that Carlyle's ownership and control was intended to benefit them, their businesses, and their bottom line.

176.    These communications regarding Carlyle's ownership and control were drafted or approved by Carlyle and were communicated for the benefit of Carlyle. These communications were also approved by Renfrew and were intended to ensure Carlyle consummated its acquisition so that Renfrew could gain substantial wealth from the transaction.

177.   These communications were intended to assure Plaintiffs and other Consultants that they and their businesses would benefit from Carlyle's acquisition. These communications were intended to prevent Plaintiffs and other Consultants from terminating or exploring terminating their relationships with Beautycounter so that Carlyle and Beautycounter could attempt to convert Consultants' customer and business relationships without compensating Consultants.

178.   Plaintiffs and other Consultants heard and read these communications and they relied on the truth of Carlyle's, Beautycounter's, and Renfrew's promises in deciding to remain investing in and contributing to Beautycounter's, and now Carlyle's, revenue and success.

179.   Plaintiffs and other Consultants did not explore other business opportunities and did not terminate their relationship with Beautycounter because of communications regarding Carlyle's acquisition promised the transaction was, at least in part, intended to benefit Plaintiffs and other Consultants and to grow their businesses and income.

180.   Unfortunately for Plaintiffs and other Consultants, Defendants knew that their promises were false including at the time they made these promises.

181.   Before Carlyle purchased its controlling interest in Beautycounter and before making or orchestrating the foregoing false promises, Carlyle, Beautycounter, and Renfrew knew that Carlyle planned to increase its profits by diminishing Plaintiffs' and other Consultants' income and income streams and interfering with Plaintiffs' and other Consultants' current and expected customer and business relationships.

182.    Before Carlyle purchased its controlling interest in Beautycounter and before making or orchestrating the foregoing false promises, Carlyle, Beautycounter, and Renfrew knew that Carlyle planned to require Beautycounter to make changes to its business model and its relationships with Plaintiffs and other Consultants that would have a devastating negative effect on their businesses, customer and business relationships, and income.

183.    Carlyle, Beautycounter, and Renfrew's false and misleading statements were designed to mislead Plaintiffs and other Consultants and to cause them to believe that their businesses, customer and business relationships, and income would benefit from Carlyle's purchase and control of Beautycounter.

184.    Renfrew received hundreds of millions of dollars from Carlyle's purchase of Beautycounter. She also remained an advisor, board member, and significant shareholder of Beautycounter after the sale. To this day, she proudly touts herself as the founder of a $1 billion startup company.

185.    Both before and after Carlyle's acquisition of Beautycounter, Carlyle, Beautycounter, and Renfrew knew that Plaintiffs and other leading Consultants resided and conducted business in Minnesota on behalf of Beautycounter.

186.    Both before and after Carlyle's acquisition of Beautycounter, Carlyle, Beautycounter, and Renfrew knew that customers and business relations of Plaintiffs and other leading Consultants also lived in and conducted business in Minnesota.

187.    Both before and after its acquisition of Beautycounter, Carlyle knew and intended that the effects of its decisions at issue in this suit—and the resulting harm to Plaintiffs and other Minnesota-based consultants—would occur and be felt in Minnesota.

188.    Plaintiffs relied on Carlyle, Beautycounter, and Renfrew's false promises and assurances regarding Carlyle's intentions and they continued their business relationships with Beautycounter after the sale to Carlyle. They continued to invest substantial resources in Beautycounter's success after Carlyle's acquisition of the company. Without these promises and assurances, Plaintiffs and other Consultants were prepared to and would have moved their businesses to another multi-level-marketing company providing skin care and cosmetic products.

189.    After Carlyle acquired control of Beautycounter, Carlyle implemented its plan to increase its profits at the expense of Plaintiffs and other Consultants.

190.    In January 2022, Carlyle replaced founder and long-time CEO Renfrew with serial CEO Marc Rey to ensure implementation of its planned strategies to increase profitability for the new owners.

191.    Carlyle controlled Beautycounter and installed representatives on its Board of Directors, including Carlyle Partner and Chief Performance Office Mindy Mackenzie, who also later served as interim CEO at Beautycounter in 2023.

192.    Carlyle required Beautycounter to implement extreme cost-cutting measures seeking to increase its revenue and profits.

193.    As it had planned, Carlyle directed Beautycounter to unlawfully cut commissions for Plaintiffs and other highly productive Consultants—labeled by Beautycounter as "Senior Directors," "Managing Directors," and "Executive Directors"— and to unlawfully interfere with, disrupt, and convert their business customer relationships and sales.

194.    In the spring of 2022, at Carlyle's direction, Beautycounter ran a promotion to recruit existing customers to become Consultants for just $1. This allowed customers to receive the Consultant discount for their own product purchases.

195.    Plaintiffs were required to promote this opportunity to their customers, which they did.

196.    Then, on April 20, 2022, Beautycounter informed Executive Directors and Managing Directors that it had decided to cease counting personal orders (orders placed by Consultants) as qualifying for commissions paid to Plaintiffs. In other words, Beautycounter (at Carlyle's direction) pulled a bait and switch. They encouraged Plaintiffs' customers to sign up as "Consultants" for a mere $1.00, and then turned around and eliminated any commissions for future sales to those customers, based on a new policy stating that personal purchases by "Consultants" would no longer generate commissions to Plaintiffs.

197.    An email to Consultants announcing the change acknowledged that this unilateral change targeted the highest earning Consultants—those with long-standing Consultant relationships and the largest downlines. The message stated "Please note, if your business is focused primarily on selling to existing or New Clients and Members and/or advocating for change by sharing our mission, you won't notice much of a difference…"

198.    Plaintiffs and other Consultants finally learned that Carlyle's true plan had been to: (a) disrupt Plaintiffs' and other Consultants' customer relationships by enticing their customers to become Beautycounter Consultants themselves; (b) decrease Plaintiffs'

and other Consultants' income by removing customers from their client commission volume; and (c) decrease Plaintiffs' and other Consultants' income by cancelling Plaintiffs' and other Consultants' longstanding right to earn commissions from procuring these customer and Consultant relationships for Beautycounter.

199.   Around the same time, Beautycounter announced Carlyle's decision to remove Managing Director bonuses, further decreasing these Consultants' income.

200.   These changes were jarring to Plaintiffs and other Consultants in light of Beautycounter's longstanding course of conduct and recent communications announcing that Carlyle intended to benefit Consultants through its acquisition of Beautycounter.

201.   Before Carlyle's owned the company, Beautycounter had only made infrequent, and minor adjustments to Consultants' commissions and commission structure.

202.   The one previous instance when Beautycounter had made a significant change to Consultant compensation, Beautycounter flew representatives to Minnesota to meet with Plaintiffs and other top Consultants to discuss the potential change, hear their concerns, and ensure the change would not dramatically harm Plaintiffs and other top Consultants.

203.   Beautycounter had established a longstanding course of dealing with Plaintiffs and other top Consultants that treated them as true business partners with Beautycounter in recognition of their work and contributions to the company's success.

204.   Carlyle was aware of Beautycounter's course of dealing with Plaintiffs and other top Consultants before it purchased Beautycounter. Despite making or directing Beautycounter and Renfrew to describe its intentions as positive, Carlyle always intended

to disrupt Beautycounter's relationships and course of dealing with Plaintiffs and other top Consultants.

205.   Instead of advance, constructive communications and being allowed input regarding potential changes affecting their businesses, Plaintiffs received impact statements from Beautycounter on or about April 22, 2022, explaining that their compensation would be unilaterally reduced. Beautycounter represented the estimated cut to be ***20-29%*** of their earnings and stated that the cuts would take effect on or about June 1, 2022—just 6 weeks later.

206.   A 20-29% reduction in pay would have been serious enough. However, the reality was far worse.

207.   On or about July 8, 2022, Shawgo received her first commissions check after the compensation plan changes. This commissions check, which reflected earnings from sales made in June 2022, was $7,886.74. This represented **a 65% decrease from her commissions check for the prior month**, when she earned $22,537.92 for sales made in May 2022. This represented a 58% decrease from her earnings for June 2021 as reflected in her July 2021 commissions check for $13,518.57.

208.   On or about July 8, 2022, Bjornlie received her first commissions check after the compensation plan changes. This commissions check, which reflected earnings from sales made in June 2022, was $7,719.73. This represented **a 66% decrease from her commissions check for the prior month**, when she earned $22,836.41 for sales made in May 2022. This represented a 36% decrease from her June 2021 earnings reflected in her July 2021 commissions check for $12,109.17.

209.    On or about July 8, 2022, Dawley received her first commissions check after the compensation plan changes. This commissions check, which reflected earnings from sales made in June 2022, was $5,969.63. This represented **a 70% decrease from her commissions check for the month,** when she earned $ 19,355.03 for sales made in May 2022. This represented a 56% decrease from her June 2021 earnings reflected in her July 2021 commissions check for $13,513.85. Dawley had not received a commissions check so low in the five years prior to this unilateral change.

210.    On or about July 8, 2022, Pike received her first commissions check after the compensation plan changes. This commissions check, which reflected earnings from sales made in June 2022, was $2,225. This represented **a 61% decrease from her commissions check for the month,** when she earned $5,745 for sales made in May 2022.

211.    This pay cut was especially significant to Pike, who relied on her modest Beautycounter income to make ends meet.

212.    Moreover, Pike had not expected the previously-announced changes to affect her income so significantly, because Beautycounter had represented that top-earners would be the most affected.

213.    Shortly after the compensation changes were implemented, one of Plaintiffs' upline mentors shared with each of the Plaintiffs individually that Beautycounter would be switching to an affiliate-link-only sales model, which would eliminate downlines. Downlines had always been a primary source of income for Plaintiffs and other Beautycounter Consultants.

214.   Deeply troubled about the impact that Carlyle's decisions to change their commission rates and opportunities to earn commissions, Plaintiffs and many other Managing Directors and Executive Directors sent letters to Beautycounter's leadership expressing anger over Carlyle's unilateral changes to their relationship with Beautycounter and threatening to terminate their business relationships with the company.

215.   Executive and Managing Directors began posting resumes, joining other companies, and looking for new ways to supplement their dramatically reduced income. Many of Beautycounter's top consultants were women who were primary breadwinners for their families.

216.   Shawgo and Bjornlie both spent significant time working with their teams to address the fallout from these pay cuts. In addition to providing emotional and psychological support, they encouraged their teams to stay positive, be forward-looking and double-down on their effort and contributions to Beautycounter so that they could replace their lost income through the few remaining means for commissions.

217.   Shawgo and Bjornlie took their own advice and revitalized their recruitment efforts in an attempt to make up for the difference in their income.

218.   On or about July 21, 2022, Beautycounter held a leadership call with new CEO, Marc Rey.

219.   Unlike previous meetings and calls with top earners in which Beautycounter leaders engaged in a respectful and open dialogue, Rey muted participants and did not allow attendees' ability to chat or ask questions.

220.    Rey called the female leaders "overreactive" and said he would not share the direction of the company (planned by Carlyle) with Plaintiffs and other Consultants because they would "freak out."

221.    Rey spoke condescendingly and patronized Beautycounter's top leaders, stating (among other things) that they would not understand the reasons for the changes to the business because they "are not businesswomen."

222.    Rey stated that "clean beauty" was not "sexy" anymore, and that "the environment" is sexy, and he intimated that company intended to pursue. This change was undertaken at the direction and with the approval of Carlyle even though the shift directly contradicted Carlyle's, Beautycounter's, and Renfrew's promises regarding Carlyle's acquisition,

223.    Rey's announcement was extremely concerning to Plaintiffs because Beautycounter's founding mission was to lead the clean beauty movement; indeed, this is what drove Plaintiffs to leverage their networks for Beautycounter in the first place.

224.    Rey also informed leaders during the July 21, 2022, call that he had "gone to bat for them" and asked Carlyle—the controlling owner of Beautycounter ultimately responsible for Beautycounter's decisions—to reconsider its aggressive compensation reductions.

225.    Rey told the leaders that he would halt the compensation plan changes for now, giving them until January 2023 for compensation plan changes to be effective, but that Caryle required him to "find $10 million" in the budget to justify the delayed implementation of Carlyle's plan to decrease Consultant compensation.

38

226. When she later returned as CEO, Renfrew acknowledged that Beautycounter's decisions to decrease Plaintiffs' and other Consultants' income and to harm their business were required by Carlyle.

227. Plaintiffs and other Consultants would not have remained with Beautycounter following the acquisition by Carlyle had they known Carlyle's and Renfrew's true intentions. Once Carlyle implemented its previously planned compensation reductions, Carlyle and Beautycounter prevented Plaintiffs and other Consultants from leaving by enforcing and threatening to enforce an unlawful non-solicitation policy intending to preventing these Consultants from bringing their business and business relationships to another company.

## Carlyle and Beautycounter's Efforts to Prevent Plaintiffs and other Consultants from Exercising Their Right to Earn Income Selling Other Products

228. Until these drastic commission cuts, Plaintiffs had never offered non-Beautycounter products to their networks or even considered it.

229. Under the Consultant Agreements Plaintiffs purportedly accepted when they first partnered with Beautycounter, Plaintiffs had a right to sell non-Beautycounter products, including competing products.

230. Renfrew had personally and directly informed Consultants—including Plaintiffs—on numerous occasions that they were business owners, should act as business owners, and did not need to be exclusive to Beautycounter. One of Renfrew's famous lines was that Beautycounter was not about exclusivity and control—rather, it was about

"abundance," meaning Consultants could promote other "clean" products to their customers and business relations.

231.   Beautycounter had allowed other Consultants to sell and promote other products for direct sales companies for years without objection.

232.   Beautycounter and Renfrew themselves promoted other "clean" beauty and skin care brands on their public social media pages and elsewhere.

233.   Having no choice but to find an alternate means to supplement the rapid decrease in their income, Plaintiffs sought opportunities where they could use their sales acumen and passion for health and wellness.

234.   On or about July 2, 2022, Dawley joined Green Compass as an independent consultant, known at Green Compass as an "Independent Advocate."

235.   On or about July 10, 2022, Shawgo joined Green Compass as an as an "Independent Advocate." Shortly thereafter, she formed an LLC, "CBD Babe, LLC" and transitioned her Green Compass business to that LLC.

236.   On or about July 14, 2022, Bjornlie joined Green Compass as an "Independent Advocate."

237.   On or about September 22, 2022, Pike joined Green Compass as an "Independent Advocate."

238.   Green Compass is a wellness company that sells a variety of hemp-derived products using a direct-sales business model.

239.   Green Compass does not sell cosmetics and at the time Plaintiffs joined, it had few skincare products.

240.    When they joined Green Compass, Plaintiffs fully intended to continue their partnership with Beautycounter at the same level and same capacity as they had been for the past 8 years. They simply needed to add something else to replace the massive loss of income.

241.    Plaintiffs understood this posed no concern to Beautycounter given Beautycounter's representation that Plaintiffs were "free" to work for other direct-sales companies, the fact that many other Consultants also worked for multiple direct-sales companies without objection from Beautycounter, and Plaintiffs' purported classification as independent contractors.

242.    On or about July 22, 2022, Beautycounter announced additional changes to the compensation plan through December 2022.

243.    Beautycounter reinstated the compensation to include Consultant consumption but continued to exclude it from the reporting of downline sales.

244.    As a result, Consultants had no ability to verify whether their compensation was being accurately paid. Beautycounter also did not retroactively credit the consumption bonuses that were lost in July 2022.

245.    On or about August 12, 2022, Beautycounter issued paychecks that were supposedly calculated according to the prior compensation plan.

246.    Based on the information available to them, these paychecks were at least 33% short for Plaintiffs.

247.    Beautycounter provided no details about the actual consultant sales volumes.

248.    Managing and Executive Directors—including Plaintiffs—were again, very upset.

249.    In response, Beautycounter claimed it would correct the August 2022 paychecks in September 2022.

250.    The September 2022 paychecks purported to correct the discrepancy, but Beautycounter provided no contemporaneous information explaining how it calculated the new payment amounts.

251.    Shawgo sent an email on or about August 31, 2022, questioning her paycheck discrepancy, but Beautycounter never responded.

**<u>Beautycounter Begins Terminating High-Earning Consultants</u>**

252.    Upon information and belief, Carlyle learned of Plaintiffs' and other leading Consultants' desire or attempts to supplement their income and directed Beautycounter to terminate certain high-earning Consultants as a means of "finding" the $10 million they sought to cut from the budget to maximize their profit.

253.    Importantly, up to this point, few—if any—Consultants of Beautycounter had ever been terminated for alleged "policy violations." Upon information and belief, before Carlyle began directing suspensions and terminations, less than 10 of Beautycounter's 70,000 Consultants had been terminated for an alleged policy violation.

254.    Upon information and belief, Carlyle was aware that Plaintiffs Dawley and Shawgo were targeted for termination given their high visibility and high profile in the Company.

255.   On or about July 29, 2022, Shawgo was summoned to a teleconference meeting with Tracy DeLisle, Vice President, and Gina Murphy, former Vice President. Tracy Delisle had been hired only a few months before, upon information and belief, at Carlyle's direction to help implement the impending pay cuts.

256.   When Shawgo asked if the meeting was about her significant new business volume and how many new consultants she had recruited recently, they responded, "yes."

257.   However, DeLisle and Murphy began to question Shawgo about Green Compass. They gave Shawgo three options: quit Green Compass, quit Beautycounter, or stay at Beautycounter and lose some of her Director perks.

258.   Shawgo shared with them her concerns about the direction of the company and the new CEO's leadership as reflected in the July 6, 2022, call.

259.   Following this call, Beautycounter excluded Shawgo from emails and calls about the compensation plan changes, upcoming product launches, and similar topics. This made it incredibly difficult for Shawgo to lead her team of Consultants. Shawgo was also kicked out of leader calls when she logged on to find out information necessary to lead her team.

260.   Dawley had a similar call with Delisle and Murphy on or about August 1, 2022.

261.   During the phone call, Dawley was questioned about her recent enrollment with Green Compass.

262.   She was questioned about whether she had recruited certain other Consultants to join Green Compass, and she replied that she had not.

263.    Dawley was also given the same three choices as Shawgo: quit Green Compass, quit Beautycounter, or stay at Beautycounter and lose some of her Director perks.

264.    On August 8, 2022, Dawley received an email from a generic Beautycounter email (*guidelines@beautycounter.com*) stating that she "may be in violation of" several of Beautycounter's policies, including an alleged non-solicitation policy, an ethical conduct policy, and a non-disparagement policy.

265.    The email did not state any alleged conduct by Dawley that violated these policies, and, in fact, Dawley had done nothing to violate them, whether she was required to abide by the policies or not.

266.    Dawley's business resources were frozen that same day – she could not access her client or team data and her personal shopping page (through which she was credited with sales) was disabled. In effect, Dawley's tools, commissions, and team were abruptly cut off from her and she had no recourse to retrieve her access.

267.    Dawley determined that Beautycounter had irreparably damaged their relationship through its interference with her business and unilateral slashes to her commissions.

268.    Further, Dawley realized that she could no longer rely on her Beautycounter business to generate the same level of income she had relied on for the four years since she quit her full-time job.

269.    On August 10, 2022, Dawley terminated her Beautycounter consultancy to pursue other sources of income to support her family.

270.   On   August   23,   2022,   Dawley   received   another   email   from *guidelines@beautycounter.com* attaching a threatening letter:

> We are writing to place you on notice of your continuing legal
> obligations to Beautycounter pursuant to the Consultant
> Agreement and Policies and Procedures, so that you can take
> all appropriate steps to ensure you are complying with those
> obligations.  If you fail to comply with these obligations, or
> engage   in   other   misconduct   against   Beautycounter,
> Beautycounter will take all necessary and lawful action against
> you to protect its interests to the fullest extent of the law.

271.   The letter referred to Dawley's suspension under the non-solicitation provision of the Policies and Procedures.

272.   The letter concluded "Please be aware we will not hesitate to enforce our rights if we find you are breaching your contractual obligations, including by misusing Beautycounter's Confidential Information, defaming Beautycounter (i.e., damaging the good reputation of Beautycounter), or tortiously interfering with Beautycounter's agreements, including its Consultant Agreements with other Consultants."

273.   Dawley's letter was signed by Jennifer Doyle, General Counsel of Beautycounter.

274.   Ms. Doyle was admitted to practice law in California in 2002 and has an active law license.

275.   Upon information and belief, Ms. Doyle has held the position of General Counsel for Beautycounter since January of 2017.

276.   Ms. Doyle knew any non-solicitation provision in Beautycounter's Policies and Procedures or form Consultant Agreements violated California Business and Professions Code § 16600 and was therefore void and unenforceable.

277.   Beautycounter, by and through its counsel, knew any non-solicitation provision in Beautycounter's Policies and Procedures or form Consultant Agreements violated California Business and Professions Code § 16600 and was therefore void and unenforceable.

278.   Carlyle, by and through its counsel, knew any non-solicitation provision in Beautycounter's Policies and Procedures or form Consultant Agreements violated California Business and Professions Code § 16600 and was therefore void and unenforceable.

279.   Nevertheless, that did not stop Carlyle and Beautycounter from wielding their power under that non-solicitation policy, including suspending, terminating and threatening legal action against Consultants who dared to join another MLM business.

280.   On or about November 18, 2022, Pike received a notice from Guidelines Support saying that she had been suspended and that she may have violated certain Policies and Procedures, including the Non-Solicitation provision.

281.   Like Dawley, all of Pike's Beautycounter tools and resources were frozen.

282.   Pike had customer pop-up sales occurring at the time and had team members relying on her to respond to their questions, but she could do nothing.

283.   For the next several weeks, Pike begged and pleaded for information from Beautycounter as to the reasons that she was shut off from her business.

284.    Pike received no meaningful information and was not interviewed as part of a purported "investigation."

285.    Beautycounter terminated Pike on November 30, 2022, usurping her business entirely.

286.    On or about November 30, 2022, Shawgo was also suspended without notice and told it would take 30 days to investigate allegations that she had violated a Beautycounter policy.

287.    Like Dawley and Pike, Shawgo's Beautycounter resources were frozen and she could not earn commissions from her personal website link.

288.    Shawgo's customers were redirected to the company's main website to purchase products, so that Beautycounter did not lose the sale and did not have to pay Shawgo a commission on it.

289.    As a result, Beautycounter reaped all of the benefits of sales Shawgo was bringing in during that time.

290.    Shawgo was not told exactly what prompted the investigation, nor was she provided any opportunity to participate in the investigation.

291.    Shawgo was never interviewed nor was she presented with any evidence of an alleged policy violation.

292.    Although she was told the investigation would take up to 30 days, that was untrue, as the investigation lagged on well past December 30, 2022.

293.   Despite Shawgo's repeated requests and pleas for information, given the impact to her family of having her ability to earn a livelihood severed right before the holidays, Beautycounter provided no substantive updates.

294.   From December 2022 to January 2023, several clients reached out to Shawgo wondering why they could not order from Shawgo's personal link. Many other customers who were redirected to Beautycounter's main website had no idea their purchases were not credited to Shawgo.

295.   On January 27, 2023, Shawgo received an anonymous termination letter from *guidelinesupport@beautycounter.com* without any further explanation.

296.   The termination letters Shawgo and Pike received were practically identical.

297.   The letters informed Shawgo and Pike that they were being terminated because of purported violations of the Non-Solicitation provision, stating "We received credible evidence that you solicited Beautycounter Consultants to Green Compass, so we regret to inform you that your Consultant Agreement has been terminated …." The letters cited no evidence and did not attempt to describe or explain the purported "credible evidence" referenced in the letters.

298.   Neither these letters, nor the email transmitting the letter, were signed by an individual. Instead, the letters stated they were from "Guidelines Support Team."

299.   Like Dawley's letter, the anonymous letter threatened to take legal action against Shawgo/Pike: "Beautycounter intends to enforce this [Confidential Information policy] and all other provisions to the fullest extent permitted by law, as may be necessary."

300.    The letters threatened to enforce the one-year post-termination non-solicitation policy, in clear violation of California law.

301.    In November 2022, Bjornlie posted information on her social media account about a "Green Saturday" event being held by Green Compass. Just days later, on or about November 30, 2022, Bjornlie was suspended without notice.

302.    According to a letter Bjornlie received, Beautycounter claimed to be investigating allegations that Bjornlie engaged in "direct or indirect" promotion of a different business.

303.    Bjornlie's Beautycounter website was unilaterally and immediately inactivated.

304.    Her customers were redirected to Beautycounter's main website, without knowing Bjornlie would not be credited with the sale.

305.    In short, Bjornlie was cut off from making any income from her business during this time.

306.    Bjornlie was also denied access to the "Behind the Counter" back-office numbers that track her sales, as well as those of her downline, and she was not permitted to attend sales events or calls.

307.    Bjornlie was told an investigation would be completed within 30 days.

308.    Given the impact on her family for the sudden loss of income from her business—especially over the holidays—Bjornlie contacted Beautycounter to seek and offer information.

309. However, Bjornlie was never told what specifically led to the investigation, nor was she asked to provide any information for the investigation.

310. Instead, nearly 60 days later, on or about January 27, 2023, Bjornlie was told without explanation that her suspension was lifted.

311. Bjornlie was issued a paycheck following her suspension that Beautycounter reported included her backpay commissions.

312. Bjornlie was never given access to her sales information during the suspension to verify the accuracy of the payment.

313. After her suspension was lifted, Bjornlie invested $4,000 into learning how to promote *both* her Beautycounter and Green Compass businesses in a cold market.

314. Because she intended to continue both businesses—and because of Beautycounter's position that she could not post about Green Compass on social media—Bjornlie knew she had to learn a new method to promote her businesses. Bjornlie needed to do both to support herself and her family.

315. Bjornlie did not intend to leave Beautycounter or to do anything that would harm her Beautycounter business. Indeed, Bjornlie could not afford to lose her remaining Beautycounter income. However, Carlye's changes to her Beautycounter compensation required Bjornlie to find a way to supplement her income.

316. A little over one month later, on March 7, 2023, like the other Plaintiffs, Bjornlie received a termination letter.

317. Bjornlie's termination letter was nearly identical to Shawgo's and Pike's letters. The letter was attached to an email from "guidelinesupport@beautycounter.com."

318.    Like the other Plaintiffs' letters, Bjornlie's termination letter accused her of vague and unsubstantiated violations of the Non-Solicitation Policy, stating "we recently received credible evidence that you solicited Beautycounter Consultants to Green Compass. We regret to inform you that your Consultant Agreement has been terminated as of March 7, 2023." Neither the letter, nor the email transmitting the letter, were signed by any individual.

319.    Bjornlie's letter echoed the threat in the letters to other Plaintiff that "Beautycounter intends to enforce [the Non-Solicitation Policy] and all other provisions to the fullest extent permitted by law, as may be necessary."

320.    After their terminations, Beautycounter provided Shawgo and Bjornlie a copy of the 2022 Consultant Agreement upon which it purported to rely. Plaintiffs had never reviewed or accepted the 2022 Consultant Agreement. That "Consultant Agreement" the contained the following language at Section 12:

> **Non-Solicitation.** During the term of this Agreement and any renewal of this Agreement and for a period of one (1) year following the termination of this Agreement, Consultant agrees to not directly or indirectly solicit any Beautycounter Consultant to (i) join, enroll or affiliate with a competitor; or (ii) terminate or alter the Consultant's business relationship with Beautycounter. In this paragraph, "solicit" is defined to include the direct or indirect, actual or attempted, solicitation, encouragement, recruitment or effort to influence another Consultant to participate in another direct selling business opportunity, even if the Consultant's actions are in response to an inquiry made by another Consultant. In this paragraph "competitor" is defined to include a network marketing, multilevel marketing, party plan or social media company that sells products or services through independent sales representatives.

51

321.   Carlyle and Beautycounter knew this provision was unlawful and unenforceable, particularly because the Policies & Procedures were governed by California law. They stated: "This Agreement, including and procedural or substantive rights in any arbitration, shall be governed by and construed in accordance with the laws of the State of California without giving effect to principles of conflicts of laws."

322.   Carlyle and Beautycounter's unlawful threats of enforcement of an illegal policy caused Plaintiffs significant harm, as they held back from soliciting and recruiting to their new businesses hundreds (or even thousands) of consultants who had a business relationship with Beautycounter.

323.   As a result of their unlawful actions, Carlyle and Beautycounter received significantly more income and profit. By implementing its plan to remove and sideline Beautycounter's most successful Consultants with significant downlines, Carlyle realized (or would have realized) substantial financial benefits at the expense of Plaintiffs and other terminated Consultants because they wrongfully converted their customers and downlines and removed their right to commissions. Beautycounter reassigned Plaintiffs' downlines and customers within the company, allowing it to realize revenues and profits associated with Plaintiffs' businesses, ***without paying commissions owed to Plaintiffs and other Consultants.***

324.   Moreover, Carlyle's and Beautycounter's decisions to suspend and terminate Plaintiffs were in bad faith. Beautycounter's Policies & Procedures were not uniformly enforced. Instead Beautycounter and Carlyle selectively enforced or threatened to enforce the unlawful Non-Solicitation Policy against high-earning consultants as part of Carlyle's

plan to wrongfully convert their customer relationships and wrongfully avoid paying commissions. And Carlyle and Beautycounter did so using false, defamatory and baseless accusations.

## **Successor Liability**

325.    From the outset of this dispute, Carlyle, Beautycounter, and Renfrew have done everything in their power to undermine this and its related legal proceeding.

326.    The first Consultant to send a demand letter to Beautycounter regarding her termination was Plaintiff Shawgo.

327.    In response, Beautycounter insisted that Shawgo comply with its Policies & Procedures by attending a mediation in California prior to bringing a lawsuit.

328.    Shawgo ultimately agreed, but then Beautycounter succeeded in delaying that mediation for six months.

329.    The mediation, which occurred in September 2023, was a complete failure and waste of time.

330.    When Shawgo informed Beautycounter, at mediation, that at least 20 other director level Consultants would likely be bringing suit, Carlyle and Beautycounter— through their shared legal counsel—attempted to abuse the legal processes by suing Shawgo in an arbitration with the American Arbitration Association, one week after the unsuccessful mediation. This suit was intended to stop Shawgo from pursuing this class action intended to assist other similarly situated Consultants.

331.    Their plan did not work. Lawsuits have only snowballed. First, this lawsuit (filed after mediation and after the arbitration was commenced) was amended to include

additional Plaintiffs who sought to represent themselves and other similarly situated Consultants through a class action.

332.   Additionally, Counter Brands, LLC was sued by 16 Consultant-plaintiffs in a related lawsuit pending in Los Angeles County, California (Case No. 24STCV03402). The plaintiffs in that lawsuit are also represented by Plaintiffs' undersigned counsel. Counsel for Counter Brands, LLC in the California lawsuit had been the same as the primary counsel representing all Defendants in this action.

333.   On March 14, 2024, the California Court issued a Temporary Restraining Order forbidding Counter Brands, LLC from enforcing the post-termination provision of the Non-Solicitation Policy and ordering the company to show cause as to why the in-term provision in the Non-Solicitation Policy should be enforced against consultants who are not selling for "competitors."

334.   A hearing on the Order to Show Cause was set for April 16, 2024.

335.   Shortly after this hearing date was set, the plaintiffs in the California action filed supplemental briefing supporting an expansion of the proposed injunction, seeking to invalidate the non-solicitation policy in its entirety.

336.   After that brief was filed (one week after the April 16 hearing had been scheduled), counsel for Counter Brands, LLC insisted the hearing had to be moved due to a vague alleged scheduling issue.

337.   The hearing was moved to May 14, 2024.

338.   On April 11, 2024, G2G (d/b/a Beautycounter) was formed as a Delaware corporation.

339.   On April 15, G2G (d/b/a Beautycounter) was registered to do business with the California Secretary of State, listing Renfrew's home address as the company's principal address listed as.

340.   On April 17, Renfrew sent an email to a group of Consultants stating that Beautycounter was terminating their relationships immediately because Beautycounter would be "winding down." Renfrew's email stated, "In connection with a sale, the Company is shutting down its operations and intends to wind-down and dissolve in the near-term." The email stated that Beautycounter would enforce the Non-Solicitation Policy that Beautycounter was and is enjoined from enforcing, stating: "As a reminder, you remain bound by all post-termination obligations under the Brand Advocate Agreement…." These obligations include the unlawful non-solicitation restriction that Counter Brands, LLC was and is enjoined from enforcing.

341.   All or most of the Consultants who were terminated have a connection to the Plaintiffs in this lawsuit or the California lawsuit, either socially or through the plaintiffs' current or former Beautycounter teams.

342.   It appears that Consultants were selected for termination in retaliation for this lawsuit and the California lawsuit—as a means of harming key contacts and business relations of the Plaintiffs in this lawsuit and the California lawsuit.

343.   The next day, April 18, other Beautycounter Consultants received a different email from Renfrew, informing them that "Over recent months, the Company faced significant challenges that required it to explore various options as potential ways to

proceed as a business. These options did not come to fruition and, as a result, Counter Brands LLC will be winding down."

344.    This email simultaneously announced that a new entity— G2G (d/b/a Beautycounter)—had been created and would continue Beautycounter's business, after a brief (14-day) interruption.

345.    The email further stated, "Practically speaking for you all, a wind-down of Counter Brands means that your old Consultant Agreement (Counter Brands, LLC) will automatically transition to the new company, G2G."

346.    The email included a notice (effective immediately) that Section 3G of the Policies and Procedures (the non-solicitation policy) was deleted and Section 12 of the Consultant Agreement was amended to substantially modify the terms of the former non-solicitation restriction, to partially conform to the ruling on the TRO.

347.    On or about April 18, Carlyle issued a statement: "With the backdrop of significant near-term capital needs, we determined that exiting the business through a sale back to Gregg was in the best interest of all parties and ensured business continuity. We look forward to following Beautycounter's next chapter and wish every success to Gregg and her team."

348.    In or about April 2024, Carlyle released its ownership of Counter Brands, LLC on unknown and undisclosed terms.

349.    In or about April 2024, Counter Brands, LLC transferred all or substantially all of its assets to G2G (d/b/a Beautycounter) and Renfrew, either directly or indirectly.

350.   The result, as represented by Counter Brands, LLC, is that it is insolvent and lacks funds even to pay its lawyers, let alone to operate any substantial business.

351.   G2G (d/b/a Beautycounter) (the successor to Beautycounter) is owned by Renfrew and other investors and led by Renfrew as the CEO.

352.   G2G (d/b/a Beautycounter) is a mere continuation of Beautycounter.

353.   Renfrew and Beautycounter repeatedly represented that the Beautycounter brand, its products, its business channels (multi-level marketing, online sales, and in-store sales), its sales team structure, its compensation plan, and its mission would continue and remain the same as Beautycounter was operated by Carlyle.

354.   As a top leader of Beautycounter announced in a video to her team, they had nothing to worry about, Beautycounter's business would be continued by G2G (d/b/a Beautycounter) and "everything" would be the same. She explained that the only reason for the "new LLC" was that the lawyers were being "very conservative."

355.   Another top leader of Beautycounter was recorded declaring that everything would be the same under G2G (d/b/a Beautycounter)—the teams, the formulas, the products, the business model, the website, the intellectual property, etc. She declared that the only reason the company needed a "new LLC" was to protect Renfrew.

356.   Another Beautycounter leader sent her team of Consultants the following explanation:

> Why We Need This Pause: This complex transaction involving vendor contracts, employment agreements, and leases. We had real estate offices and stores, and everything had to be acquired under new LLC [sic]. All employees from Counter Brands HQ were terminated but will be rehired by the new company. **This**

**reorganization is necessary to offload debt and shift ownership and contracts within the legal structure to aid Gregg in moving the company forward**. Please ignore rumors and social media trashing; they are toxic and often misleading. **Rely only on information from me and HQ**.

(emphasis added.)

357.    There are numerous other examples of videos, social media posts, and emails in which representatives of Beautycounter and G2G (d/b/a Beautycounter) relayed similar messages that they had received from Renfrew and Beautycounter's corporate leadership.

## **Fraudulent Transfer**

358.    Beautycounter and many of its Managing Directors have revealed that the transition from Beautycounter to its successor, G2G (d/b/a Beautycounter) was unexpected and hurried.

359.    Indeed, it was unexpected for everyone. Carlyle had not planned to discard Beautycounter and its employees and Consultants before this action and the related California lawsuit were filed.

360.    Renfrew had not planned to create G2G (d/b/a Beautycounter) before Beautycounter was enjoined by the Court in the California lawsuit.

361.    The first mention to any of the Plaintiffs or their representatives that Beautycounter's would or might be dissolved was 20 minutes after the TRO hearing in the California lawsuit in which Beautycounter was enjoined and ordered to show cause. Beautycounter's counsel from Latham & Watkins (who also represents Carlyle in this action) informed Plaintiffs' counsel that if Plaintiffs did not relent, there could be a "bankruptcy."

362.    No plaintiffs relented. The California plaintiffs pressed forward with a preliminary injunction motion in California state court, which was subsequently granted.

363.    Attempting to avoid liability and the need to defend this action and the related California lawsuit, Defendants concocted a scheme to attempt to avoid this Court's jurisdiction and their liability for harming Plaintiffs and other Consultants.

364.    Upon information and belief, the dissolution of Beautycounter and the transfer of assets from Beautycounter to its successor, G2G (d/b/a Beautycounter), was planned by Carlyle, Beautycounter, and Renfrew in an attempt to avoid liability for their wrongdoing and harm to the California plaintiffs, Plaintiffs in this action, and other similarly situated Consultants who are members of the putative class in this action.

365.    Defendants' unlawful scheme is evident from the fact that ***the day after the sale from Carlyle back to Renfrew was announced***, and within hours of meeting with Renfrew, top-level consultants (Managing Directors) began proudly announcing that the lawsuits would be "going away" as a result of Defendants' maneuvers and transaction.

366.    Renfrew and Managing Directors informed Consultants that Plaintiffs would have "no remedy" because there would be "no assets" to collect as a result of Carlyle's and other Defendants fraudulent transfers.

367.    On or about April 19, the day after the announcement of Carlyle's sale or transfer of Beautycounter or its assets to GTG, a Beautycounter Managing Director sent a text to at least twenty other director-level Beautycounter Consultants, stating: "I'm pretty sure [the Plaintiffs in the Lawsuits] are about to find out some bad news: the company they're suing no longer exists. They haven't seemed to do that math yet."

368.   The same day, another Beautycounter Managing Director implied that the transition from Beautycounter to its successor G2G (d/b/a Beautycounter) was because of this lawsuit, stating: "I would be more OK if you, [Jenny Shawgo] didn't [sue] my company you greedy, manipulative bitch."

369.   Defendants' unlawful scheme includes interference with legitimate discovery served in the California lawsuit. According to the testimony of a current Beautycounter Managing Director, outside counsel for "Carlyle or Beautycounter" met with Managing Directors, including several who live in Minnesota and who had received subpoenas in the California action. Beautycounter's General Counsel, Jennifer Doyle, also attended those meetings.

370.   According to this Managing Director, outside counsel (believed to be Latham & Watkins) advised Beautycounter Managing Directors how to avoid producing documents in response to the subpoenas. Counsel advised Managing Directors that they could state that they "didn't have" any documents responsive to the subpoenas even though counsel and the other call participants knew this was false and that all of the Managing Directors had documents responsive to the detailed subpoena requests.

371.   These Managing Directors were also told by counsel that they need not respond to the subpoenas because Carlyle and other Defendants transactions meant that the lawsuits were "going away."

372.   The same Minnesota Managing Director relied on counsel's "suggestion" to inform Plaintiffs' counsel in response to her subpoena: "I am not in possession of any of the information you requested I provide. As you know, the defendant in the case, Counter

Brands LLC, no longer exists, so it is likely unproductive for you to pursue a ruling in the matter as no assets are there to be awarded and only debt remains."

373.    After the same Managing Director later retained her own counsel who apparently advised her more appropriately as to her legal obligations, she produced **hundreds of communications** responsive to the subpoena – despite initially following "Carlyle or Beautycounter's" counsel's suggestion to falsely state she had none.

374.    After Plaintiffs repeatedly requested and demanded that Defendants' counsel confirm that Renfrew and Managing Directors are preserving evidence for the litigation, Defendants refused to do so, apparently because they and their counsel deem their efforts to conceal and transfer assets will allow them to undermine and avoid this Court's jurisdiction.

375.    For example, Plaintiffs' counsel sent letters to Defendants' counsel in March 2024 asking for confirmation that Renfrew was preserving cell phone evidence, among other forms of evidence. The letter also asked Defendants' counsel to confirm that the highest-level Managing Directors (who are in frequent direct communication with Renfrew) were aware of the lawsuits and had been instructed by Beautycounter to preserve evidence.

376.    These letters were completely ignored by Defendants' counsel and a deposition in the California action revealed that Beautycounter's highest-level Managing Directors were entirely **unaware** of the lawsuits and **had never been instructed to preserve evidence** until Plaintiffs' counsel served them with subpoenas in the California action in April 2024.

377.   Upon information and belief, Defendants have intentionally spoliated and refused to preserve evidence for months due to the false announcements by Defendants and their counsel that the lawsuits would be "going away."

378.   Upon information and belief, Defendants and their counsel failed to take adequate steps to preserve text messages, audio messages, and other evidence on Renfrew's and other Beautycounter leaders' cell phones.

379.   Beautycounter has avoided responding to discovery in the California action and has refused to even answer the California Complaint when its counsel (Defendants' counsel) moved to withdraw from the case on the same day that Beautycounter was required to answer the complaint, and just before its discovery responses were due.

380.   Rather than wait to withdraw until the purported assignment for benefit of creditors (ABC) was complete Beautycounter instructed its counsel to immediately withdraw from both lawsuits—***apparently because Carlyle, G2G (d/b/a Beautycounter), and Renfrew hope to avoid this Court's jurisdiction and their obligation to provide any evidence to Plaintiffs***.

381.   To date, Renfrew and G2G (d/b/a Beautycounter) have refused to substantively respond to lawfully served subpoenas in the California lawsuit.

382.   Renfrew and G2G (d/b/a Beautycounter)'s counsel, who had been Beautycounter's counsel and who is Carlyle's counsel, refused to substantively respond to subpoenas in the California lawsuit, suggested that Renfrew and G2G (d/b/a Beautycounter) should not have to respond to the lawful subpoenas due to Beautycounter's default and that they were serving the objections "out of an abundance of caution."

383. Defendants' actions were intended to undermine and thwart this legal proceeding and the exercise of this Court's jurisdiction.

384. Their actions reveals that the transfer of assets from Beautycounter to its successor, G2G (d/b/a Beautycounter) is fraudulent and is an unlawful attempt to hide assets and escape liability for Beautycounter and Defendants' unlawful acts and to avoid its debts and liabilities, including from this lawsuit.

385. Renfrew and Carlyle have unlawfully stripped Beautycounter of its assets and transferred them to G2G (d/b/a Beautycounter) without a proper purpose and intending to prevent Plaintiffs from collecting a judgment in this action and the related California lawsuit.

386. Although Beautycounter has represented that the transfer will take the form of an "assignment for the benefit of creditors," it has given no indication that the assignment will allow Plaintiffs to have any recourse for recovering the debts that Beautycounter and the Defendants in this action owe them.

387. As a result of the transfer, Beautycounter is unable to pay Plaintiffs' or the class claims in this case.

388. Additional facts support multiple theories of successor liability:

a. Upon information and belief, there was a lack of adequate consideration for the acquisition of Beautycounter I's assets to be made available to unsecured creditors. Adequate consideration would have left Beautycounter with at least enough funds to pay its lawyers in this action.

b. If Beautycounter was paid any consideration for its transfer of assets to G2G (d/b/a Beautycounter), Beautycounter has represented that none of it will be available to satisfy any judgment in this case.

c.    In addition, one or more persons were officers, directors or shareholders of both Beautycounter and G2G (d/b/a Beautycounter).

d.    Renfrew, in particular, was a significant shareholder in Beautycounter and is a significant shareholder in G2G (d/b/a Beautycounter).

e.    The CEO of Beautycounter and G2G (d/b/a Beautycounter) is the same person – Renfrew.

f.    Upon information and belief, other officers of Beautycounter are the same as officers of G2G (d/b/a Beautycounter).

g.    Beautycounter's headquarters remain the same.

h.    Beautycounter's public website address remains the same.

i.    G2G (d/b/a Beautycounter) continues to sell the same products in Ulta stores, simply stepping into the shoes of Beautycounter.

j.    Upon information and belief, a substantial number, if not all, of G2G (d/b/a Beautycounter)'s employees are the same as Beautycounter's employees.

k.    Upon information and belief, G2G (d/b/a Beautycounter) is, or is planning to, sell substantially the same products to substantially the same customer base as Beautycounter.

l.    Renfrew and G2G (d/b/a Beautycounter) have repeatedly represented, and/or are planning to comprehensively represent, to Beautycounter employees, consultants, customers, investors, and other stakeholders, that G2G (d/b/a Beautycounter) has succeeded to and replaced Beautycounter.

m.    G2G (d/b/a Beautycounter) has expressly assumed many of the purported contractual obligations and rights of Beautycounter, including most consultant agreements that Beautycounter purported to have. But, upon information and belief, G2G (d/b/a Beautycounter) purports *not* to have assumed Beautycounter's liabilities to Plaintiffs or class members.

## CLASS ACTION ALLEGATIONS

389. All Plaintiffs bring this action individually and as a class action pursuant to Minnesota Rule of Civil Procedure 23 on behalf of themselves and all others similarly situated. Plaintiffs hereby request that this Court certify this matter as a class action with the below subclasses as the Court deems appropriate, defined as follows:

- **Commission Subclass**: All Senior Director, Executive Director and Managing Director level Consultants who were subject to Beautycounter's cut in their commissions as announced by Beautycounter on April 20-22, 2022, regardless of when such pay cut went into effect for that Consultant;

- **Non-Solicitation Subclass**: All Consultants and former Consultants who were terminated, suspended, or otherwise disciplined or threatened with enforcement of Beautycounter's Non-Solicitation Policy, beginning April 1, 2022, and continuing through the present.

390. The requirements of Minn. R. Civ. P. 23 are satisfied as follows:

a. Upon information and belief, the above-described conduct by Defendants took place within the class period as described above pursuant to uniform company policies and practices and resulted in similar harm to Consultants besides Shawgo, Bjornlie, Dawley, and Pike.

b. Upon information and belief, the persons included in each above subclass are sufficiently numerous to make joinder impracticable and to support class certification.

c.    Plaintiffs' claims are typical of both subclasses in that they and all class members experienced similar tortious and other unlawful conduct and statutory violations by Defendants or persons acting on Defendants' behalf, discretion, or control.

d.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the class and have retained counsel competent and able to perform the duties of litigation.

391.    A class action is superior to other available methods for the fair and efficient adjudication of Defendants' practices because joinder of all members is impractical as a result of numerosity. Prosecution of separate actions by individual class members would create an inherent risk of inconsistent and varying adjudications, with the concomitant risk of the establishment of incompatible and conflicting standards of conduct for Defendants. In addition, due to the unequal power of Plaintiffs versus Defendants, a class action may be the only way, as a practical matter, that their claims will be adjudicated. Plaintiffs foresee no difficulty managing this matter as a class action.

392.    Common questions of law and fact exist as to all members of the subclasses. Among the questions of law and fact common to the class are:

a.    Whether Beautycounter and Carlyle's unilateral compensation change was lawful under California or Minnesota law;

b.    Whether Beautycounter's Non-Solicitation policies violates California law;

c.      Whether Beautycounter and Carlyle's enforcement of the Non-Solicitation Policy through termination, suspension, or threats of the same, was lawful under California or Minnesota law;

d.      Whether Plaintiffs and class members are entitled to equitable or declaratory relief and the appropriate nature of such equitable relief.

393.   Defendants have acted on grounds that apply generally to the proposed class, including, *inter alia*, terminating high ranking consultants for the purpose of taking present and future economic advantage of their personal businesses.

## COUNT I
**Tortious Interference with Prospective Economic Advantage (California Law)**
(By all Plaintiffs and all Class Members)
(Against all Defendants)

394.   Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

395.   Plaintiffs and their customers were in an economic relationship that would have resulted in an economic benefit to Plaintiffs.

396.   Plaintiffs and each of the Consultants in their downlines were in an economic relationship that would have resulted in an economic benefit to Plaintiffs.

397.   Defendants knew of Plaintiffs' relationships with their customers and downlines, including the specific financial value of those relationships to Plaintiffs.

398.   Defendants engaged in wrongful conduct by suspending or terminating Plaintiffs for alleged violations of a non-solicitation provision that is invalid under Cal. Bus. & Prof. Code § 16600.

399.   Defendants engaged in wrongful conduct in the form of unfair business practices in violation of Cal. Bus. & Prof. Code § 17200 by terminating Plaintiffs or inducing their resignation to avoid paying commissions owed them. Defendants' unfair business practices deprived Plaintiffs of the benefits of competitive compensation in violation of the underlying policy and spirit of antitrust laws, and otherwise significantly threatened or harmed competition, when they substantially cut Plaintiffs' compensation, suspended Plaintiffs for seeking to supplement their income by joining a different direct-sales company, and then subsequently terminated them or forced their resignation.

400.   Defendants engaged in wrongful conduct because the Agreement upon which they attempt to rely is substantively and procedurally unconscionable with respect to Beautycounter's unilateral right to change the terms of the business relationship at any time.

401.   By engaging in this conduct, Defendants intended to disrupt Plaintiffs' relationships with their customers and downline consultants and/or knew that disruption of those relationships was certain or substantially certain to occur as a result.

402.   The nature of Plaintiffs' business is such that Plaintiffs received recurring sales from their customer base; Plaintiffs reasonably expected each of the customers who bought from them in the last 12 months would continue purchasing a similar (or greater) volume in the future.

403.   Plaintiffs' relationships with their customers were disrupted when Beautycounter suspended their individual web pages and redirected customers to Beautycounter's website when those customers attempted to purchase from Plaintiffs.

404.   Plaintiffs' relationships with their customers were further disrupted when Beautycounter terminated Plaintiffs or forced their resignation and forced customers who wanted to purchase products from Plaintiffs to instead purchase directly from Beautycounter or purchase from another Consultant.

405.   Plaintiffs' relationships with their downline Consultants were disrupted because, as a direct result of being suspended, locked out, and eventually terminated, Plaintiffs' economic relationships with their downlines were severed, in effect causing Plaintiffs to lose their business overnight.

406.   Plaintiffs were harmed because they were deprived of commissions from their own customers' purchases and their downlines' sales. Plaintiffs had already earned the commissions they were deprived of by recruiting the Consultants in their downlines.

407.   Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

408.   As a result of Defendants' conduct, Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial. Plaintiff Bjornlie was damaged in an amount in excess of $2.15 million (representing lost compensation only). Plaintiff Dawley was damaged in an amount in excess of $2.03 million (representing lost compensation only). Plaintiff Pike was damaged in an amount in excess of $505,000 (representing lost compensation only). Plaintiff Shawgo was damaged in an amount in excess of $2.5 million (representing lost compensation only).

## COUNT II
**Tortious Interference with Prospective Economic Advantage (Minnesota Law)**
(By all Plaintiffs and any Minnesota Class Members)

(Against all Defendants)

409.   Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

410.   Plaintiffs had a reasonable expectation of economic advantage from their customers' purchases and from the sales generated by Consultants in their downlines.

411.   Defendants knew of Plaintiffs' relationships with their customers and downlines, including the specific financial value of those relationships to Plaintiffs.

412.   Defendants engaged in wrongful conduct by suspending and terminating Plaintiffs to avoid paying commissions in violation of Minnesota Statutes section 181.145.

413.   Defendants engaged in wrongful conduct by terminating and suspending Plaintiffs to usurp the relationships they had spent nearly a decade building with their customers and downline, thereby getting the benefit of Plaintiffs' years of hard work without having to pay Plaintiffs and without having to put effort into developing, establishing, or maintaining customer and downline relationships.

414.   Defendants engaged in wrongful conduct because the Agreement upon which they attempt to rely for Plaintiffs' suspension and termination is substantively and procedurally unconscionable with respect to Beautycounter's unilateral right to change the terms of the business relationship at any time.

415.   Defendants engaged in wrongful conduct by implementing a unilateral and material change to the terms of Plaintiffs' compensation.

416.    In the absence of Defendants' wrongful acts, it is reasonably probable that Plaintiffs would have realized an economic advantage—namely, commissions—from their customers' purchases and their downlines' sales.

417.    Indeed, Plaintiffs had already earned the commissions they were deprived of by recruiting the Consultants in their downlines.

418.    As a result of Defendants' conduct, Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial. Plaintiff Bjornlie was damaged in an amount in excess of $2.15 million (representing lost compensation only). Plaintiff Dawley was damaged in an amount in excess of $2.03 million (representing lost compensation only). Plaintiff Pike was damaged in an amount in excess of $505,000 (representing lost compensation only). Plaintiff Shawgo was damaged in an amount in excess of $2.5 million (representing lost compensation only).

## COUNT III
### Breach of Implied Covenant of Good Faith and Fair Dealing (California Law)
(By all Plaintiffs and Class Members)
(Against all Defendants)

419.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

420.    Plaintiffs and Beautycounter had an implied contract established by the parties' course of conduct, pursuant to which Plaintiffs would sell Beautycounter's products and recruit Consultants to sell Beautycounter's products. In return, Beautycounter would pay Plaintiffs commissions for their product sales and sales made by Consultants in their downlines.

421.   Under this implied contract, Plaintiffs were permitted to engage in other direct-sales opportunities.

422.   Plaintiffs agreed to the terms of their compensation and the time of their enrollment as Consultants, and consistent with the parties' practice, any changes to such terms were to be communicated well in advance of implementation. Plaintiffs had the opportunity to ask questions and object to the impact of such changes on their business.

423.   Also consistent with Beautycounter's mission of "Truth and Transparency," Plaintiffs understood that, in the event of account suspension or involuntary termination, a fair and transparent investigation would occur in which Plaintiffs would be able to view any evidence supporting Beautycounter's decision to suspend them and provide Plaintiffs an opportunity to be heard.

424.   During the entirety of their relationship with Beautycounter, Plaintiffs performed under the contract by selling Beautycounter's products and recruiting Consultants to sell Beautycounter's products.

425.   As such, all conditions required for Beautycounter's performance had occurred.

426.   Beautycounter and Carlyle instead unilaterally implemented substantial compensation reductions with little notice and no meaningful opportunity for Plaintiffs to ask questions or voice concerns.

427.   Beautycounter implemented these compensation reductions at the direction of Carlyle and after Renfrew and Carlyle agreed on the plan to implement the compensation cuts, in part to justify a $1 billion valuation.

428.   Beautycounter suspended Plaintiffs' accounts and refused to provide updates on the investigation of purported wrongdoing despite Plaintiffs' requests, preventing Plaintiffs from managing their teams or making sales during the suspension.

429.   Beautycounter terminated Shawgo and Bjornlie for engaging in another direct-sales opportunity even though they were permitted to do so.

430.   Upon information and belief, Beautycounter's suspension and termination of Plaintiffs for reasons inconsistent with the prior course of conduct that created an implied contract between the Plaintiffs and Beautycounter occurred at the direction of Carlyle.

431.   In doing so, Defendants did not act fairly or in good faith, in part because the Agreement upon which they attempt to rely for their suspension and termination of Plaintiffs is substantively and procedurally unconscionable with respect to Beautycounter's unilateral right to change the terms of the business relationship at any time.

432.   Plaintiffs were harmed by Defendants' conduct by losing out on commissions from their customers' purchases and their downline consultants' purchases during the suspension, the ability to recruit new consultants to grow their businesses during the suspension, and from being deprived of the future commissions they would have continued to earn but for Defendants' conduct.

433.   As a result of Defendants' conduct, Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial. Plaintiff Bjornlie was damaged in an amount in excess of $2.15 million (representing lost compensation only). Plaintiff Dawley was damaged in an amount in excess of $2.03 million (representing lost compensation only). Plaintiff Pike was damaged in an amount in excess

of $505,000 (representing lost compensation only). Plaintiff Shawgo was damaged in an amount in excess of $2.5 million (representing lost compensation only).

**COUNT IV**

**Breach of Implied Covenant of Good Faith and Fair Dealing (Minnesota Law)**
(By all Plaintiffs and Minnesota Class Members)
(Against all Defendants)

434.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

435.    Plaintiffs and Beautycounter had an implied contract established by the parties' course of conduct, pursuant to which Plaintiffs would sell Beautycounter's products and recruit Consultants to sell Beautycounter's products. In return, Beautycounter would pay Plaintiffs commissions for their product sales and sales made by Consultants in their downlines.

436.    Under this implied contract, Plaintiffs were explicitly permitted to engage in other direct-sales opportunities.

437.    Beautycounter would set the terms of Plaintiffs' compensation, and consistent with the parties' practice, any changes to such terms would be communicated well in advance of implementation. Plaintiffs would have the opportunity to ask questions and voice concerns about the impact of such changes on their business.

438.    Also consistent with Beautycounter's mission of "Truth and Transparency," Plaintiffs understood that, in the event of account suspension or involuntary termination, a fair and transparent investigation would occur in which Plaintiffs would be able to view

any evidence supporting Beautycounter's decision to suspend them and provide Plaintiffs an opportunity to tell their side of the story.

439.   During the entirety of their relationship with Beautycounter, Plaintiffs performed under the contract by selling Beautycounter's products and recruiting Consultants to sell Beautycounter's products.

440.   As such, all conditions required for Beautycounter's performance had occurred.

441.   Beautycounter and Carlyle instead unilaterally implemented substantial compensation reductions with little notice and no meaningful opportunity for Plaintiffs to ask questions or voice concerns.

442.   Beautycounter implemented these compensation reductions at the direction of Carlyle and after Renfrew and Carlyle agreed on the plan to implement the compensation cuts.

443.   Beautycounter suspended Plaintiffs' accounts and refused to provide updates on the investigation of purported wrongdoing despite Plaintiffs' requests, preventing Plaintiffs from managing their teams or making sales during the suspension.

444.   Beautycounter terminated Shawgo and Bjornlie for engaging in another direct-sales opportunity even though they were permitted to do so.

445.   In doing so, Beautycounter unjustifiably hindered and frustrated Plaintiff's performance of the implied contract with Beautycounter.

446.   Beautycounter's suspension and termination of Plaintiffs for reasons inconsistent with the prior course of conduct that created an implied contract between the Plaintiffs and Beautycounter occurred at the direction of Carlyle.

447.   In doing so, Defendants did not act fairly or in good faith, in part because the Agreement upon which they attempt to rely for their suspension and termination of Plaintiffs is substantively and procedurally unconscionable with respect to Beautycounter I's unilateral right to change the terms of the business relationship at any time.

448.   Plaintiffs were harmed by Defendants' conduct by losing out on commissions from their customers' purchases and their downline Consultants' purchases during the suspension, the ability to recruit new Consultants to grow their businesses during the suspension, and from being deprived of the future commissions they would have continued to earn but for Defendants' conduct.

449.   As a result of Defendants' conduct, Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial. Plaintiff Bjornlie was damaged in an amount in excess of $2.15 million (representing lost compensation only). Plaintiff Dawley was damaged in an amount in excess of $2.03 million (representing lost compensation only). Plaintiff Pike was damaged in an amount in excess of $505,000 (representing lost compensation only). Plaintiff Shawgo was damaged in an amount in excess of $2.5 million (representing lost compensation only).

## COUNT V
**Unfair Business Practices in Violation of Cal. Bus. & Prof. Code § 17200**
(By all Plaintiffs and Class Members)
(Against all Defendants)

450.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

451.    California Business & Professions Code Section 17200 prohibits any unlawful, unfair, or fraudulent business act or practice.

452.    A business practice is unfair if it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 973 P.2d 527 (1999).

453.    Defendants' unilateral and significant change to the commissions structure Plaintiffs relied on was an unlawful and unfair business practice under § 17200 because, *inter alia*, it violated the implied-in-fact contract between each Plaintiff and Beautycounter.

454.    Defendants' use of an unlawful non-solicitation provision in violation of Cal. Bus. & Prof. Code § 16600 to discipline and terminate Plaintiffs or threaten to do the same was an unlawful and fraudulent business practice in violation of § 17200. *See Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564, 575 (2009).

455.    Defendants' use of an unlawful non-solicitation provision in violation of Cal. Bus. & Prof. Code § 16600 to hinder Plaintiffs' ability to join another MLM and bring their

teams to another MLM following their terminations from Beautycounter was an unlawful and fraudulent business practice in violation of § 17200.

456. These unlawful, unfair, and fraudulent business practices allowed Defendants to acquire by means of unfair competition commissions otherwise belonging to Plaintiffs.

457. As a result of Defendants' conduct, Plaintiffs are entitled to restitution and damages in excess of $50,000, the specific amount to be determined at trial. Plaintiff Bjornlie was damaged in an amount in excess of $2.15 million (representing lost compensation only). Plaintiff Dawley was damaged in an amount in excess of $2.03 million (representing lost compensation only). Plaintiff Pike was damaged in an amount in excess of $505,000 (representing lost compensation only). Plaintiff Shawgo was damaged in an amount in excess of $2.5 million (representing lost compensation only).

<u>COUNT VI</u>
**Promissory Estoppel (California Law)**
(By all Plaintiffs and Class Members)
(Against all Defendants)

458. Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

459. When they joined Beautycounter, Beautycounter represented to Plaintiffs that they could work for other direct-sales companies while also working in partnership with Beautycounter.

460.   Renfrew herself made this representation to Plaintiffs on multiple occasions, and she and Beautycounter publicly promoted other beauty and skin care brands, including on Renfrew's personal social media page.

461.   When Carlyle acquired a majority interest in Beautycounter, Carlyle, Renfrew and Beautycounter represented to Plaintiffs that the Consultants' relationship with Beautycounter would be enhanced by the partnership with Carlyle, that all day-to-day business terms would remain the same, and that Consultants would be financially enriched by the partnership with Carlyle.

462.   Defendants' promises did induce such action or forbearance by the Plaintiffs because, relying on Beautycounter and Renfrew's promise that they could work for other direct-sales companies while continuing to work for Beautycounter, Plaintiffs joined Green Compass to supplement the compensation cuts Beautycounter implemented at Carlyle's direction—in 2022.

463.   Plaintiffs relied on Beautycounter and Renfrew's promise to their detriment because Beautycounter terminated Plaintiffs for conduct—working for another direct-sales company—that Beautycounter and Renfrew previously represented was permissible, and which Beautycounter had in fact allowed other Consultants to engage in until Carlyle directed Beautycounter to use previously permissible conduct as an excuse to terminate high-earning Consultants for its own gain and at Plaintiffs' expense.

464.   Plaintiffs also relied on Beautycounter, Renfrew and Carlyle's promises with respect to the partnership with Carlyle to their detriment by remaining in partnership with Beautycounter, rather than moving their downlines and customers to another cosmetic/skin

care company after the Carlyle acquisition. Plaintiffs remained in partnership with Beautycounter after the Carlyle acquisition because they relied on the promises and representations by Beautycounter, Renfrew, and Carlyle with respect to the benefits of that partnership to the Consultants.

465.    Injustice can be avoided only by enforcing the promises made by Defendants.

466.    As a result of Defendants' conduct, Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial. Plaintiff Bjornlie was damaged in an amount in excess of $2.15 million (representing lost compensation only). Plaintiff Dawley was damaged in an amount in excess of $2.03 million (representing lost compensation only). Plaintiff Pike was damaged in an amount in excess of $505,000 (representing lost compensation only). Plaintiff Shawgo was damaged in an amount in excess of $2.5 million (representing lost compensation only).

## COUNT VII
### Unjust Enrichment (California Law)
(By all Plaintiffs and Class Members)
(Against all Defendants)

467.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

468.    Defendants received a benefit in the form of commissions from purchases made by Plaintiffs' customers and commissions from sales made by Consultants in Plaintiffs' downlines during Plaintiffs' suspension and after their termination.

469.    Defendants retained these proceeds and commissions by not paying Plaintiffs.

470.    Defendants' retention of these proceeds and commissions was unjust because the basis for suspending Plaintiffs and withholding the proceeds and commissions and terminating Plaintiffs—i.e., Plaintiffs' work for another direct sales company—was grounded in a policy to which Plaintiffs never agreed, which Beautycounter was not enforcing with respect to other Consultants, and which was part of a larger scheme by Beautycounter—operating at the direction of Carlyle—to terminate high-earning Consultants and reap the benefits of the businesses Plaintiffs' spent years building.

471.    Defendants retained proceeds and commissions from Plaintiffs' customers and downline Consultants at Plaintiffs' expense because Plaintiffs' suspension and subsequent termination prevented them from collecting the fruits of their labor.

472.    As a result of Defendants' conduct, Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial. Plaintiff Bjornlie was damaged in an amount in excess of $2.15 million (representing lost compensation only). Plaintiff Dawley was damaged in an amount in excess of $2.03 million (representing lost compensation only). Plaintiff Pike was damaged in an amount in excess of $505,000 (representing lost compensation only). Plaintiff Shawgo was damaged in an amount in excess of $2.5 million (representing lost compensation only).

## COUNT VIII
### Unjust Enrichment (Minnesota law)
(By all Plaintiffs and Minnesota Class Members)
(Against all Defendants)

473.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

474.   Defendants received a benefit in the form of commissions from purchases made by Plaintiffs' customers and commissions from sales made by Consultants in Plaintiffs' downlines during Plaintiffs' suspension and after their termination.

475.   Defendants retained these proceeds and commissions by not paying Plaintiffs.

476.   Defendants' retention of these proceeds and commissions was unjust because the basis for suspending Plaintiffs and withholding the proceeds and commissions and terminating Plaintiffs—i.e., Plaintiffs' work for another network marketing company—was grounded in a policy to which Plaintiffs never agreed, which Beautycounter was not enforcing with respect to other Consultants, and which was part of a larger scheme by Beautycounter, operating at the direction of Carlyle, to terminate high-earning Consultants and reap the benefits of the businesses Plaintiffs' spent years building.

477.   Defendants retained proceeds and commissions from Plaintiffs' customers and downline Consultants at Plaintiffs' expense because Plaintiffs' suspension and subsequent termination prevented them from collecting the fruits of their labor.

478.   In doing so, Defendants knowingly received or obtained something of value—commissions and the good will Plaintiffs established with their customers and downline consultants—for which the Defendants in equity and good conscience should pay.

479.   As a result of Defendants' conduct, Plaintiffs each individually suffered damages in excess of $50,000, the specific amount to be determined at trial. Plaintiff Bjornlie was damaged in an amount in excess of $2.15 million (representing lost

compensation only). Plaintiff Dawley was damaged in an amount in excess of $2.03 million (representing lost compensation only). Plaintiff Pike was damaged in an amount in excess of $505,000 (representing lost compensation only). Plaintiff Shawgo was damaged in an amount in excess of $2.5 million (representing lost compensation only).

## COUNT IX
### Fraudulent Misrepresentation (California Law)
(By Plaintiffs and the Non-Solicitation Subclass)
(Against all Defendants)

480.   Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

481.   The Non-Solicitation Policy is void and unenforceable under Cal. Bus. And Prof. Code § 16600.

482.   Defendants knew the Non-Solicitation Policy was void and unenforceable.

483.   Defendants misrepresented the validity and enforceability of the Non-Solicitation Policy to Consultants by including it in its Policies and Procedures and form Consultant Agreements.

484.   Defendants misrepresented the validity and enforceability of the Non-Solicitation Policy when Beautycounter leaders discussed the policy with Dawley and Shawgo and threatened them with enforcement.

485.   Defendants misrepresented the validity and enforceability of the Non-Solicitation Policy when Beautycounter threatened to discipline Plaintiffs for an alleged violation of the policy.

486.   Defendants misrepresented the validity and enforceability of the Non-Solicitation Policy when Beautycounter suspended Plaintiffs, both by its actions and its written communications to Plaintiffs.

487.   Defendants misrepresented the validity and enforceability of the Non-Solicitation Policy when and after Beautycounter terminated Plaintiffs, both by its actions and its written communications to Plaintiffs.

488.   Defendants intended its actions and communications to induce Plaintiffs' reliance on its misrepresentations that the Non-Solicitation Policy was enforceable.

489.   Plaintiffs relied on Defendants' misrepresentation that the Non-Solicitation Policy was valid and enforceable when Plaintiffs relinquished their Beautycounter businesses.

490.   Plaintiffs' reliance on Defendants' misrepresentation was a substantial factor in causing them harm through the loss of their Beautycounter businesses.

491.   Plaintiffs were justified in relying on Beautycounter I's misrepresentations about its non-solicitation policy because, *inter alia*, Beautycounter was a sophisticated company with counsel advising it.

492.   Defendants also made numerous false statements to Plaintiffs regarding Carlyle's acquisition, assuring Consultants that their businesses would not be negatively affected, including that the sale "doesn't change anything in terms of your day-to-day" and that "Gregg will remain as Founder and CEO, and is as committed to the brand and its future as ever before."

493.    Defendants knew these statements were false at the time they were made, because Carlyle, Beautycounter I, and Renfrew were planning significant compensation cuts and were planning Renfrew's departure from the CEO role.

494.    These statements were meant to induce reliance by Consultants, including Plaintiffs, and prevent them from terminating their consultantships with Beautycounter.

495.    These statements did in fact induce reliance by Plaintiffs, who chose to remain as Beautycounter consultants after the sale. Plaintiffs were justified in this reliance because they had no reason to believe Defendants would mislead them and because it was feasible that their businesses and compensation would remain the same.

496.    By remaining with Beautycounter instead of starting businesses elsewhere, Plaintiffs were harmed by the sudden and severe compensation cuts, enforcement of the non-solicitation policy against them, and by continuing to build their Beautycounter businesses by recruiting to Beautycounter instead of building teams and clients at other companies that would not have subjected them to the harms herein alleged.

497.    Plaintiffs were damaged by this reliance in an amount to be proven at trial, with damages exceeding $50,000. Plaintiff Bjornlie was damaged in an amount in excess of $2.15 million (representing lost compensation only). Plaintiff Dawley was damaged in an amount in excess of $2.03 million (representing lost compensation only). Plaintiff Pike was damaged in an amount in excess of $505,000 (representing lost compensation only). Plaintiff Shawgo was damaged in an amount in excess of $2.5 million (representing lost compensation only).

**COUNT X**

### Declaratory Relief (California Law)
(By Plaintiffs and the Non-Solicitation Subclass)
(Against all Defendants)

498.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

499.    In suspending, terminating, and forcing resignation of Plaintiffs, or in threatening to do the same, Defendants relied on a non-solicitation clause (in various forms over time) that Plaintiffs allegedly agreed to abide by.  Under Cal. Bus. & Prof. Code § 16600, by which "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void," the non-solicitation clause is void because it purports to restrain Consultants from engaging in lawful recruitment to and promotion of their non-Beautycounter businesses.

500.    California courts routinely rule that non-solicitation clauses are void under Cal. Bus. & Prof. Code § 16600. *See AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th 923, 936 (2018) (finding void the "broadly worded provision prevent[ing] individual defendants, for a period of at least one year . . ., from either 'directly or indirectly' soliciting or recruiting, or causing others to solicit or induce, any employee of [plaintiff]"); *see also WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 851 (N.D. Cal. 2019), modified in part, No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019), and *Fillpoint, LLC v. Maas*, 208 Cal. App. 4th 1170, 1183 (2012).

501.    Like employees, independent contractors may not be subject to contracts restricting competition in violation of section 16600, including non-solicitation agreements. *Nulife Ventures, Inc. v. Avacen, Inc.*, No. 20-CV-2019-BAS-KSC, 2020 WL

7318122, at *11 (S.D. Cal. Dec. 11, 2020) (finding Cal. Bus. & Prof. Code § 16600 applied to a non-solicitation clause purportedly binding former independent contractors of a multi-level-marketing company); *see also Guardian Life Ins. Co. of Am., Inc. v. Andraos*, No. CV0705732SJOFMOX, 2009 WL 10675264, at *3 (C.D. Cal. Mar. 26, 2009) ("The Court sees no reason why the California Supreme Court's interpretation of [section 16600] would apply differently to employees versus independent contractors."); *see also Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1149–50 (2020) ("section 16600 applies to business contracts," and is not limited to employment contracts).

502.   Because the various forms of the non-solicitation clause on which Beautycounter relied were all void under California law, Beautycounter I's suspension, termination, and forced resignation, and threats of the same, of Plaintiffs for alleged violations of that policy was unlawful.

503.   Based upon the foregoing, a live controversy exists between the parties that warrants declaratory relief pursuant to the California Code of Civil Procedure § 1060.

504.   Plaintiffs request a declaration that Defendants' Non-Solicitation Policy in any form attempted to be enforced against Plaintiffs and the Non-Solicitation Subclass members, violates Cal. Bus. & Prof. Code § 16600.

## COUNT XI
### Declaratory Relief (California Law)
(By All Plaintiffs and All Class Members)
(Against all Defendants)

505.   Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

506.    Based upon the foregoing, a live controversy exists between the parties that warrants declaratory relief pursuant to the California Code of Civil Procedure § 1060.

507.    A declaration that Plaintiffs are not bound by any arbitration provision in any purported agreement with Beautycounter is necessary to effectuate the relief sought.

508.    Plaintiffs' requested declaration serves the interests of justice and equity. Defendants cannot meet their "burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecomm. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017). Even if an arbitration agreement existed, such an agreement is procedurally and substantively unconscionable and therefore unenforceable. *Yeomans v. World Fin. Group Ins. Agency, Inc.*, 485 F. Supp. 3d 1168, 1184–89 (N.D. Cal. 2020), *aff'd sub nom. Yeomans v. World Fin. Group Ins. Agency, LLC.*, No. 20-16937, 2021 WL 5356537 (9th Cir. Nov. 17, 2021) (unpublished) (finding a similar arbitration agreement was unenforceable because it was procedurally and substantively unconscionable).

## COUNT XI
### Fraudulent Inducement
(By All Plaintiffs and All Class Members)
(Against all Defendants)

509.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

510.    Defendants made numerous false statements to Plaintiffs regarding Carlyle's acquisition, assuring Consultants that their businesses would not be negatively affected, including that the sale "doesn't change anything in terms of your day-to-day" and that

"Gregg will remain as Founder and CEO, and is as committed to the brand and its future as ever before."

511.   Defendants knew these statements were false at the time they were made, because Carlyle, Beautycounter I, and Renfrew were planning significant compensation cuts and were planning Renfrew's departure from the CEO role.

512.   These statements were meant to induce reliance by Consultants, including Plaintiffs, and prevent them from terminating their consultantships with Beautycounter.

513.   These statements did in fact induce reliance by Plaintiffs, who chose to remain as Beautycounter consultants after the sale. Plaintiffs were justified in this reliance because they had no reason to believe Defendants would mislead them and because it was feasible that their businesses and compensation would remain the same.

514.   By remaining with Beautycounter instead of starting businesses elsewhere, Plaintiffs were harmed by the sudden and severe compensation cuts, enforcement of the non-solicitation policy against them, and by continuing to build their Beautycounter businesses by recruiting to Beautycounter instead of building teams and clients at other companies that would not have subjected them to the harms herein alleged.

515.   Due to their reliance, Plaintiffs were harmed in an amount exceeding $50,000, to be proven at trial. Plaintiff Bjornlie was damaged in an amount in excess of $2.15 million (representing lost compensation only). Plaintiff Dawley was damaged in an amount in excess of $2.03 million (representing lost compensation only). Plaintiff Pike was damaged in an amount in excess of $505,000 (representing lost compensation only).

Plaintiff Shawgo was damaged in an amount in excess of $2.5 million (representing lost compensation only).

## COUNT XIII
### Constructive Fraudulent Transfer – Cal. Uniform Voidable Transactions Act
(By All Plaintiffs and All Class Members)
(As against All Defendants)

516.    Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

517.    Under the Uniform Voidable Transactions Act, a transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation. Cal. Civ. Code § 3439.05.

518.    Plaintiffs made claims for payment to Counter Brands, LLC and Carlyle before the series of transactions described in this Complaint resulting in Counter Brands, LLC's insolvency and Assignment for the Benefit of Creditors.

519.    Carlyle did not receive a reasonably equivalent value for the transfer of its ownership interest in Counter Brands, LLC.

520.    Counter Brands, LLC did not receive a reasonably equivalent value for the transfer of its assets to G2G (d/b/a Beautycounter) and to Renfrew.

521.    As a result of the transfers, Counter Brands, LLC was left insolvent.

522.   As a result of the transfers, Plaintiffs have been harmed due to Counter Brands, LLC's inability to pay amounts owed for their claims.

523.   Plaintiffs therefore seek the voidance of the transfers, which were constructively fraudulent under the Uniform Voidable Transfer Act.

**COUNT XIV**
**Fraudulent Transfer – Cal. Uniform Voidable Transactions Act**
(By All Plaintiffs and All Class Members)
(As against All Defendants)

524.   Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

525.   Under the Uniform Voidable Transactions Act, a transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud a creditor. Cal. Civ. Code § 3439.04.

526.   Plaintiffs made claims for payment to Counter Brands, LLC and Carlyle before the series of transactions described in this Complaint resulting in Counter Brands, LLC's insolvency and Assignment for the Benefit of Creditors.

527.   The transactions were made by all Defendants with intent to hinder Plaintiffs' recovery for their claims against Counter Brands, LLC, and with the intent to defraud them.

528.   Carlyle did not receive a reasonably equivalent value for the transfer of its ownership interest in Counter Brands, LLC.

529.    Counter Brands, LLC did not receive a reasonably equivalent value for the transfer of its assets to G2G (d/b/a Beautycounter) and to Renfrew.

530.    As a result of the transfers, Counter Brands, LLC was left insolvent.

531.    As a result of the transfers, Plaintiffs have been harmed due to Counter Brands, LLC's inability to pay amounts owed for their claims.

532.    Plaintiffs therefore seek the voidance of the transfers, which were fraudulent under the Uniform Voidable Transfer Act.

### COUNT XV
**Common Law Fraudulent Transfer**
(By All Plaintiffs and All Class Members)
(As against All Defendants)

533.    Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

534.    California law allows common law claims for fraudulent transfer in addition to claims under the Uniform Voidable Transactions Act. "By its terms the UVTA was intended to supplement, not replace, common law principles relating to fraud." *Berger v. Varum*, 248 Cal. Rptr. 3d 51, 55 (Cal. App. 1st 2019).

535.    Plaintiffs made claims for payment to Counter Brands, LLC and Carlyle before the series of transactions described in this Complaint resulting in Counter Brands, LLC's insolvency and Assignment for the Benefit of Creditors.

536.    The transactions were made by all Defendants with the intent to hinder Plaintiffs' recovery for their claims against Counter Brands, LLC, and with the intent to defraud them.

537. Carlyle did not receive a reasonably equivalent value for the transfer of its ownership interest in Counter Brands, LLC.

538. Counter Brands, LLC did not receive a reasonably equivalent value for the transfer of its assets to G2G (d/b/a Beautycounter) and to Renfrew.

539. As a result of the transfers, Counter Brands, LLC was left insolvent.

540. As a result of the transfers, Plaintiffs have been harmed due to Counter Brands, LLC's inability to pay amounts owed for their claims and due to Counter Brands, LLC's resulting inability to represent itself in this Court.

541. Plaintiffs therefore seek damages in the amount owed for the claims alleged in this lawsuit prior to Counter Brands, LLC's insolvency, which are in excess of $50,000, in an amount to be proven at trial. Plaintiff Bjornlie was damaged in an amount in excess of $2.15 million (representing lost compensation only). Plaintiff Dawley was damaged in an amount in excess of $2.03 million (representing lost compensation only). Plaintiff Pike was damaged in an amount in excess of $505,000 (representing lost compensation only). Plaintiff Shawgo was damaged in an amount in excess of $2.5 million (representing lost compensation only).

## COUNT XVI
### Conspiracy to Commit Common Law Fraudulent Transfer
By All Plaintiffs and All Class Members)
(As against All Defendants)

542. Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

543.    California law allows common law claims for fraudulent transfer in addition to claims under the Uniform Voidable Transactions Act. "By its terms the UVTA was intended to supplement, not replace, common law principles relating to fraud." *Berger v. Varum*, 248 Cal. Rptr. 3d 51, 55 (Cal. App. 1st 2019).

544.    All Defendants intended to and did conspire to fraudulently transfer assets away from Counter Brands, LLC, as alleged herein.

545.    Plaintiffs made claims for payment to Counter Brands, LLC and Carlyle before the series of transactions described in this Complaint resulting in Counter Brands, LLC's insolvency and Assignment for the Benefit of Creditors.

546.    The transactions were made by all Defendants with intent to hinder Plaintiffs' recovery for their claims against Counter Brands, LLC, and with the intent to defraud them.

547.    Carlyle did not receive a reasonably equivalent value for the transfer of its ownership interest in Counter Brands, LLC.

548.    Counter Brands, LLC did not receive a reasonably equivalent value for the transfer of its assets to G2G (d/b/a Beautycounter) and to Renfrew.

549.    As a result of the transfers, Counter Brands, LLC was left insolvent.

550.    As a result of the transfers, Plaintiffs have been harmed due to Counter Brands, LLC's inability to pay amounts owed for their claims and due to Counter Brands, LLC's resulting inability to represent itself in this Court.

551.    Plaintiffs therefore seek damages in the amount owed for the claims alleged in this lawsuit prior to Counter Brands, LLC's insolvency, which are in excess of $50,000, in an amount to be proven at trial. Plaintiff Bjornlie was damaged in an amount in excess

of $2.15 million (representing lost compensation only). Plaintiff Dawley was damaged in an amount in excess of $2.03 million (representing lost compensation only). Plaintiff Pike was damaged in an amount in excess of $505,000 (representing lost compensation only). Plaintiff Shawgo was damaged in an amount in excess of $2.5 million (representing lost compensation only).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court grant the following relief:

A.      Judgment against Defendants on all counts;

B.      A declaration that the Non-Solicitation Policy is invalid as a matter of California law under Cal. Bus. & Prof. Code § 16600;

C.      A declaration that Plaintiffs are not bound by any arbitration provision in any purported agreement or policy with Beautycounter;

D.      A declaration that the transactions resulting in Counter Brands, LLC's insolvency and Assignment for the Benefit of Creditors are void;

E.      An award of damages, attorney's fees, costs and disbursements in excess of $50,000, including the following amounts:

   i.   Damages to Plaintiff Bjornlie in an amount in excess of $2,150,000, reflecting lost compensation only;

   ii.  Damages to Plaintiff Dawley in an amount in excess of $2,030,000, reflecting lost compensation only;

   iii. Damages to Plaintiff Pike in an amount in excess of $505,000, reflecting lost compensation only;

   iv.  Damages to Plaintiff Shawgo in an amount in excess of $2,500,000, reflecting lost compensation only;

F.      Such other and further relief as the Court deems just and equitable.

Dated:  June 17, 2024

**CROSSCASTLE PLLC**

By: /s/ *Pamela Abbate Dattilo*
Pamela Abbate Dattilo (MN# 0389889)
Samuel W. Diehl (MN# 0388371)
Tara A. Kennedy (MN# 0400320)
333 Washington Avenue N.
Ste 300-9078
Minneapolis, MN 55401
P: (612) 429-8100
F: (612) 234-4766
pamela.dattilo@crosscastle.com
sam.diehl@crosscastle.com
tara.kennedy@crosscastle.com

**ATTORNEYS FOR PLAINTIFFS**