IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| JENNIFER SHAWGO, an individual, JENNIFER SHAWGO BC LLC, a Minnesota limited liability company, MOLLY BJORNLIE, an individual, MOLLY BJORNLIE, LLC, a Minnesota limited liability company, AYESHA DAWLEY, an individual, DAWLEY, LLC, a Minnesota limited liability company, CAITY PIKE, an individual, on behalf of themselves and all others similarly situated, | Case No. 24-cv-00556 (PJS/TNL)<br><br>**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' MOTIONS TO COMPEL ARBITRATION OR, ALTERNATIVELY, TO DISMISS** |
| Plaintiffs, | |
| v. | |
| COUNTER BRANDS, LLC d/b/a BEAUTYCOUNTER, a California limited liability company, THE CARLYLE GROUP INC., a Delaware corporation, COUNTER BRANDS, INC. d/b/a BEAUTYCOUNTER, a Delaware corporation, G2G NEWCO, Inc. d/b/a BEAUTYCOUNTER, a Delaware corporation, and SUSAN GREGG RENFREW, an individual, | |
| Defendants. | |

i

**INTRODUCTION**

For almost a decade, Plaintiffs earned their livelihoods through mutually successful partnerships with Defendants' Beautycounter business. Plaintiffs made six-figure incomes, and brought Beautycounter thousands of customers and additional consultants, and tens of millions of dollars in revenue. They had no material issues or disputes—until Beautycounter was purchased by a private-equity company, Defendant The Carlyle Group Inc.

On Carlyle's orders, Beautycounter viciously turned on the Plaintiffs—usurping their customers, businesses, and revenues for Beautycounter and Carlyle; devastating Plaintiffs' incomes; and leaving them in serious financial straits. To top it off, Defendants tried to prevent Plaintiffs from re-building their businesses elsewhere by threatening to enforce clearly unlawful post-separation non-solicitation policies. After Plaintiffs filed this litigation—and after Defendants lost an injunction motion in the parallel California action—Carlyle and Counter Brands abruptly "sold" the Beautycounter business back to its founder and CEO, Defendant Susan Gregg Renfrew. They then immediately announced that the Beautycounter business would continue as normal, except that Counter Brands was insolvent and judgment-proof in this case.

Defendants now seek to compel arbitration; and in the alternative contest personal jurisdiction and argue that Plaintiffs have not pleaded various claims adequately. None of these arguments are meritorious.

The Court must decide personal jurisdiction first. The Court does have jurisdiction, for multiple reasons. Among them: Defendants have consented to jurisdiction by moving to compel arbitration; these claims arise directly from Defendants' longstanding efforts to serve the Minnesota market through relationships

with Minnesota saleswomen; and Defendants have fraudulently transferred assets with the specific intention of avoiding liability in Minnesota.

Next, Defendants' demands for arbitration (or transfer) suffer from a long list of fatal defects. Defendants have no evidence that the "Agreement" on which they rely even purported to be in force at the relevant time, or that they ever offered the "Agreement" to any Plaintiff, or that any Plaintiff ever accepted it. The purported arbitration terms (and their delegation clause independently) are facially illusory and unconscionable under extraordinarily well-settled law. And in any event, all arbitration and transfer rights have been waived by the default of Counter Brands, LLC, the only purported signatory to the "Agreement."

Defendants' arguments to dismiss or strike Plaintiffs' claims fare no better. Beautycounter's non-solicitation policy blatantly violates settled California law. Plaintiffs easily plead that Beautycounter and Carlyle tortiously interfered and unfairly competed with Plaintiffs' customer and downline relationships; that Beautycounter and Renfrew defrauded them; that G2G is liable as Counter Brands' successor; and that all Defendants are separately liable for a fraudulent transfer. And because Plaintiffs' class allegations are easily consistent with common questions as to all terminated Beautycounter consultants, striking them from the pleadings would be badly premature and improper. In all events, any deficiencies could be cured by granting leave to amend the complaint.

The motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs brought this suit because Defendants engaged in serious misconduct that destroyed Plaintiffs' once-successful businesses and livelihoods.

### A.    Plaintiffs Were Top Beautycounter Consultants.

Beautycounter holds itself out as a "clean beauty" company that makes cosmetics and skin-care products. (SAC, ECF 45, at ¶¶2, 44.) In growing from a start-up to a billion-dollar company, Counter Brands did not hire sales employees, but instead created independent-contractor business partnerships with consultants who sell to customers and recruit, train and manage their own consultant teams. (SAC ¶¶3, 44-46.) Consultants are truly independent businesses; they control their own schedules, strategy, sales goals, and the like—and they put in long hours and personal sacrifices to match. (SAC ¶¶73-74.)

Beautycounter chose the business model known as "multilevel marketing," commonly abbreviated as "MLM." (SAC ¶44.) Each consultant would not just sell Beautycounter products but also build a sales organization by recruiting other people in her personal networks (e.g., friends, family, neighbors) to be her "downline." (SAC ¶¶66-67.) Each consultant's business income, then, came from commissions on a combination of her own sales of Beautycounter products and those of her downline organization. (SAC ¶¶70-71, 79-80.) For many successful consultants, supporting and facilitating downline sales was the most significant part of their businesses: some downlines consisted of several thousand consultants. (SAC ¶68.)

Named Plaintiffs were highly successful Minnesota Beautycounter consultants. The four individual Plaintiffs joined Beautycounter between 2014 (shortly after it was founded) and 2017. (SAC ¶¶84, 101, 123, 153.) Plaintiffs Dawley and Pike

already had other full-time careers, but after a few years they left to focus full-time on their Beautycounter businesses. (SAC ¶¶134-35, 156, 161.) Dawley's media appearances, social-media presence, political advocacy, and public speaking made her a prominent public face of Beautycounter. (SAC ¶¶137-148.)

All Plaintiffs put years of hard work and significant investments into their Beautycounter businesses. (*E.g.,* SAC ¶¶92-95, 108-114.) For most Plaintiffs, the result was a sales organization of many hundreds of consultants[1] generating tens of millions of dollars of revenue for Beautycounter[2] and six-figure incomes for Plaintiffs and their families.[3]

For many years, Beautycounter supported Plaintiffs' efforts. Beautycounter shipped thousands of dollars of products to Minnesota that Plaintiffs bought to support their sales efforts. (Declaration of Ayesha Dalwey ("Dawley Decl.") ¶16; Declaration of Caity Pike ("Pike Decl.") ¶13; Declaration of Jennifer Shawgo ("Shawgo Decl.") ¶16; Declaration of Molly Bjornlie ("Bjornlie Decl.") ¶15.) Beautycounter paid Plainitffs' commissions directly to their Minnesota-bank accounts. (*Id.*)

Over the years, Plaintiffs' relationships with Beautycounter remained largely consistent even as the legal parties to the relationship changed somewhat. Between 2016 and 2019, Shawgo, Bjornlie, and Dawley created LLCs to conduct

---

[1] SAC ¶96 (Shawgo had more than 1100 downline consultants), ¶115 (Bjornlie had more than 800).

[2] SAC ¶97 (Shawgo's downline generated $35 million), ¶116 (Bjornlie's generated $25 million), ¶150 (Dawley's generated over $15 million).

[3] SAC ¶¶100, 119, 151.

their growing Beautycounter businesses. (SAC ¶¶86, 103, 124.) These LLCs are also Plaintiffs here. From the time of their respective creations, the LLCs took over the corresponding individual Plaintiffs' relationships with Defendants and the conduct of their Beautycounter businesses. (*Id.*)[4] On Beautycounter's side, the individual Plaintiffs originally signed up for consultancies with Defendant "Counter Brands, Inc., dba Beautycounter." (ECF 14-3 at 1, 14-5 at 1.) But at some point, a new entity—defendant Counter Brands, LLC—stepped into Plaintiffs' Beautycounter consultant relationships. Nothing in the record indicates that Plaintiffs' relationships with Counter Brands, Inc. have somehow lapsed. Plaintiffs therefore allege that Counter Brands, Inc. and Counter Brands, LLC "operated as one seamless business." (SAC ¶14.) Hereinafter, the two are often referred to jointly as "Counter Brands" or "Beautycounter."

## B.   Carlyle Buys Beautycounter And Usurps Plaintiffs' Businesses.

After several flourishing years, things changed dramatically in 2021, when Beautycounter's founder (Defendant Renfrew) sold a majority stake to Carlyle. (SAC ¶¶6-7, 40-41.) It was widely reported that the sale valued Beautycounter at $1 billion. (SAC ¶167.) Carlyle is one of the world's largest private-equity funds (SAC ¶¶16-17), and regularly serves the Minnesota business market. Over the past decade, Carlyle has taken over and managed many Minnesota companies, including Eden Prairie-based Victory Innovations Co. and KLDiscovery; Involta, LLC with its large data center in Duluth; and others. (SAC ¶¶18-21.) Carlyle has

---

[4] The SAC refers to the individual and LLC Plaintiffs interchangeably as "Shawgo," "Bjornlie," and "Dawley." (SAC ¶¶86, 103, 124.) The context makes clear which is intended.

facilitated, underwritten, or attempted many other purchases of Minnesota businesses, including the NBA's Timberwolves and WNBA's Lynx. (SAC ¶¶22-24.)

When Carlyle took over Beautycounter, it was planning to—and tried to—do what many private-equity firms do: dramatically increase profitability by slashing the ranks and compensation of the people it regarded as upper-middle management. (SAC ¶¶181-182.) Evidently, Carlyle thought this meant getting rid of high-earning consultants like Plaintiffs and taking over their businesses (downlines and customers) for itself. (SAC ¶193.) In early 2022, Carlyle gave a series of orders to Beautycounter to minimize the commissions paid to top-earning consultants, including Plaintiffs—treating them like at-will employees as opposed to the business partners that they were. (*See id.*) First, Carlyle directed Beautycounter and Plaintiffs to encourage all existing customers to become consultants, by allowing them to do so for $1. (SAC ¶194.) Plaintiffs cooperated, not knowing what was coming next. (SAC ¶¶194-195.) Immediately thereafter, Carlyle made Beautycounter stop paying commissions to consultants for orders placed by other consultants in their downlines. (SAC ¶196.) These moves were self-evidently calculated to reduce the income of consultants with the largest downlines, like Plaintiffs. (SAC ¶¶197-198.) If further confirmation were needed, shortly thereafter Carlyle directed Beautycounter to eliminate Managing Director bonuses for consultants. (SAC ¶199.)

Carlyle knew full well that this was a dramatic departure from the long-standing course of dealing between Beautycounter, its Consultants, and their customers. (SAC ¶¶200-204.) Indeed, that was the point: Carlyle wanted to dramatically reduce the income of Plaintiffs and consultants like them, so it could keep

that money for itself. The CEO installed by Carlyle, Marc Rey, in fact told Plaintiffs, when discussing these abrupt changes, that he was ordered **by Carlyle** to "find" $10 million in the budget to cut. (SAC ¶225.)

In addition, at some point Beautycounter unilaterally revised its form Consultant Agreement to add a provision purporting to prohibit consultants from soliciting (directly or indirectly) other consultants in their own network to join any other businesses. (SAC ¶64.) Beautycounter Consultants—who are not employees—never have been required to be exclusive to Beautycounter, and it is very common for MLM consultants to represent and promote multiple brands. (SAC ¶¶241, 459-460.)

All these cuts hit Plaintiffs hard. In April 2022, Beautycounter notified most Plaintiffs that their compensation would be unilaterally reduced by 20-29%, starting in just six weeks. (SAC ¶205.) That proved to be a gross underestimate. In early July, Plaintiffs received their first commission checks under the new rules—and discovered that their commissions had fallen by 60-to-70 percent.[5] Soon after, Plaintiffs each learned that Beautycounter was planning to eliminate downlines altogether—wiping out the remaining core of their businesses and livelihoods. (SAC ¶213.)

This forced Plaintiffs to find supplemental work. Between July and September 2022, the individual Plaintiffs became consultants with Green Compass, a direct-sales company that sells hemp-derived products (not cosmetics). (SAC ¶¶234, 236, 238-39.) The individual Plaintiffs had no plans to discontinue the LLC

---

[5] SAC ¶¶207-210 (Shawgo LLC's income fell by 65% month-on-month, Bjornlie LLC's by 66%, Dawley LLC's by 70%, and Pike's by 61%.)

Plaintiffs or cause them to enter any relationship with Green Compass, or any non-Beautycounter MLM organization. (SAC ¶240.) Rather, the Green Compass consultancies are held by the individuals Dawley, Bjornlie, and Pike, and a separate LLC that Shawgo formed for that purpose. (SAC ¶¶234-237.)

Nevertheless, Carlyle and Beautycounter used that as an excuse to push Plaintiffs completely out the door and finish taking over their businesses. Although Plaintiffs' purported agreements with Beautycounter left them free to join Green Compass—and although the individuals Shawgo, Bjornlie, and Dawley and Shawgo's Green-Compass-specific LLC had no contractual obligations to Beautycounter at all—between August and December 2022, each Plaintiff found her access to her Beautycounter business frozen. (SAC ¶¶246-66, 285-287, 301-06.) For at least two Plaintiffs, this resulted in their customers' orders being routed directly to Beautycounter—completing Beautycounter's and Carlyle's takeover. (SAC ¶¶288-89 (Shawgo LLC); ¶¶303-04 (Bjornlie LLC).) Plaintiffs spent eight years building these customer relationships—but Beautycounter cut them out of all revenues from those relationships.

After this freezout, Dawley felt she had no choice but to terminate her LLC's consultancy in August 2022. (SAC ¶269.) Following Beautycounter's freezeouts of Shawgo LLC and Pike, it terminated them in November 2022 and January 2023, respectively, based on an unexplained assertion "that you solicited Beautycounter Consultants to Green Compass." (SAC ¶¶285, 295-97.) And although Beautycounter initially lifted Bjornlie LLC's suspension after about two months, it then terminated Bjornlie LLC barely a month later, based on an identical unsupported allegation, in March 2023. (SAC ¶¶310, 316-18). No Plaintiff has ever been

provided with any evidence of her alleged solicitations, despite repeated pleas and demands for this information. (SAC ¶¶291, 438.) Prior to Carlyle's involvement, working for a direct-sales company other than Beautycounter was never an issue, as Renfrew herself confirmed. (SAC ¶463.)

After terminating Plaintiffs, Beautycounter threatened them with enforcement of a non-solicitation policy. In other words, taking Plaintiffs' downlines and customers was not enough: Beautycounter also prevented them from rebuilding businesses with Green Compass, by telling them that they could not recruit the sales organizations that they themselves had built to do so. (SAC ¶13.)

## C.    In Response To This Suit, Carlyle Abandons Beautycounter And Renfrew And G2G "Buy Back" The Business.

This harsh conduct might have been legal if Plaintiffs had been Beautycounter's at-will sales employees. But Carlyle and Beautycounter overlooked—or chose to ignore—that consultants like Plaintiffs instead were independent businesses whose entire value was in their painstakingly-built customer and downline relationships. Beautycounter had recruited and paid them not to build businesses *for Beautycounter*, but to build businesses that they would own. (SAC ¶¶72-73.)

Plaintiffs here allege that by destroying those businesses and relationships, Defendants tortiously interfered with their prospective economic advantages (SAC ¶¶394-418), breached the implied contractual covenant of good faith and fair dealing (SAC ¶¶419-449), engaged in unfair business practices (SAC ¶¶450-457), engaged in conduct barred by promissory estoppel (SAC ¶¶458-466), were unjustly enriched (SAC ¶¶467-479), and committed fraudulent misrepresentations or fraudulent inducement. (SAC ¶¶480-497, 509-515.) Plaintiffs' Second Amended Complaint also seeks declaratory relief that Beautycounter's non-solicitation

policy is unlawful (SAC ¶¶498-504) and that they have no arbitration obligations (SAC ¶¶505-08.)[6]

Defendants' response to this litigation was to transfer the Beautycounter business in an attempt to avoid liability. In early 2023, Plaintiff Shawgo gave Counter Brands and Carlyle notice of this controversy by sending a demand letter. (SAC ¶¶326-29.) Following an otherwise-unproductive mediation in September 2023, Shawgo disclosed that many other terminated Beautycounter consultants likely would sue. (SAC ¶¶329-30.) Counter Brands responded by initiating arbitration against Shawgo in California. (SAC ¶330.)

Until that point, Carlyle and Renfrew fully intended that Carlyle would continue owning and operating Beautycounter, and Renfrew would continue as its CEO. (SAC ¶359.) But they turned on a dime when this litigation began to go south for Beautycounter. This case was filed in October 2023. While it began as a two-Consultant case, in January 2024, Plaintiffs asserted class claims as dozens of additional women sought to be added. (*See* SAC ¶15; Declaration of Pamela Dattilo ("Dattilo Decl.") ¶5.) ¶In February, a companion action asserting similar claims by other terminated Beautycounter consultants was filed in California state court in February 2024. (*See* SAC ¶332.) In March 2024, the California court entered a temporary restraining order preventing Counter Brands from asserting non-solicitation obligations against terminated consultants. (SAC ¶333, *see* Dattilo Decl., Ex. B.) At the same time, the court entered an order to show cause why the injunction should not be expanded to include current consultants. (*Id.*) The injunction and

---

[6] Counter Brands, LLC is in default of the Second Amended Complaint and Plaintiffs will be moving for default judgment on these declaratory judgment claims.

"show cause" hearing was set for April 16, 2024. (SAC ¶334.) Counter Brands then insisted that the hearing be postponed to May, for reasons that did not add up. (SAC ¶336.)

Once that happened, Defendants took immediate action to evade liability. On April 15, Renfrew incorporated G2G, with herself as CEO and major owner, and with a principal address of Renfrew's home address. (SAC ¶¶335-39, 351.) On April 18, Carlyle publicly announced that it would "exit[] the [Beautycounter] business through a sale back to Gregg [Renfrew]" because of "significant near-term capital needs." (SAC ¶347.) A few days later, Carlyle transferred ownership of Counter Brands on terms that are unknown to Plaintiffs. (SAC ¶348.) And Counter Brands then promptly transferred all its assets to G2G. (SAC ¶349.) Currently, Counter Brands, LLC represents that it is insolvent and has no assets—three years after being purchased at a $1 billion valuation by one of the largest private equity companies in the world. (SAC ¶350.)

Almost instantly after the sale announcement, high-ranking Beautycounter personnel stated repeatedly and prominently that (1) the Beautycounter business would continue almost seamlessly, except that (2) this litigation (and the parallel action in California) would end. On the one hand, Renfrew and other Beautycounter leaders repeatedly said that "everything" about the Beautycounter business will remain the same, and that the purpose of the sale was "to offload debt." (SAC ¶356; *see id.* ¶¶353-57.) On the other hand, starting the day after the announcement, top Beautycounter personnel stated—including to other putative-class-member consultants—that this litigation was "going away" because Plaintiffs have "no remedy." (SAC ¶¶365-66.) Concurrently with the sale, Renfrew fired

an additional group of Beautycounter consultants connected to this litigation—falsely telling them that the company was shutting down, and threatening them with enforcement of the enjoined non-solicitation policy. (SAC ¶¶340-41.) At the same time, Renfrew emailed non-fired consultants saying that she was buying back Beautycounter, that there would be a 14-day pause in the business, and that their consultancies then "will automatically transition to the new company." (SAC ¶¶343-45.)

This was confirmed by the conduct of Defendants and their counsel in this litigation. Almost immediately on the announcement of the sale, before the Beautycounter assets were even transferred, Counter Brands instructed its attorneys to withdraw and put it into default. (SAC ¶380; *see* ECF 36, 108.) Counter Brands, LLC thus abandoned its then-pending motion to compel arbitration. (ECF 7.) Simultaneously, it withdrew from its already-filed California arbitration against Shawgo. (Dattilo Decl. ¶18, Exs. D, E.) The same law firm that represents Carlyle (and represented Counter Brands, LLC) in this case then began instructing Beautycounter personnel that this litigation was "going away," so they could represent that they "didn't have" documents responsive to subpoenas in the California action—even when they definitely did. (SAC ¶¶370-73.)

Defendants have dressed up G2G's purchase of the Beautycounter business as "a foreclosure" or an "assignment for the benefit of creditors." (SAC ¶¶29, 386.) But although Plaintiffs had asserted their claims well before that transaction was announced, there is no indication that they will recover anything in the transaction. (SAC ¶¶386-87.) The only ones who apparently "benefit" from this "assignment" are Defendants.

In sum, the SAC alleges that Counter Brands sold essentially all its assets to a company owned and controlled by its own CEO and significant shareholder (Renfrew)—which supposedly left Counter Brands with no funds whatsoever to pay Plaintiffs. Renfrew and G2G have repeatedly said that, after the sale, the Beautycounter business will operate in exactly the same way—same headquarters, same website, same product, same employees, same contractual rights and obligations—except, apparently, that consultants associated with this litigation have been terminated and the company's debts to them supposedly are gone. (SAC ¶¶386-88.)

## D.   Defendants Seek Arbitration Based On Illusory "Agreements" That Plaintiffs Never Saw.

Defendants (except for in-default Counter Brands, LLC) seek arbitration based on documents they refer to as "the 2022 Agreement," filed at ECF Nos. 14-23 and 14-24. (*See* ECF 70 at 3-4, 7.) No Plaintiff ever accepted or agreed to these documents.

### 1.   There is no evidence Plaintiffs saw or accepted the 2022 documents.

Defendants contend that when the individual Plaintiffs first became Beautycounter consultants—between 2014 and 2017—they clicked "I agree" on a "Consultant Agreement" that expired by its terms after one year. (ECF 70 at 2-3.[7]) Those are the only documents that Defendants present any evidence that any Plaintiff actually agreed to. Those documents did not include detailed arbitration agreements, but stated that certain "dispute[s] … shall be settled …by arbitration as

---

[7] *See* ECF 14-3 at ¶5 ("The term of this agreement is one year"); ECF 14-4 at ¶5 (same).

more fully described in the Policies and Procedures" (ECF 14-3 at ¶12; ECF 14-4 at ¶12)—which the new consultant could not even access until after she clicked "Agree" and paid for her consultancy. (SAC ¶¶58-59.) None of the Plaintiffs saw the Polices and Procedures before clicking "Agree." (Dawley Decl. ¶10; Shawgo Decl. ¶9; Bjornlie Decl. ¶9; Pike Decl. ¶¶9, 7 (never saw policies and procedures until suspended.) The same is true for thirty-seven additional potential class members. (*See cites infra p. 15.*)

Instead of these long-expired 2014 and 2017 agreements, Defendants now invoke a purported "Consultant Agreement" that lists an effective date of January 2020, and a Policies & Procedures document dated June 1, 2022. (Dkt. 14-23, 14-24.) Defendants' evidence shows that Beautycounter frequently "amended" these documents, including multiple times in 2022 itself. (ECF 13-1). Indeed, the June 2022 version of the documents, on which Defendants apparently rely, purported to be in effect only for one month—additional "amendments" purportedly took effect on July 1. (*Id.*)

The 2022 documents purport to be contracts "between Counter Brands, LLC dba Beautycounter ('Beautycounter') and Independent Consultant." (ECF 14-23 at 2.) They purport to provide that "Consultant and Beautycounter mutually agree that any claim or dispute between them" meeting certain criteria "shall be submitting to binding individual arbitration." (*Id.* at 6.)

Defendants present no evidence that any Plaintiff agreed to, reviewed, or even saw this supposed "2022 Agreement." They state that Plaintiffs "renewed" their Beautycounter consultancies each year after their initial signups (ECF 70 at 3, 100 at 6-7), but do not assert that this involved any review of documents or express

14

manifestation of agreement to anything. Defendants' declarant makes a similarly vague assertion that Plaintiffs "purchased the renewal SKU each year," without saying that this involved any review of documents or manifestation of assent. (ECF 14 ¶¶21, 24, 27, 30) The declarant's supporting exhibits show only computer code and generic spreadsheet entries. (ECF 14-33, 14-16, 14-19, 14-22.) Plaintiffs, along with 37 other putative-class-member consultants, specifically deny any understanding that their annual re-enrollments involved accepting any written contract or policies. (Dawley Decl. ¶¶11-12; Shawgo Decl.¶¶10-11; Pike Decl. ¶10; Bjornlie Decl. ¶10.; Declaration of Amanda Scott ¶8; Declaration of Anne Huitt, ¶9;  Declaration of Barri Sptizer, ¶10; Declaration of Bronte Picou, ¶9; Declaration of Carrie Smith, ¶10; Declaration of Charla Bagzis ¶8, Declaration of Christine Calegari ¶8, Declaration of Christine Kreinbihl ¶9, Declaration of Cindy Persky ¶7; Declaration of Darcy Ivnans ¶8, Declaration of Dawn Bures ¶9, Declaration of Gina Quattrochi ¶9, Declaration of Jean Zirlin ¶11, Declaration of Julie Eisenberg ¶6, Declaration of Karleigh Hatland ¶8, Declaration of Kelli Weber ¶9, Declaration of Kellie Sibley ¶9, Declaration of MaryLousie Howley ¶9; Declaration of Mary-Therese Fiorentini ¶8, Declaration of Medina Culver ¶9; Declaration of Melicent Sibley ¶9; Declaration of Michelle Lilly ¶9; Declaration of Mimi MacLean ¶9; Declaration of Morgan Moore ¶9; Declaration of Page Calla ¶9; Declaration of Rachel Menard ¶9; Declaration of Renee Hill ¶8; Declaration of Rikki Miller ¶8; Declaration of Robyn Bouman ¶9; Declaration of Ruby Guardia ¶8; Declaration of Sondra McCummen ¶8; Declaration of Stacey Heiny ¶10; Declaration of Staci Kalvaitis ¶8; Declaration of Stephanie Dalton ¶9; Declaration of Stephanie Morris ¶9; Declaration of Stephanie Whittaker ¶9; Declaration of Windy Silver ¶9.)

Carlyle states that Beautycounter periodically e-mailed consultants (including Plaintiffs) about policy "updates"—usually buried in lengthy newsletters about a variety of topics. (ECF 70 at 4.)  Carlyle points to exactly **two** of these updates stating that continuing a consulting business meant accepting that particular update—one from 2018 and the other from 2019, both multiple years before the events at issue here. (ECF 13-6 at 6, 13-8 at 3.) Carlyle does not contend that these particular "updates" were specifically relevant to any arbitration provision—and it has submitted 14 other email "updates" by Beautycounter that do not include any language about acceptance. (*See* ECF 13-2 to -5, 13-7, 13-9 to -17.) Carlyle points to no "update" purporting to notify Plaintiffs of the June 2022 documents on which Defendants now rely.

### 2.   The "agreements" on which Defendants rely could be (and were) changed whenever and however Beautycounter wanted.

The "2022 Agreement" purports to say that the relationship between Beautycounter and its consultants is governed by four documents: (1) "this Independent Consultant Agreement," (2) "the Beautycounter Policies & Procedures," (3) "the Beautycounter Compensation Plan," and (4) "the Beautycounter Business Entity Addendum (if applicable)." (ECF 14-23 ¶1.) It refers to these four documents, collectively, as "the Agreement," (*id.*), and provides that "the terms of this Agreement, including the Beautycounter Policies & Procedures and Beautycounter Compensation Plan may be amended at the sole discretion of Beautycounter." (*Id.*¶23.)

The 2022 documents place no limits on how Beautycounter could change the arbitration provision. Although the Consultant Agreement states "that amended **policies** shall not apply retroactively," it specifies that Beautycounter's

Policies & Procedures are a separate document—and the arbitration provision is found in the Consultant Agreement itself, not the Policies & Procedures. (*See id.* ¶¶23, 33.) Likewise, the Policies & Procedures state that Beautycounter "reserves the right to amend the Agreement, including these Policies and Procedures, at its discretion," but that "[a]ny amendment(s) ***to these Policies*** shall *not* apply retroactively." (ECF 14-24 at 4 (first emphasis added).) Nothing in any of these documents bars retroactive amendments to any other portion of the "Agreement," including the Consultant Agreement or its arbitration provision.

**ARGUMENT**

I. **The Court Has Personal Jurisdiction—But If Not, It Must Transfer The Case Without Deciding Other Issues.**

    A. **The Court Must Determine Personal Jurisdiction Before Arbitra-bility.**

Although Defendants purport to contest personal jurisdiction in this Court, they ask the Court to skip the personal-jurisdiction analysis in favor of compelling arbitration. (ECF 70 at 6, ECF 100 at 4.) That is improper.

The weight of authority holds that "a court cannot rule on arbitrability without subject-matter **and personal** jurisdiction," and "motions to compel arbitration are not one of the limited instances in which district courts have leeway to pretermit the resolution of [personal] jurisdictional challenges." *Hines v. Stamos*, ---F.4th----, 2024 WL 3580618, at *9-10 (5th Cir. July 30, 2024) (emphasis added). This rule applies regardless of whether the party contesting personal jurisdiction is seeking or resisting arbitration. *See id; accord Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 95 (3d Cir. 2018).[8]

That is the logically correct rule. "[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over … the parties (personal jurisdiction)," but "a non-merits ground for dismissal" does not

---

[8] *See also, e.g., Castillero v. Xtend Healthcare, LLC*, 2023 WL 8253049, at *10 (D.N.J. Nov. 29, 2023); *Marshall v. Hipcamp, Inc.*, 2023 WL 8627671, at *1 n.1 (D. Or. Nov. 8, 2023); *Walker v. Walgreens Specialty Pharmacy, LLC*, 2023 WL 5334609, at *5 n.7 (N.D. Ill. Aug. 18, 2023); *Ritz Fuente, LLC v. Schafer*, 2023 WL 5310562, at *5 (S.D. Cal. Aug. 17, 2023); *Johns v. Newsmax Media, Inc.*, 887 F. Supp. 2d 90, 97 (D.D.C. 2012); *Hunter Douglas Metals, Inc. v. New Bay Fin. Shipping Co.*, 1988 WL 115234, at *2 (E.D. La. Oct. 28, 1988).

require jurisdiction. *Sinochem Int'l Co. v. Malysia Int'l Shipping Corp.*, 549 U.S. 422, 431-32 (2007). In this dichotomy, a decision about whether to compel arbitration is best considered a "merits" ruling. "[C]ompel[ling] arbitration has little in common with … threshold non-merits dismissals" because it "requires the court to apply its law-declaring power." *Hines*, 2024 WL 3580618, at *9 (quoting *Reading Health Sys.*, 900 F.3d at 95.) Unlike true threshold grounds for dismissal, an order compelling arbitration is a binding exercise of the court's power to decide at least some of the legal rights and responsibilities of the parties before it. That requires both subject-matter and personal jurisdiction.

Defendants are wrong, therefore, to assert that "Courts in this district routinely compel arbitration before reaching other jurisdictional and merits arguments." (ECF 70 at 6; *see* ECF 100 at 4 (similar).) Defendants cite exactly one decision of this Court that skipped a jurisdictional argument to compel arbitration: *Essence Skin Clinic, LLC v. Wakaya Perfection, LLC*, where the court compelled arbitration without commenting on whether personal jurisdiction was required to do so. 2019 WL 186668, at *1 (D.Minn. Jan. 14, 2019). Neither of Defendants' other cited decisions involve a court bypassing a personal-jurisdiction objection to compel arbitration. See *Mainville v. College Town Pizza, Inc.*, 629 F.Supp.3d 913, 925 (D.Minn. 2022) (compelling arbitration without deciding non-jurisdictional transfer motion); *Bam Navigation, LLC v. Wells Fargo & Co.*, 2021 WL 533692, at *2, *6 n.7 (D.Minn. Feb. 12, 2021) (compelling arbitration without deciding whether plaintiff "fails to state a claim").

The Court therefore must assess personal jurisdiction before any other issue.

19

### B.    Defendants Have Waived Objections To Personal Jurisdiction.

As noted, compelling arbitration requires personal jurisdiction. Therefore, by asking the Court to compel arbitration without deciding personal jurisdiction, Defendants have consented to personal jurisdiction in this Court.

### 1.    A party can waive personal-jurisdiction objections by demanding to compel arbitration.

"[T]he requirement of personal jurisdiction" is "an individual right" that "can … be waived." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). Although it was long held that appearing in court for any purpose other than contesting personal jurisdiction waived any such objections, Rule 12(b) now provides that "[n]o defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion." But "this rule sets only the outer limits of waiver; it does not preclude waiver by implication." *Yeldell v. Tutt*, 913 F.2d 533, 539 (8th Cir. 1990) (cleaned up). Even a personal-jurisdiction objection properly raised under Rule 12 still can "be lost … by formal submission in a cause, or by submission through conduct" that "d[oes] not comply with the spirit of the rule." *Id.*; *accord White v. Nat'l Football League*, 41 F.3d 402, 407 (8th Cir. 1994).

The Eighth Circuit has not articulated a standard for assessing whether, under Rule 12, a defendant's conduct has forfeited personal-jurisdiction objections. But several other Courts of Appeals have. Under one frequently-applied rule, "submissions, appearances, and filings that … must cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking, result in waiver of a personal jurisdiction defense." *Blessing v. Chandrasekhar*, 988 F.3d 889, 895 (6th Cir. 2021); *see Hedeen Int'l, LLC v. Zing Toys, Inc.*, 811 F.3d 904, 906 (7th Cir.

2016); *First Liberty Ins. Corp. v. Examworks, LLC*, 2023 WL 6049509, at \*3 (D.S.D. Sept. 15, 2023). Under another, "where a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter." *In re Asbestos Prod. Liab. Litig. (No. VI)*, 921 F.3d 98, 105 (3d Cir. 2019); *PaineWebber Inc. v. Chase Manhattan Priv. Bank (Switzerland)*, 260 F.3d 453, 460–61 (5th Cir. 2001).

Since compelling arbitration requires personal jurisdiction (*see supra*) a defendant's arbitration demand easily qualifies as "affirmative relief," or "effort that would be wasted if personal jurisdiction is lacking," under these standards. And that is the only fair outcome: otherwise, a defendant could force arbitration if it won the motion, but if it lost could argue that it was not bound due to a lack of personal jurisdiction. *See Yeldell*, 912 F.2d at 539 (in analogous context, "disavow[ing] tolerance of … a procedure" that would "play fast and loose with the power of the federal court") (cleaned up). Unsurprisingly, then, many courts—including the Minnesota courts—have found that defendants waive personal-jurisdiction objections by moving to compel arbitration without contesting personal jurisdiction. *E.g., Mississippi Valley Dev. Corp. v. Colonial Enterprises, Inc.*, 300 Minn. 66, 71 (1974); *Jorgensen v. Jorgensen*, at \*7 (Minn. Ct. App. Aug. 7, 2023) (request to compel mediation); *B. Little & Co., Inc. v. Choi Wai Printing (Hong Kong) Ltd.*, 364 So. 3d 1078, 1081 (Fla. Dist. Ct. App. 2023)*; Deverze v. Uber Techs., Inc.*, 2021 WL 1053641, at \*13 (N.D. Ga. Feb. 4, 2021).

## 2.   Defendants' arbitration demands here are waivers.

Defendants have demanded arbitration and objected to personal jurisdiction simultaneously, in the same documents. This by itself is not waiver. But

Defendants have taken a large additional step that *is* waiver: they demand that the Court compel arbitration *without deciding* whether it has personal jurisdiction. Both of Defendants' briefs are explicit: "Before reaching any other issue, this Court should compel arbitration and stay proceedings" (ECF 100 at 4), and "the most efficient approach here is to compel arbitration" without deciding the other issues (ECF 70 at 6). Their proposed orders make matters even clearer: each of them simply orders arbitration, with no mention of personal jurisdiction. (ECF 70-3, 103.)

So: Defendants clearly consent to the Court deciding their arbitration motions. As a matter of law, that decision requires personal jurisdiction. Therefore, Defendants consent to personal jurisdiction.

The final question is whether a defendant can "temporarily waive its objections to the exercise of personal jurisdiction to allow the court to rule on a motion to compel arbitration," while reserving personal-jurisdiction objections regarding the case as a whole. *Nationwide Agribusiness Ins. Co. v. Buhler Barth GmbH*, 2015 WL 6689572, at *2 (E.D. Cal. Oct. 30, 2015). Of the few courts that have addressed this question, some say no, *see id.*, while others allow a plaintiff to "submit[] to the court's jurisdiction for the sole purpose of compelling arbitration." *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 541 (5th Cir. 2019).

There is no logical support for allowing that kind of partial consent. Personal jurisdiction is all-or-nothing: a defendant cannot selectively invoke a court's authority to rule on issues where he thinks he will win, while simultaneously objecting to the court's authority on other issues in the same case. Restatement (Second) of Conflict of Laws 32, cmt. (d) (asking for affirmative relief consents to

personal jurisdiction "[e]ven though the defendant expressly states … that he does not consent to the exercise of jurisdiction over him"). There is no support for a novel special appearance limited to a motion to compel arbitration.

In sum, by unambiguously asking the Court to rule on the parties' legal rights and obligations, Defendants have consented to the Court's jurisdiction over the entire case.

### C.  Defendants Also Are Subject To Personal Jurisdiction For These Claims.

Alternatively, each Defendant also is subject to personal jurisdiction for these particular claims.

"[T]o survive a timely motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie showing that personal jurisdiction exists by pleading sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction." *Hawkeye Gold, LLC v. China Nat'l Materials Indus. Imp. & Exp. Corp.*, 89 F.4th 1023, 1030 (8th Cir. 2023). Although the Court "*may* look beyond the pleadings to determine whether personal jurisdiction exists, including reviewing affidavits and other exhibits," still "[t]he evidentiary showing required at the prima facie stage is minimal." *Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 951 (8th Cir. 2022) (cleaned up; emphasis added). Here, all moving Defendants argue only that Plaintiffs have failed to "allege" facts supporting personal jurisdiction. (ECF 70 at 15-17; ECF 100 at 16-20.)

### 1.  There easily is personal jurisdiction over Counter Brands, and G2G inherits those contacts.

Plaintiffs allege that G2G is liable as the successor to Counter Brands. G2G correctly concedes that, for purposes of personal jurisdiction for these claims, it

inherits its predecessors' contacts with Minnesota. (ECF 100 at 17-18; *see Rescap Liquidating Trust v. LendingTree, LLC*, 2020 WL 1317719, at *8 (D.Minn. Mar. 20, 2020) ("Well-pleaded allegations of successor liability can establish personal jurisdiction.") (collecting cases).) G2G contends that "there are no colorable allegations of personal jurisdiction over Counter Brands, LLC either" (*id*. at 18), but it is badly wrong.

### a. Counter Brands, LLC consented to general personal jurisdiction.

First, Counter Brands, LLC consented to general personal jurisdiction in Minnesota. Until February 2024—multiple months after it was served in this case—Counter Brands, LLC was registered to do business in Minnesota and had appointed an agent for service of process here.[9] For foreign corporations, "appointment of an agent for service of process under Minn. Stat. § 303.10 gives consent to the jurisdiction of Minnesota courts for any cause of action, whether or not arising out of activities within the state." *Brunhilda v. Purdue Univ. Glob., Inc.*, 2022 WL 607408, at *1 (D.Minn. Mar. 1, 2022) (Schiltz, J.) (cleaned up); *see Knowlton v. Allied Van Lines, Inc.*, 900 F.2d 1196, 1200 (8th Cir. 1990); *Rykoff-Sexton, Inc. v. Am. Appraisal Assocs., Inc.*, 469 N.W.2d 88, 91 (Minn. 1991). The U.S. Supreme Court recently confirmed that this is permissible. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 134–35 (2023).

Counter Brands is a foreign LLC rather than a foreign corporation, but Minnesota's requirement of "designat[ing] a registered agent" for service of process applies equally to foreign corporations and foreign LLCs. *See* Minn. Stat. §5.001,

---

[9]                    https://mblsportal.sos.state.mn.us/Business/SearchDetails?filingGuid=f5251b39-e611-ed11-9061-00155d01c614

subd. 2 (defining "business entity" to include both), 5.36, subd. 2; *see also* Minn. Stat. 322C.0805(5) (specifically requiring foreign LLCs to appoint agents for process in Minnesota). There is no indication that this appointment has drastically different legal consequences for a foreign LLC than for a foreign corporation.

G2G and Renfrew may protest that they cannot inherit Counter Brands, LLC's consent to Minnesota jurisdiction, because Counter Brands allowed its registration to expire about two months before G2G and Renfrew "bought" its assets. That would be mistaken. An agent's appointment need not be in effect at the moment a complaint is served in order to be effective as consent to personal jurisdiction. *See Lettieri's Inc. v. McLane Co.*, 2003 WL 22663839, at *4 (D.Minn. Nov. 10, 2003). Indeed, any other rule would defeat the whole purpose of successor liability—including the succession to jurisdictional contacts—by allowing a transfer of assets to require termination of an already-filed lawsuit against the transferor, even in the face of a valid successor-liability claim. That would be improper. Successor liability means succeeding to ongoing litigation.

> **b.  This case arises directly from Counter Brands' extensive relationships with Minnesota businesses for the purpose of serving the Minnesota market.**

Second, even without consent, Counter Brands obviously subjected itself to specific personal jurisdiction in Minnesota for this suit by contracting, and maintaining business relationships, with Minnesota Plaintiffs for the plain purpose of selling its products to Minnesota customers. *See supra* Facts Pt. A.

When a defendant maintains "a long-term, systematic business relationship" with a Minnesota company, it is subject to personal jurisdiction in Minnesota for claims of wrongdoing in that relationship. *St. Paul Fire & Marine Ins. Co. v.*

25

*Servidone Const. Corp.*, 778 F. Supp. 1496, 1503 (D.Minn. 1991). That rule has been applied again and again by both this Court[10] and the Eighth Circuit.[11] Thus, out-of-state companies are subject to specific personal jurisdiction in Minnesota for disputes arising from their relationships with their Minnesota employees, *Volkman v. Hanover Invs., Inc.*, 843 N.W.2d 789, 796–97 (Minn. Ct. App. 2014); with Minnesota dealers of their products, *Agri-Cover, Inc. v. Christensen Mfg. Corp.*, 2011 WL 2579883, at *2 (D.Minn. June 29, 2011); and with their Minnesota sales agents. *Ciofoletti v. Securian Fin. Grp., Inc.*, 2020 WL 12863773, at *1 (D.Minn. Sept. 21, 2020).

So here. The whole point of Beautycounter's yearslong relationships with Plaintiffs was to sell Beautycounter products in Minnesota, where Beautycounter knew Plaintiffs lived. *See supra* Facts Pt. A. To that end, Beautycounter sent thousands of dollars of cosmetics to Plaintiffs in Minnesota; millions of dollars of cosmetics to Minnesota customers who bought from Plaintiffs; and millions of dollars in commissions into Minnesota bank accounts designated by Plaintiffs. *Id.* Moreover, Plaintiffs' allegations in this case are that all Defendants, including Counter

---

[10] *E.g., Cambria Co. LLC v. Disney Worldwide Servs., Inc.*, 651 F. Supp. 3d 1073, 1079–80 (D.Minn. 2023); *Razor Cap., LLC v. HP Debt Exch., LLC*, 2013 WL 4483366, at *4–5 (D.Minn. Aug. 19, 2013); *Hormel Foods Corp. v. Medina & Medina, Inc.*, 2006 WL 2735491, at *8 (D.Minn. Sept. 25, 2006).

[11] *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 981 (8th Cir. 2015); *Minnesota Min. & Mfg. Co. v. Nippon Carbide Indus. Co.*, 63 F.3d 694, 697 (8th Cir. 1995); *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1434 (8th Cir. 1995); *Watlow Elec. Mfg. Co. v. Patch Rubber Co.*, 838 F.2d 999, 1002 (8th Cir. 1988).

Brands, usurped these specific downline and customer relationships—in the Minnesota market—for their own profit.

So, Defendants cannot protest that "merely entering into a contract with a forum resident does not provide" personal jurisdiction. (ECF 100 at 18 (citation omitted).) That is true of "an isolated or one-off transaction," *Cambria Co.*, 651 F.Supp.3d at 1079, but personal jurisdiction still can arise from the "contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985). It definitely does here.

In short, G2G may try to contest on the merits whether it is liable as Counter Brands' successor for Plaintiffs' claims. But because Counter Brands plainly is subject to jurisdiction for those claims in Minnesota, G2G equally is subject to jurisdiction for Plaintiffs' claims of successor liability.

### 2. All Defendants directed misconduct at Minnesota by transferring the Beautycounter business in an attempt to avoid liability in this very case.

Furthermore, all Defendants are subject to specific personal jurisdiction as a result of their aggressive efforts to transfer assets trying to make Counter Brands judgment-proof in this very case.

A defendant's "intentional, and allegedly tortious, actions … expressly aimed at" a State generate personal jurisdiction there. *Calder v. Jones*, 465 U.S. 783, 789 (1984). "An individual injured in" her home State "need not go to [another State] to seek redress from persons who … knowingly cause the injury" through "alleged wrongdoing intentionally directed at a [forum State] resident." *Id.*

This test is satisfied, as a matter of law, when a defendant in a pending suit "became insolvent … by fraudulently transferring its assets … for the purposes of rendering [it] judgment-proof in th[e pending] case," and the transferees "took up where the dissolved [defendant] left off, continuing its business … using the same assets." *Citimortgage, Inc. v. Chicago Bancorp, Inc.*, 2013 WL 3338501, at *1, *5 (E.D. Mo. July 2, 2013). The parties to such an alleged transfer are subject to personal jurisdiction in the court where the lawsuit is pending: "[t]his is more than enough to satisfy the *Calder* effects test" because "the transfers were … specifically intended to undermine this lawsuit," and thus created "an intimate relationship among the defendant, the forum, and the litigation." *Id.* (cleaned up); *accord Dontos v. Vendomation NZ Ltd.*, 582 F. App'x 338, 348 (5th Cir. 2014); *Tatung Co. v. Hsu*, 2015 WL 11072178, at *43 (C.D. Cal. Apr. 23, 2015); *State Farm Mut., Auto. Ins. Co. v. Tz'doko V'CHESED*, 543 F. Supp. 2d 424 (E.D. Pa. 2008); *C.D. Acq. Hldgs. v. Meinershagen*, 2007 WL 184796, at *4–5 (W.D. Pa. Jan. 22, 2007).

That is exactly the situation here. Plaintiffs squarely allege—and Defendants barely bother to deny—that Counter Brands shut down and transferred its assets to G2G, after its prospects in this litigation soured, to avoid paying any judgment herein. *See supra* Facts Pt. C. The only States where this litigation was pending (either then or now) are Minnesota and California. That conduct, squarely aimed at this case in Minnesota, is the basis for Plaintiffs' successor-liability and fraudulent-transfer allegations in this case. (As explained *infra* at § III.B, Renfrew is liable for the fraudulent transfer as a beneficiary and conspirator, and Carlyle is liable as a conspirator.)

It is no good for Renfrew to argue, in passing, that she supposedly facilitated the fraudulent transfer as "a corporate officer or agent," so her jurisdictional contacts with Minnesota count only against the corporation and not against her personally. (ECF 100 at 17.) Legally, the "fiduciary shield" doctrine that Renfrew invokes derives from certain state long-arm statutes, not due-process requirements[12]—and Minnesota's long-arm statute does not include any such shield,[13] so Renfrew's argument is inapposite as a matter of law.[14] Factually, moreover, a

_____

[12] *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984) ("[R]eject[ing] the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity…. Each defendant's contacts with the forum State must be assessed individually."); *Berd v. De Bastos*, 2017 WL 5075249, at *3 (D.N.D. Nov. 2, 2017) ("[T]he state-created corporate identity does not serve to confer any additional due process protections to corporate employees above and beyond the traditional minimum contacts inquiry…. [A]ny additional protection stemming from the corporate form must arise out of state law" (cleaned up)); *Westlake Invs., L.L.C. v. MLP Mgmt. L.L.C.*, 707 F. Supp. 2d 904, 913 (S.D. Iowa 2010); *Cantrell v. Extradition Corp. of Am.*, 789 F. Supp. 306, 310 (W.D. Mo. 1992).

[13] *Stratasys, Inc. v. ProtoPulsion, Inc.*, 2011 WL 2750720, at *5 (Minn. Ct. App. July 18, 2011) ("Nor is [defendant] shielded from personal jurisdiction simply because his actions were taken in his capacity as CEO.") *Safco Prod. Co. v. WelCom Prod., Inc.*, 730 F. Supp. 2d 959, 966 (D.Minn. 2010) ("The Minnesota Supreme Court has given no indication that it is inclined to adopt the fiduciary shield doctrine," and "Minnesota's long-arm statute extends the personal jurisdiction of Minnesota courts as far as the Due Process Clause of the federal constitution allows") *BioE LLC v. Mediatech, Inc.*, 2011 WL 31727, at *4 (D.Minn. Jan. 5, 2011) (same); *M.G. Incentives, Inc. v. Marchand*, 2001 WL 96223, at *5 (Minn. Ct. App. Feb. 6, 2001) ("This doctrine has never been adopted in Minnesota.")

[14] Renfrew's only citation on this point is a 1986 Eighth Circuit decision applying Arkansas' long-arm statute. *Ark. Rice Growers Co-Op. v. Alchemy Indus., Inc.*, 797 F.2d 565, 574. Much more recently, the Eighth Circuit has clarified that *Arkansas Rice Growers* does not govern the due-process inquiry, under which "[t]he Supreme Court has directed courts to consider and assess individually each

"fiduciary shield" does not protect a corporate officer who "is a primary partici-
pant in an alleged wrongdoing intentionally directed at forum-state residents."
*Westlake Invs., L.L.C. v. MLP Mgmt. L.L.C.*, 707 F. Supp. 2d 904, 914 (S.D. Iowa 2010)
(discussing *Iowa ex rel. Miller v. Grodzinsky*, 571 N.W.2d 1 (Iowa 1997)). And here,
Renfrew was *the* primary participant in "buying back the Beautycounter business"
to evade a judgment in this case—which is the basis for Plaintiffs' successor-liabil-
ity and fraudulent transfer claims.

### 3. By regularly serving the Minnesota market for private-equity takeo-vers and management, Carlyle has subjected itself to personal jurisdiction for in-State harms from that business.

Alternatively, Carlyle is subject to specific personal jurisdiction by serving
the Minnesota market for corporate takeovers and management.

Carlyle concedes that it has many contacts with Minnesota: it has deliber-
ately reached out to Minnesota in buying and managing many Minnesota compa-
nies, and has facilitated or attempted many other such purchases. Carlyle just ar-
gues that these contracts "are beside the point," because they allegedly lack "any
connection to Plaintiffs' claims." (ECF 70 at 15.) Carlyle is mistaken.

The Supreme Court recently clarified that "[w]hen a company serves a mar-
ket for a product in a State and that product causes injury in the State to one of its
residents, the State's courts" have personal jurisdiction to "entertain the resulting
suit"—even if the defendant did not sell "the particular" product that caused the
injury within the forum State. *Ford Motor Co. v. Montana Eighth Judicial District
Court*, 592 U.S. 351, 355 (2021). This case is *Ford Motor Co.* for private-equity

---

defendant's contacts with the forum state." *Henry L. Firm v. Cuker Interactive, LLC*,
950 F.3d 528, 533 (8th Cir. 2020).

behemoths like Carlyle: instead of cars, the relevant "product" is corporate takeovers and management.

In *Ford* the Supreme Court found Ford subject to personal jurisdiction in Minnesota for a suit about a car that Ford sold elsewhere but that crashed in Minnesota—holding "that specific jurisdiction attaches … when a company … serves a market for a product in the forum State and [one of] the product malfunctions there," even if the particular product at issue was actually sold elsewhere. *Id.* at 363. When a company like Ford sells products nationwide, this likely subjects it to personal jurisdiction in whatever State they happen to cause injury—but that did not seem to trouble the Supreme Court at all.

Of course, the holding of *Ford* is not limited to retail sales. Other courts have applied it to find personal jurisdiction based on wholesale transactions, *Foti v. Ezri-Care, LLC*, 2023 WL 11117028, at *6 (C.D. Cal. Nov. 22, 2023), or sales of components added to other products, *B.D. ex rel. Myers v. Samsung SDI Co.*, 2022 WL 22662132, at *3 (S.D. Ind. Sept. 30, 2022). Nor is *Ford* limited to physical goods: other courts have applied it in cases involving financial instruments, *Eng v. Banta*, 2023 WL 4306051, at *12 (D. Haw. June 30, 2023), and intellectual property, *Univ. of Tennessee Rsch. Found. v. Caelum Biosciences, Inc.*, 2021 WL 10428708, at *5 (E.D. Tenn. Apr. 28, 2021). The North Carolina Supreme Court has even applied *Ford* to claims that defendants directed business fraud toward one State, which harmed their plaintiff-employee in another State where defendants conducted extensive similar business activities. *See generally Schaeffer v. SingleCare Hldgs., LLC*, 884 S.E.2d 698 (N.C. 2023).

31

Here, Carlyle conducts corporate takeovers on the same nationwide scale that Ford sells cars, including in Minnesota. While the world's largest investment funds may serve a "market" that is less familiar to most people than that for cars, that is no reason to exempt them from the rule of *Ford*. Carlyle has purposefully availed itself of the opportunity to buy and manage businesses in Minnesota. Therefore, having injured these Plaintiffs in Minnesota through its purchase and mismanagement of a business, Carlyle cannot complain that this particular business was headquartered elsewhere. What was true of Ford is equally true of Carlyle: "[i]n conducting so much business in … Minnesota, [Carlyle] enjoys the benefits and protection of [Minnesota's] laws—the enforcement of contracts, the defense of property, the resulting formation of effective markets." 592 U.S. at 367. This creates "reciprocal obligations" that Carlyle manage its businesses not to harm Minnesota citizens—and Minnesota's enforcement of those obligations "can hardly be said to be undue." *Id.* at 368 (cleaned up).

### D. To Any Extent That Personal Jurisdiction Or Venue Is Improper, The Court Should Sever The Relevant Claims And Transfer To The Central District Of California.

To any extent that the Court disagrees with Plaintiffs and finds that personal jurisdiction or venue is not proper here for any Defendant or claim, Plaintiffs request that the Court sever the relevant claim(s) and transfer them to the Central District of California, where jurisdiction and venue are indisputably proper. This is a common remedy when the venue where plaintiffs filed a case is proper as to some but not all of the case. *See Rappoport v. Steven Spielberg, Inc.*, 16 F.Supp.2d 481, 496 (D.N.J. 1998) (collecting cases); *Voss v. Johnson & Johnson*, 2008 WL 697474, at *1 (D.Minn. Mar. 12, 2008) (similar).

## II.     Defendants' Requests For Arbitration (Or Transfer) Fail.

Defendants' demands to compel arbitration fail for a cascade of reasons. Their afterthought request to transfer the case fails for many of the same reasons.

"Arbitration is a matter of contract law, and favored status notwithstanding, parties cannot be compelled to arbitrate unless they have contractually agreed to be bound by arbitration." *Shockley v. PrimeLending*, 929 F.3d 1012, 1017 (8th Cir. 2019). "The threshold inquiry" on a motion to compel arbitration, "therefore, is whether the parties contractually agreed to arbitrate their dispute…. [T]he party seeking to compel arbitration[] bears the burden of proving that such an agreement exists and is enforceable." *Anhui Powerguard Tech. Co. v. DRE Health Corp.*, 95 F.4th 1146, 1149 (8th Cir. 2024).

Procedurally, "When parties submit affidavits in conjunction with a motion to compel arbitration, the district court treats the motion akin to a motion for summary judgment, viewing the record in the light most favorable to the nonmovant." *Duncan v. Int'l Markets Live, Inc.*, 20 F.4th 400, 403 (8th Cir. 2021). Here, far from showing that the record compels a finding of arbitrability, Defendants have failed to produce competent evidence that could even *allow* such a finding.

### A.     Defendants Have Not Adduced Any Arbitration Agreement That Even Purported To Be In Effect At The Relevant Time.

Most fundamentally, Defendants have not carried their burden of showing a relevant arbitration agreement (or forum-selection clause) at all. As described above, Plaintiffs are suing about conduct that Defendants announced and began in March and April 2022, resulting in severe compensation cuts to Plaintiffs starting in July 2022, and suspensions and terminations of the Plaintiffs' particular consultancies between August 2022 and March 2023. *See supra* Facts Pts. B, D. But

33

Defendants seek arbitration based on a document that, on their own evidence, was in force only from June 1 to July 1, 2022.

The arbitration provision Defendants point to is contained in a document that states it is "Effective January 15, 2020." (ECF 14-23 at 21 (date in document footer).) Defendants' evidence shows that they frequently revised the document including, amendments effective June 1 and July 1, 2022. (ECF 13-1 at 3-5.) Defendants do not specify which version of the "2022 Agreement" they have adduced. They submit a companion "Policies and Procedures" document that states it is effective June 1, 2022. (ECF 14-24.) As far as the record shows, then, Defendants' "2022 Agreement" purported to be in force only for the month of June 2022.

Little if any of Plaintiffs' claims arose in June 2022. Beautycounter slashed Plaintiffs pay in July 2022, and terminated each of them between then and March 2023. *See supra* Facts Pt. B. Thus, Defendants have failed to submit an arbitration provision (or forum-selection clause) that even purported to be in effect at the relevant time.[15]

### B.   Defendants Have No Evidence Of Offer Or Acceptance For The "Contract" On Which They Rely.

Second, Defendants have utterly failed to show that anyone ever offered Plaintiffs the purported 2022 contract, or that Plaintiffs ever agreed to it.

---

[15] Plaintiffs sought discovery on this and other arbitrability issues, but the Magistrate Judge denied this request, finding no "good cause." [Dkt. 95.] Therefore, Defendants must be held accountable for all evidentiary gaps in their supporting "evidence," and cannot be permitted to supplement or clarify the record.

1.    **Defendants bear the burden of proving offer and acceptance.**

"At the most fundamental level, assent is required for a contract or an agreement [to arbitrate] to exist." *Burnett v. Nat'l Ass'n of Realtors*, 75 F.4th 975, 981 (8th Cir. 2023) (cleaned up). "[C]ontract formation requires an offer, acceptance, and consideration," and "[m]utual assent … is assessed under an objective standard." *Ballou v. Asset Mktg. Servs., LLC*, 46 F.4th 844, 851 (8th Cir. 2022). It is not enough that a plaintiff merely "acknowledged the existence of" an arbitration provision, or "was aware of the terms," or "reviewed" the provision. *Shockley*, 929 F.3d at 1019 (applying Missouri contract law). Without proof of "an unequivocal acceptance," "the arbitration provision was not a validly formed contract." *Id.* at 1019-20.

This Court has applied these rules to an arbitration provision in an employee handbook. "[I]f the terms" of the handbook "are not communicated to the employee, no contract can be formed…. In short, the Court cannot find that [plaintiffs] are bound by [an] arbitration clause … unless there is evidence that [they] received a copy." *Nabry v. MV Transp, Inc.*, 2007 WL 4373107, at *5 (D.Minn. Dec. 13, 2007) (Schiltz, J.) The plaintiffs' general awareness of company policies does not make them a contract: some actual presentation to the plaintiff is required. *See id.* at *6-7. This is especially true where Plaintiffs here are not at-will employees, they are contractors with a business relationship with Beautycounter.

And of course, an offer is only half the contract-formation process: the plaintiff must also accept. Thus, this Court has adopted a magistrate judge's conclusion that, although a plaintiff possessed an "unsigned" document containing an arbitration provision, it could not be enforced without any "competent basis upon

which to find that" the plaintiff "ever consented to … arbitration." *ABC Bus Leasing, Inc. v. Traveling in Style (TIS) Inc.*, 2007 WL 2768292, at *6 (D.Minn. Sept. 18, 2007) (report and recommendation); *id.* at *1 (Schiltz, J.) (agreeing with the R&R's analysis).[16]

### 2.    Defendants have wholly failed to carry their burden.

Here, with respect to Defendants' purported "2022 Agreement," they have no evidence of either offer or acceptance.

First, there is no indication that anyone ever offered the "2022 Agreement" to any Plaintiff. Many years before 2022, Plaintiffs clicked "Accept" on online "terms and conditions" that expressly expired after one year. *See supra* Facts Pt. D. There is no evidence, and Defendants do not argue, that Plaintiffs ever clicked "accept" as to the 2022 documents. Defendants assert only that Plaintiffs (1) renewed their Beautycounter memberships for 2022 through an online checkout, and (2) continued to act as Beautycounter consultants. (ECF 70 at 7-8, ECF 100 at 6-7.) This is unavailing for multiple reasons.

First, three of the seven Plaintiffs—the individuals Shawgo, Dawley, and Bjornlie—*did not* renew Beautycounter consultancies or act as Beautycounter consultants for 2022. Only the Shawgo, Dawley, and Bjornlie LLCs did that. *See supra* Facts Pt. B. This is no academic distinction: it was the individual Plaintiffs (not the

---

[16] California courts hold similarly. *E.g.*, *Quiroz v. World Variety Produce, Inc.*, 2021 WL 1939073, at *3 (Cal. Ct. App. May 14, 2021) ("[C]onspicuously absent from the acknowledgment receipt form was any reference to an agreement by the employee to abide by the employee handbook's arbitration agreement provision." (cleaned up)).

LLCs) who went to work with Green Compass and thereby gave Defendants their purported grounds for termination; and it was the individuals against whom Defendants threatened enforcement of post-termination non-solicitation obligations. These individuals have separate claims in this case, and there is no argument that they are subject to arbitration or a California forum requirement.

Second, there is no evidence that Beautycounter (or anyone) ever offered the 2022 documents for *any* Plaintiff's agreement, or indicated that their membership renewals or conduct of business would express agreement to the 2022 documents. Plaintiffs simply "bought" Beautycounter memberships in an online checkout, without viewing or even being told about any written terms. *See supra* Facts Pt. D. So it does not help Defendants to cite (ECF 100 at 7) California's hesitant approval of online membership offers that ***do*** "include a textual notice indicating the user will be bound by the terms." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 471 (2021). Defendants cannot meet even that factual standard.

To be sure, Carlyle ***argues*** that "Plaintiffs … opened numerous emails alerting them that their 'continuation' of 'business after the effective date of new Agreements … means they 'accept them.' (ECF 70 at 7-8.) But Defendants offer no ***evidence*** of this with respect to anytime in 2022. Carlyle points only to emails from 2018 and 2019—neither of which notified Plaintiffs of or offered them the terms of the "2022 agreement" that Carlyle is relying on here.

Third, because Defendants have no evidence that the 2022 documents were offered to Plaintiffs, they correspondingly cannot prove acceptance. Defendants gain nothing by noting (ECF 70 at 7, 100 at 7) that *employees* can accept modified terms of employment simply by continuing to work. The obvious prerequisite to

is that the employees be *offered* the terms (or modifications). Defendants have no evidence of any offer here. Moreover, Defendants chose *not* to hire Plaintiffs as employees, so case law in the employment at-will context has limited application here.

Finally, it does not help Carlyle to point out that Shawgo referred to Beautycounter Policies and Procedures in an email to Beautycounter. (ECF 70 at 5.) The question is not whether any Plaintiff knew that a document purporting to be the "2022 agreement" existed, or subjectively believed that it was binding.[17] The question is whether Defendants have proved that any Plaintiff actually was offered and accepted such an agreement. They have wholly failed to do so.

### C.  Beautycounter Could Amend the Alleged Arbitration Agreements (and Forum-Selection Clauses) Whenever It Wanted, so they are Illusory and Unenforceable.

Even if Defendants had proved that Plaintiffs were offered and accepted an arbitration agreement (or forum-selection clause) that purported to be in effect at the relevant time, they would run into another fatal contract-formation obstacle: lack of consideration.

"Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise," and such a promise "is not consideration for a return promise." Restatement (Second) of Contracts 77 cmt.a. Thus, "an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory" and unenforceable.

---

[17] As Shawgo explains in her declaration, she sent the email in question based on what she now regards as faulty legal advice, seeking to save her livelihood at a time when many of her counterparts were losing theirs. (Shawgo Decl. ¶18.)

*Dumais v. Am. Gol Corp.*, 299 F.2d 1216, 1219 (10th Cir. 2002). A great many Courts of Appeals apply this rule[18]—including to dispute-resolution agreements between multilevel-marketing organizations and their consultants. *Morrison v. Amway Corp.*, 517 F.3d 248, 257 (5th Cir. 2008) ("arbitration agreement was illusory and unenforceable" where the organization's "right of unilateral amendment extends to providing for (and, by necessary implication, to modifying or repealing) arbitration"); *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 999 (9th Cir. 2010) (conciliation provision was illusory where "Quixtar reserved to itself 'the sole right to adopt, amend, modify, supplement, or rescind any or all of these Rules'").

There is one exception: some courts rule, primarily in at-will employment cases, that modification authority does not vitiate an arbitration clause if (among other things) it "extends only to prospective claims" and cannot be used retroactively to change the arbitration rules for claims that have already arisen. *Nelson v. Watch House Int'l, L.L.C.*, 815 F.3d 190, 194 (5th Cir. 2016); *see Yufan Zhang v. UnitedHealth Grp.*, 367 F. Supp. 3d 910, 916 (D.Minn. 2019). It is not clear whether this narrow exception should apply outside the employment context. But in all events,

---

[18] *E.g., id.*; *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939 (4th Cir. 1999) (arbitration agreement unenforceable where "Hooters reserves the right to modify the rules, 'in whole or in part,' whenever it wishes"); *Druco Restaurants, Inc. v. Steak N Shake Enterprises, Inc.*, 765 F.3d 776, 783 (7th Cir. 2014) (where "Steak n Shake was free to exercise or not exercise the arbitration clause at its whim," the "clause is illusory because performance is entirely optional with the promisor"); *Douglas v. Johnson Real Est. Invs., LLC*, 470 F.App'x 823, 826 (11th Cir. 2012) ("Johnson's promise to arbitrate was illusory" where "Johnson could modify the [agreement] unilaterally"); *Day v. Fortune Hi-Tech Mktg., Inc.*, 536 F.App'x 600, 604 (6th Cir. 2013) (where "Defendant could modify the arbitration clause to suit its purposes at any time," "in effect, Defendant promised to do certain things unless it decided not to, and that is by definition illusory").

outside this narrow exception, the law is clear: one side's boundless amendment authority renders an arbitration provision illusory and unenforceable.

Here, Defendants' "2022 Agreement" fails this test. It expressly provides that "the terms of this Agreement, including the Beautycounter Policies & Procedures and Beautycounter Compensation Plan may be amended at the sole discretion of Beautycounter." (ECF 14-23 ¶23.) There were no limits: Beautycounter could completely eliminate or rewrite its own arbitration or forum-selection "obligations" while leaving the consultant's obligations unchanged (or even making them more severe).

Moreover, Beautycounter could do so retroactively. The "2022 Agreement" says only "that amended *policies* shall not apply retroactively to conduct that occurred prior to the effective date of the amendment." (ECF 14-23 ¶23.) But the "Beautycounter Policies & Procedures" are a separate document—they are not the same as the Consultant Agreement itself, which contains the arbitration provision. (*Id.*) When the Consultant Agreement refers to itself, the Policies & Procedures, and other documents collectively, it calls them "the Agreement." (*Id.* ¶1, ECF 14-24 at 4.) By contrast, when the Consultant Agreement and accompanying documents use the word "policies," they plainly are referring only to the Policies & Procedures document. (ECF 14-23 ¶5 (referring to "the Beautycounter Policies and the Beautycounter Compensation Plan"), ECF 14-24 at 3, 10, 11.) Indeed, the parallel provision in the Policies & Procedures document itself clarifies that Beautycounter "reserves the right to amend the Agreement, including these Policies and Procedures, at its discretion," but "[a]ny amendment(s) *to these Policies* shall *not* apply retroactively." (ECF 14-24 at 4 (first emphasis supplied).) So there plainly

was no bar on retroactive revisions to the "2022 Agreement," which includes the arbitration and forum-selection provisions.

Even "silence about the possible retroactive application of amendments to the arbitration policy" is enough to render an arbitration agreement illusory and unenforceable. *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 206–07 (5th Cir. 2012). Here, Defendants' purported "agreement" goes well beyond silence.

These same flaws apply to the "2022 Agreement's" purported requirement that the arbitrator decide questions of arbitrability (ECF 14-23 ¶33.c). This delegation clause, too, could be amended by Beautycounter however and whenever it wanted—so the delegation clause itself is independently illusory and unenforceable.

In short, the purported arbitration provision amounted to a promise that Beautycounter would arbitrate only if it felt like it. Likewise, the forum-selection clause amounted to Beautycounter's commitment to litigate in California only if it wanted to. That is insufficient to form a contract.

### D.    The Arbitration Agreements Are Unconscionable.

Third, even assuming that the arbitration provision appears in valid contracts, it—and its delegation provision specifically—would still be unconscionable and unenforceable.

### 1.    "Mutuality" is the "paramount" requirement for a California arbitration agreement—and it is lacking here under settled law.

The "2022 Agreement" provides that it "shall be governed by and construed in accordance with the laws of the State of California without giving effect to

principles of conflicts of laws." (ECF 14-23 ¶31.) If the parties had entered this agreement, then, California law would govern unconscionability.

In California, generally speaking,

> procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability…. Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.

*Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000). "[A] contract of adhesion" generally qualifies as procedurally unconscionable under California law. *Id.* at 118.[19] The arbitration provision here unquestionably is adhesive: as Defendants concede (ECF 70 at 9), if it is binding, Plaintiffs could avoid it only by ending their relationship with Beautycounter and finding other work.

[I]n assessing substantive conscionability" of an arbitration agreement under California law, "[t]he paramount consideration … is mutuality." *Davis v. Kozak*, 53 Cal. App. 5th 897, 910 (2020). This means that "unconscionability limits" a party from "impos[ing] the arbitration forum on the weaker party without accepting that forum for itself." *Armendariz*, 24 Cal.4th at 118. Thus, California "courts repeatedly have found an employer-imposed arbitration agreement to be substantively unconscionable when it requires the employee to arbitrate the claims he or she is most likely to bring, but allows the employer to go to court to pursue the claims it is most likely to bring." *Carbajal v. CWPSC, Inc.*, 245 Cal.App.4th 227, 248

---

[19] On this point, Carlyle cites principally to a case applying a much different Minnesota-law standard *Butler v. ATS Inc.*, 2021 WL 1382378, at *19 (D.Minn. Apr. 13, 2021). That is inapposite.

(2016).[20] This rule looks beyond the face of the contractual language to determine whether, in practice, it requires arbitration predominantly for claims likely to be brought by one side. *Sanchez v. Valencia Holding Co., LLC*, 61 Cal.4th 899, 915 (2015) (looking past arbitration provision's facial neutrality and noting, "[i]n the vernacular … let us 'get real'") (cleaned up).

One of the ways that arbitration agreements most frequently violate this rule is by including an "exemption for injunctive relief for claims of unfair competition, trade secrets, or confidential information." *Durruthy v. Charter Commc'ns, LLC*, 2020 WL 6871048, at *8 (S.D.Cal. Nov. 23, 2020). Such a provision is unlawfully one-sided because "[a]n employee terminated for stealing trade secrets, for example, must arbitrate his wrongful termination claim under the agreement but [the other side] can avoid a corresponding obligation to arbitrate its trade secrets claim against the employee by the simple expedient of requesting injunctive or declaratory relief."[21]

"This issue is not a close call," and there is an "abundance of case law on [it]." *Buchsbaum v. Digital Intel. Sys., LLC*, 2020 WL 7059515, at *6 (S.D. Cal. Dec. 2, 2020). Indeed, even in just the last few years, a veritable avalanche of California

---

[20] Although this rule arose in the employment context, as the cases cited here show, California courts apply it in other contexts as well.

[21] *Mercuro v. Superior Ct.*, 96 Cal.App.4th 167, 176 (2002); *accord, e.g., Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 784–85 (9th Cir. 2002); *accord, e.g., Carbajal v. CWPSC, Inc.*, 245 Cal.App.4th 227, 248–49 (2016).

authority has held arbitration provisions exempting trade-secrets injunctions are unconscionably one-sided.[22]

So here. The "2022 Agreement" says that "either Party may bring an action in a court seeking a restraining order, temporary or permanent injunction, or other equitable relief to protect its intellectual property rights, including … customer and/or Consultant lists as well as other trade secrets, trademarks, trade names, patents, and copyrights." (ECF 14-23 9 ¶35.) That is *exactly* what California law forbids, so the arbitration provision is unconscionable.

This is a question for the Court, and not for an arbitrator, because the "2022 Agreement's" delegation clause itself is unconscionably non-mutual. Indeed, that is true twice over. First and most simply, the "Agreement's" unconscionably one-sided IP carveout applies to the delegation clause as well. The IP carveout appears in the document's text after the delegation clause—and specifies that it applies "**[n]otwithstanding the foregoing.**" (*Id.* (emphasis added).) Evidently, then, it purports to allow a court and not an arbitrator to decide whether an action comes within the "IP carveout." This makes the delegation provision itself unconscionably one-sided.

Second, and separately, the delegation provision is unconscionably non-mutual because it expressly exempts the "2022 Agreement's" class-action waiver from its terms—providing that "that any claim or contention that all or part of this

---

[22] *Murrey v. Superior Ct.*, 87 Cal.App.5th 1223, 1251–52 (2023); *King v. Baker Petrolite LLC*, 2023 WL 4246784, at *12-14 (Cal.Ct.App. June 29, 2023) (collecting cases); *Barraza v. Tesla, Inc.*, 2023 WL 2887547, at *6-7 (Cal.Ct.App. Apr. 11, 2023); *Ramirez v. Charter Commc'ns, Inc.*, 75 Cal.App.5th 365, 383 (2022); *Storms v. Paychex, Inc.*, 2022 WL 2160414, at *16 (C.D.Cal. Jan. 14, 2022) (collecting cases); *Davis v. Kozak*, 53 Cal.App.5th 897, 915–16 (2020).

class action waiver is unenforceable may be determined only by a court of compe-
tent jurisdiction and not by an arbitrator." (*Id.* ¶34.)[23] Since Beautycounter pur-
portedly offered this form agreement to all new consultants, they were far more
likely than Beautycounter to assert class claims. Therefore, requiring that the arbi-
trator decide every issue *except* the validity of a class-action waiver plainly lacks
mutuality and is unconscionable.[24]

### 2.    California prohibits "fee-splitting" arrangements like this one.

Second, under California unconscionability law, "an arbitration agreement
cannot generally require the employee to bear any type of expense that the em-
ployee would not be required to bear if he or she were free to bring the action in
court." *Mills v. Facility Sols. Grp., Inc.*, 84 Cal.App.5th 1035, 1055 (2022) (emphasis
omitted) (quoting *Aremandariz*, 24 Cal.4th at 110-111; *accord, e.g., OTO, L.L.C. v. Kho*,
8 Cal.5th 111, 134–35 (2019) (California "requires that employers bear most arbi-
tration costs, which, because they include the arbitrator's compensation, can be
substantial"); *Lim v. TForce Logistics, LLC,* 8 F.4th 992, 1002 (9th Cir. 2021).[25] Thus,

---

[23] This betrays rather naked cynicism by Beautycounter about arbitrators: it trusted
arbitrators when they stood to earn increased arbitration fees by ruling in Beau-
tycounter's favor (on arbitrability), but ***not*** when they stood to earn increased ar-
bitration fees by ruling against Beautycounter (on the availability of class proceed-
ings).

[24] This is fully compatible with the rule that "[r]equiring the availability of class-
wide arbitration interferes with fundamental attributes of arbitration and thus cre-
ates a scheme inconsistent with the FAA." *AT&T Mobility LLC v. Concepcion*, 563
U.S. 333, 344 (2011). Having an arbitrator *decide* whether a class-action waiver is
valid does not remotely interfere with arbitration.

[25] California courts apply the same principles to non-employment contracts "suf-
ficiently similar to that of an employee-employer relationship." *Ali v. Daylight
Transp., LLC*, 59 Cal.App.5th 462, 473–74 (2020); *Subcontracting Concepts (CT), LLC*

in order to avoid unconscionability, "the employer must bear the arbitration forum costs, such as arbitrators' fees" — and when arbitration agreements say otherwise, "[t]he Ninth Circuit has held repeatedly that such provisions are substantively unconscionable and thus unenforceable under California law." *Blair v. INFORM Software Corp.*, 2023 WL 137471, at *9 (N.D.Cal. Jan. 8, 2023); *accord, e.g., Roe v. SFBSC Mgmt., LLC*, 2015 WL 930683, at *11 (N.D.Cal. Mar. 2, 2015).

Outside the consumer context, therefore, a California arbitration agreement is "substantively unconscionable [if] it requires the arbitrator's fees to be paid equally by the parties." *Martin v. TeleTech Holdings, Inc.*, 213 F.App'x 581, 583 (9th Cir. 2006); *see Ramos v. Superior Ct.*, 28 Cal.App.5th 1042, 1064 (2018), *modified* (Nov. 28, 2018) (unconscionable to require plaintiff to "bear half of the costs of arbitration"); *Scally v. PetSmart LLC*, 2023 WL 9103618, at *3 (N.D.Cal. May 25, 2023). A long line of cases follow this rule.[26]

Here again, the "2022 Agreement" purports to require the claimant to pay "the initial filing fees and costs charged by AAA," and mandates that "[t]he Parties shall share equally the costs of case management fees, arbitrator fees or other fees

---

*v. De Melo*, 34 Cal.App.5th 201, 209 -10 (2019). *Cf. OTO, L.L.C. v. Kho*, 8 Cal.5th 111, 129 n.9 (2019) (applying *Armendariz* outside its original statutory context); *Nielsen Contracting, Inc. v. Applied Underwriters, Inc.*, 22 Cal.App.5th 1096, 1110-1113 (2018), *modified* (May 23, 2018) (applying these rules to arbitration provision in reinsurance contract); *Saravia v. Dynamex, Inc.*, 310 F.R.D. 412, 421 (N.D.Cal. 2015) (applying these principles to federal wage-and-hour claim).

[26] *E.g., Antonelli v. Finish Line, Inc.*, 2012 WL 525538, at *5 (N.D.Cal. Feb. 16, 2012); *Ortolani v. Freedom Mortg. Corp.*, 2017 WL 10518040, at *6 (C.D.Cal. Nov. 16, 2017); *Chavarria v. Ralphs Grocer Co.*, 812 F. Supp. 2d 1079, 1087–88 (C.D Cal. 2011), *aff'd*, 733 F.3d 916 (9th Cir. 2013); *Haydon v. Elegance at Dublin*, 97 Cal.App.5th 1280, 1291 (2023).

charged by the AAA." (ECF 14-23 ¶33.) This prevents consultants from even as-
serting claims against Beautycounter unless they are able and willing to pay tens—
possibly hundreds—of thousands of dollars in fees. (Dattilo Decl. ¶¶23-26; Ex. G)
(arbitrators proposed by the AAA for the Shawgo mediation charge upwards of
$14,000 *a day*). Like most people, Plaintiffs here could not do that, and so the arbi-
tration provision would effectively foreclose their claims from any forum. (Dawley
Decl.¶17; Shawgo Decl. ¶17; Pike Decl. ¶12; Bjornlie Decl. ¶16; Declaration of
Amanda Scott ¶12; Declaration of Anne Huitt, ¶11;  Declaration of Barri Sptizer,
¶12; Declaration of Bronte Picou, ¶11; Declaration of Carrie Smith, ¶16; Declara-
tion of Charla Bagzis ¶12, Declaration of Christine Calegari ¶10, Declaration of
Christine Kreinbihl ¶11, Declaration of Cindy Persky ¶11; Declaration of Darcy
Ivanans ¶10, Declaration of Dawn Bures ¶11, Declaration of Gina Quattrochi ¶11,
Declaration of Jean Zirlin ¶17, Declaration of Julie Eisenberg ¶11, Declaration of
Karleigh Hatland ¶10, Declaration of Kelli Weber ¶11, Declaration of Kellie Sibley
¶13, Declaration of MaryLousie Howley ¶11; Declaration of Mary-Therese Fioren-
tini ¶10, Declaration of Medina Culver ¶11; Declaration of Melicent Sibley ¶11;
Declaration of Michelle Lilly ¶11; Declaration of Mimi MacLean ¶13; Declaration
of Morgan Moore ¶11; Declaration of Page Calla ¶11; Declaration of Rachel
Menard ¶11; Declaration of Renee Hill ¶10; Declaration of Rikki Miller ¶10; Dec-
laration of Robyn Bouman ¶11; Declaration of Ruby Guardia ¶10; Declaration of
Sondra McCummen ¶10; Declaration of Stacey Heiny ¶15; Declaration of Staci
Kalvaitis ¶12; Declaration of Stephanie Dalton ¶11; Declaration of Stephanie Mor-
ris ¶11; Declaration of Stephanie Whittaker ¶11; Declaration of Windy Silver ¶11.)
California law does not allow that.

And here again, California law is extraordinarily clear that this is a question for the Court, not an arbitrator. "[T]he requirement that [a plaintiff] pay half of the arbitration fees" is unconscionable if it applies "with respect to the gateway issue of arbitrability." *Lim v. TForce Logistics, LLC,* 8 F.4th 992, 1003 (9th Cir. 2021); *see Nielsen Contracting, Inc. v. Applied Underwriters, Inc.*, 22 Cal.App.5th 1096, 1110-1113 (2018), *modified* (May 23, 2018). It is independently unconscionable to require a plaintiff to pay an arbitration fee "in order to even arbitrate the issue of arbitrability." *Gountoumas v. Giaran, Inc.*, 2018 WL 6930761, at *12 (C.D.Cal. Nov. 21, 2018); *accord Saravia v. Dynamex, Inc.*, 310 F.R.D. 412, 421 (N.D.Cal. 2015) (finding unconscionability where, "even to resolve the question of arbitrability, [the plaintiff] would be responsible for substantial filing fees, final fees, and costs such as arbitrator compensation, which he would not face in court"). That is precisely the problem here, so the Court must decide this issue.

### E. The Only Signatory to the "2022 Agreement," Counter Brands, LLC, has Waived Arbitration—and This Binds All Defendants.

Regardless whether Defendants ever had enforceable arbitration rights (or forum-selection rights), they have been waived here. The "2022 Agreement" purports to be "between Counter Brands, LLC" and each individual consultant. (ECF 14-23 at "Terms and Conditions".) The moving Defendants claim they are third-party beneficiaries. But the *first* party—Counter Brands, LLC—has clearly waived arbitration and a California forum.[27] As a matter of law, that precludes third parties from asserting the waived rights.

---

[27] "[T]he standard for waiver of an arbitration clause" applies equally "to waiver of a forum-selection clause." *Wildhawk Invs., LLC v. Brava I.P., LLC*, 2022 WL

1.      **Counter Brands, LLC waived arbitration.**

As noted above, Counter Brands, LLC (in this section, "Counter") has abandoned its California arbitration against Shawgo, abandoned its motion to compel arbitration in this case, defaulted in this case and the parallel California action, and abandoned its defense of Plaintiffs' claim that the arbitration clause is unenforceable. *See supra* Facts Pt. C; Dattilo Decl. ¶¶ 7-20.) While *all* of this conduct waives Counter's arbitration and forum-selection rights, the default in this action is enough by itself.

Defaulting in litigation alone waives any arbitration demand. *E.g., Palmetto Constr. Grp., LLC v. Restoration Specialists, LLC*, 2024 WL 3811674, at *5 (S.C.Ct. App. Aug. 14, 2024); *LaFrance Architect v. Point Five Dev. S. Burlington, LLC*, 91 A.3d 364, 372 (Vt. 2013); *Interconex, Inc. v. Ugarov*, 224 S.W.3d 523, 535-36 (Tex. Ct. App. 2007); *Tri-State Delta Chemicals, Inc. v. Crow*, 61 S.W.3d 172, 174 (Ark. 2001); *Woodruff v. Spence*, 883 P.2d 936, 938 (Wash. Ct. App. 1994), *amended* (Jan. 30, 1995); *Charming Shoppes, Inc. v. Overland Const., Inc.*, 717 N.Y.S.2d 860, 863 (N.Y.Sup. Ct. 2000). Here, the waiver is even clearer. For one thing, Counter actually *started* an arbitration against one Plaintiff and moved to compel arbitration against others, but then withdrew from and abandoned those efforts. For another thing, Counter has defaulted in its defense of Plaintiffs' claim for declaratory relief **that they are not bound to arbitrate**—which Plaintiffs have asserted consistently since they filed this case. (Dkt. 45 Count XI; Dkt. 1-6 Count XII; Dkt. 1-1 Count X.)

---

18539509, at *2 (S.D. Iowa Feb. 28, 2022) (collecting cases).

## 2.      The waiver binds all third-party Defendants.

This waiver binds both Counter and any third-party beneficiaries whose rights derive from Counter's. Under ordinary contract principles, a "third party beneficiary of a contract can gain no greater rights under that contract than the contracting parties." *Harris v. Superior Ct.*, 188 Cal.App.3d 475 (Ct. App. 1986). Thus, if a contract creates arbitration rights for a signatory and names others as third-party beneficiaries, the third parties' arbitration rights are no greater than the first party's. *Erdman Co. v. Phoenix Land & Acq., LLC*, , 2010 WL 11448227, at *6 (W.D. Ark. July 29, 2010) (contract signatory "waived its right to arbitrate," so "the Court need not consider whether [others] can compel arbitration... as their rights and responsibilities—if they exist—flow from their status as third-party beneficiaries").

California applies the same principle. *See Harris*, 188 Cal.App.3d at 479. That is especially true where the third parties knew of and supported the first party's waiver—as Defendants certainly did here. Carlyle and Counter were represented by the same counsel—who continue representing Carlyle today. (ECF 28-29.) At the time of the waiver, the same counsel represented Renfrew and G2G as well. (Dattilo Decl. ¶¶17-18; Ex. F.) None of them did anything to stop or protest Counter's obvious waiver.

This is not a case where the purported contract grants specific, independent rights to third parties. Rather, the "2022 Agreement" simply purports to require arbitration as between Counter and consultants, and separately specifies certain third-party beneficiaries. (ECF 14-23 at 2, 6). This makes the third parties'

contractual rights entirely derivative of Counter's. Its waiver therefore binds all Defendants.

Nor does it do Defendants any good to argue, as a backstop (ECF 100 at 11-12), that Plaintiffs are somehow equitably estopped from opposing arbitration. As Defendants acknowledge, this kind of equitable estoppel prevents a plaintiff from "rely[ing] on the terms of [an] agreement" for her substantive claims while simultaneously trying to evade her arbitration obligations under "the same contract." (*Id.* at 11-12 (citation omitted).) But Plaintiffs are not remotely doing that. They claim that **no part** of the "2022 Agreement" is valid or enforceable, and that the parties' obligations are instead defined by their course of dealing under an implied-in-fact contract that includes no arbitration agreement. (SAC 420, 507.) There is nothing inequitable about presenting that claim to the Court.

### 3.    Waiver is a question for the Court, not the arbitrator.

Generally, "[c]ourts determine whether a party waives arbitration, not arbitrators." *Breadeaux's Pisa, LLC v. Beckman Bros.*, 83 F.4th 1113, 1118–19 (8th Cir. 2023) (citation omitted). Specifically, as this Court has recognized, **courts** decide whether a party has waived arbitration "by actively participat[ing] in a lawsuit or tak[ing] other action inconsistent with the right to arbitration," while an arbitrator would "decide claims of waiver that rest on the argument that arbitration would be inequitable to one party because relevant evidence has been lost due to the delay of the other." *Parler v. KFC Corp.*, 529 F. Supp. 2d 1009, 1012 (D.Minn. 2008) (Schiltz, J.) (cleaned up). California law is the same. *Samson v. Nama Holdings, LLC*, 2009 WL 10674355, at *3 (C.D. Cal. May 13, 2009) ("Courts decide waiver when the argument is based on conduct before the court," which "is an issue for the court

51

because it is one the contracting parties would expect the court to decide itself" (cleaned up)).

> A delegation clause does not change that rule:
>
>> HCI does not cite a single case in which a court left to the arbitrator to determine whether a party's litigation conduct amounted to a waiver of its arbitration rights. And the cases in which courts themselves make this determination are legion, likely because waiver does not go to the applicability, enforcement, or formation of the agreement to arbitrate but rather goes to whether a party's conduct before the Court should estop the party from later forcing its opponent to relitigate in an arbitral forum that which has already been litigated.
>> * * *
>> A waiver of the right to arbitrate implicates courts' authority to control <u>judicial</u> procedures or to resolve issues arising from <u>judicial conduct</u>. Thus, HCI is mistaken that the Court has no power to determine whether it waived its right to arbitrate these disputes.

*Borup v. CJS Sols. Grp., LLC,* , 2020 WL 2769143, at *1 (D.Minn. May 28, 2020), *aff'd sub nom. Vallone v. CJS Sols. Grp., LLC,* 9 F.4th 861 (8th Cir. 2021).

So here. Counter waived its arbitration rights exclusively through its conduct in this litigation (and the parallel arbitration). The legal consequences of Counter's actions in this Court are manifestly for this Court to decide.

### F.    All Defendants Have Separately Waived the Forum-Selection Clause.

Finally, Defendants have waived the purported forum-selection clause by asking this Court (not their requested transferee court) to decide the merits of Plaintiffs' claims. Carlyle does not request transfer at all. The other Defendants seek transfer only "if the Court were to get past every deficiency" argued in their brief—that is, only if this Court holds on the merits that Plaintiffs have pleaded valid claims. (ECF 100 at 32.)

As noted, the standards for waiver of forum-selection and arbitration pro-
visions are the same. *Wildhawk Invs., LLC*, 2022 WL 18539509, at \*2. And "[r]equest-
ing that a court dispose of a case on the merits before reaching arbitration" waives
arbitration rights. *Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080, 1087 (8th
Cir. 2021) (cleaned up); *see In re Pawn Am. Consumer Data Breach Litig.*, 108 F.4th
610, 613–14 (8th Cir. 2024). By the same token, requesting that a court decide the
merits before transferring waives transfer rights.

Both judicial efficiency and basic fairness foreclose Defendants from seeking
this Court's ruling on the merits, and then seeking a different forum only if this
Court rules against them. Their transfer arguments are waived.

## III. Plaintiffs Plead Valid Claims.

Carlyle argues that Plaintiffs have not pleaded valid claims against it. (ECF
70 Pt.III.) Renfrew states in passing that the allegations of her conduct are insuffi-
cient (though she fails to contest any specific cause of action) and G2G contests
Plaintiffs' pleadings of successor liability and fraudulent transfer. (ECF 100 at 23-
28.)

Two points of clarification are in order. First, Plaintiffs did not intend to as-
sert contract, promissory-estoppel, or fraud claims against Carlyle. To the extent
the SAC does so, it is inartfully drafted, and—if the Court has personal jurisdiction
over Carlyle—Plaintiffs consent to the dismissal of those claims or request leave
to amend the Complaint to remove them as to Carlyle.

 Second, Carlyle and Renfrew seem to misunderstand the bases for their li-
ability. Plaintiffs do not allege that they are somehow vicariously liable for

Counter Brands' or G2G's conduct as their owners and executive. Rather, the SAC alleges in detail specific actions **by Carlyle and Renfrew** that create liability.

### A. Carlyle is Liable for Tortious Interference and Unfair Competition.

#### 1. Plaintiffs plead tortious interference against Carlyle.

Minnesota law includes an expansive tortious-interference cause of action. It covers interference with a sales representative's customer relationships by terminating the sales representative in a manner that interferes with the representative's customer relationships. *Automated Telemarketing Servs., Inc v. Aspect Software, Inc.*, 2011 WL 13104398, at *2 (D. Minn. July 13, 2011) (upholding $1.7 million jury award for such claims). It covers corporate officers who interfere with other employees' relationships with their own company. *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 507 (Minn. 1991). And it does not require a specific pleading of malice. *Lucas v. United Am. Ins. Co.*, 2004 WL 784094, at *5 (D. Minn. Apr. 8, 2004).

Plaintiffs easily plead such claims here against all Defendants, including Carlyle. They allege in detail that Carlyle destroyed and usurped their long, successful business relationships with Beautycounter, their downline consultants, and their customers—for instance, pushing a $1 consultancy sign-up for customers, and then eliminating Plaintiffs' commissions from sales to the new "consultants." (SAC ¶¶194-196.) They plead that Carlyle itself ordered Beautycounter to do these things—indeed, two consecutive Beautycounter CEOs expressly stated that their marching orders on squeezing high-earning consultants came from Carlyle. (E.g., SAC ¶¶8, 41, 181-82, 196, 198-99, 204, 220, 222, 224-27, 324.) And they plead that Carlyle did all of this for its own benefit—why pay Plaintiffs six-figure commissions when Carlyle could just take their businesses for its own profit?

This easily passes the plausibility test. Plaintiffs allege that Carlyle tried to do exactly what many private-equity firms do when they buy a company: squeeze profits out of it by slashing the ranks and pay of upper-middle management. (SAC ¶¶181 ("Carlyle planned to increase its profits by diminishing Plaintiffs' and other Consultants' income"), 182 ("Carlyle planned to require Beautycounter to make changes to … its relationships with Plaintiffs and other Consultants that would have a devastating negative effect on their businesses."), 204 ("Carlyle always intended to disrupt Beautycounter's relationships and course of dealing with Plaintiffs and other top Consultants.").) Again, Plaintiffs even plead that two consecutive Beautycounter CEOs **said** that Carlyle was making them do this. (*Id.* ¶¶224-26.) These allegations easily plead tortious interference by Carlyle.

### 2. Carlyle's counterarguments fail.

Carlyle wholly fails in its effort to deny that any of this was unlawful.  It contends that Plaintiffs cannot plead "that Beautycounter's unilateral adjustment of its Consultants'' compensation was improper," because Beautycounter supposedly "had a contractual *right* to modify Consultant compensation" however it wanted. (ECF 70 at 20; *see id.* at 24-25.) But the SAC says nothing to plead the existence or enforceability of the contract Carlyle invokes.[28] Quite the contrary: the SAC repeatedly pleads that Plaintiffs "had an implied contract established by the parties' course of conduct," not any written contract. (SAC ¶¶420-22, 435-37.) Indeed, even had Plaintiffs agreed to Carlyle's purported "2022 Agreement"—and they plead the opposite—if Carlyle's so-called "Change Provision" really allowed

---

[28] And as Section I above discusses, nowhere has Carlyle proved either of these points.

Beautycounter to change (or eliminate) Consultant compensation in any way, at any time, that would only underline that the purported agreement was illusory or unconscionable, as Plaintiffs also allege. (SAC ¶¶400, 414, 431, 447.)

Carlyle next argues that Beautycounter's non-solicitation provision was valid under California statutes. (ECF 70 at 21-22.) As an initial matter, this argument again applies only to the Plaintiffs who actually were Beautycounter consultants in 2022—that is, not to the individuals Bjornlie, Shawgo, or Dawley.

But more fundamentally, Carlyle's argument fails under California law. California's "general rule is that covenants not to complete are void." *Kelton v. Stravinksi*, 138 Cal.App.4th 941, 946 (2006); California Business and Professions Code 16600 expressly says as much. Outside the context of a business's current ***employees***, who have duties of loyalty, courts regularly strike down non-competition contracts under California law in every possible factual context—including MLM contractor agreements. *Kelton v. Stravinski*, 138 Cal.App.4th at 944-45, 947 (ongoing business partnership); *FaZe Clain Inc. v. Tenney*, 467 F.Supp.3d 180, 187-88 (S.D.N.Y. 2020) (independent contractors; "exception for employer-employee contracts relates to the unique attributes of the employment relationship" (cleaned up)); *Herbalife Int'l of Am., Inc. v. Ford*, 2009 WL 10668461, at *15 (C.D.Cal. Aug. 25, 2009) (MLM contractor); *Nulife Ventures, Inc. v. Avacen, Inc.,* 2020 WL 7318122, at *11 (S.D.Cal. Dec. 11, 2020) (same).

Carlyle relies on a single, outlying contrary case. *Youngevity Int'l Corp. v. Smith*, 224 F.Supp.3d 1022 (S.D.Cal. Dec. 1, 2016); *see id.*, 2021 WL 1041712, at *4

(Feb. 4, 2021). In addition to representing a decided minority view,[29] *Youngevity* unduly implied an exception to the plain language of Section 16600.

To top things off, the *Youngevity* non-solicitation provision applied *only* while the independent-contractor agreement was in force. Neither it nor any other authority supports the lawfulness of a provision, like Beautycounter's here, that purports to apply both during and after the contractor's term. So even if *Youngevity* were correct, settled California law bars re-writing this contract to comply with it. *See Kolani v. Gluska*, 64 Cal.App.4th 402, 407–08 (1998) ("Generally, courts reform contracts only where the parties have made a mistake and not for the purpose of saving an illegal contract. Illegal contracts are void."); *D'sa v. Playhut, Inc.*, 85 Cal.App.4th 927, 935 (2000) (declining to sever or reform an illegal non-compete); *Strategix, Ltd. v. Infocrossing W., Inc.*, 142 Cal.App.4th 1068, 1074 (2006) ("We decline to rewrite overbroad covenants not to solicit … into narrow bars against soliciting … Had the parties intended to reach such limited — and enforceable — covenants, they could have negotiated for them. We will not do so for the parties now.").

Carlyle next argues that the SAC "do[es] not specifically identify the individual customers involved" in Plaintiffs' tortious-interference claims. (ECF 70 at 22 (cleaned up).) California law does not require customers in tortious-interference claims to be "specifically mentioned by name;" they need only be "identified in

---

[29] The *Youngevity* court stated that "other courts have held" the difference between independent contractors and employees to be "without consequence" for Section 16600, *id.* at 4 — but those cases merely held that California generally *bars* non-competition agreements for both employees and independent contractors. They did not suggest that an implied *exception* from non-enforceability for employees would also apply to independent contractors.

some manner." *Ramona Manor Convalescent Hosp. v. Care Enterprises*, 177 Cal. App. 3d 1120, 1133 (Cal. Ct. App. 1986), *modified* (Mar. 5, 1986). Judges of this Court have applied a similar rule to Minnesota tortious-interference claims, at least at the pleadings stage. *Toyota Motor Sales, U.S.A., Inc. v. Allen Interchange LLC*, 2023 WL 5206884, at *11 (D.Minn. Aug. 14, 2023); *Paisley Park Enterprises v. Boxill*, 361 F. Supp. 3d 869, 881 (D.Minn. 2019). Thus, it is enough for a tortious-interference plaintiff to generally identify a group of people whose "identities … are known to the parties." *J & M Distrib., Inc. v. Hearth & Home Techs., Inc.*, 2014 WL 12597431, at *27 (D.Minn. July 8, 2014).

Plaintiffs have done that here: they have thousands of repeat customers and downline consultants, the SAC identifies that class of people, and Defendants know well who those people are. In all events, if more specific identification is necessary, the proper remedy is amending the complaint to provide it. *See Clancy v. Vacationaire Ests., Inc.*, 2019 WL 955113, at *9 (D.Minn. Feb. 27, 2019); *Beaulieu v. Stockwell*, 2018 WL 894571, at *2 (D.Minn. Feb. 14, 2018).

Carlyle also contends that the SAC fails to plead "wrongful conduct" under any "determinable legal standard." (ECF 70 at 22.) This is primarily based on Carlyle's contention that Plaintiffs' other claims fail (*id.*); since they do not, as explained here, the tortious-interference claim may proceed as well. But regardless of the technical sufficiency of Plaintiffs' other pleadings, they amply allege that Carlyle's conduct was independently wrongful in several ways: it sought to enforce a non-solicitation provision that California law prohibits (SAC ¶398); it sought to avoid Beautycounter's commission obligations under its implied-in-fact contract with Plaintiffs and under Minnesota law (SAC ¶¶399, 412); and it directed

6

Beautycounter to violate its covenant of good faith and fair dealing with Plaintiffs (SAC ¶¶415, 419-449).

### 3. Plaintiffs plead a UCL claim.

Separately, Carlyle challenges Plaintiffs' UCL claim only by arguing that they seek forbidden "lost profits" as a remedy. (ECF 70 at 24.) Carlye is again mistaken. California authorizes courts "to restore to any person in interest any money or property, real or personal, which may have been acquired by means of … unfair competition". Cal. Bus. & Prof. Code 17203. This "is not limited only to the return of money or property that was once in the possession of [a plaintiff]," but instead extends to any "money or property in which [the plaintiff] has a vested interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003). Thus, an unfair-business-practices plaintiff may seek the return of "earned but unpaid" funds. *Id.*

Plaintiffs plead exactly that here. They do not merely contend that they lost business because of Defendants' conduct. Rather, Plaintiffs plead that Defendants owe them specific commissions for specific sales of Beautycounter products. Some of these were sales that Plaintiffs and their downlines actually made, but that Defendants did not pay commissions for—either because they unfairly slashed commissions or because they wrongly terminated Plaintiffs. *See supra* Facts Pt. B.  Others were purchases that Plaintiffs' customers made by going to Plaintiffs' websites but, due to Defendants' unfair conduct, wound up completing (often unwittingly) those purchases with Defendants themselves, depriving Plaintiffs of any commission. *See supra* Facts Pt. B. Each of these requested recoveries precisely tracks

California's requirement that Plaintiffs seek restitution of monies "earned but unpaid." *Korea Supply*, 29 Cal. 4th at 1149.

**B.    Renfrew is Liable for Her Own Actions.**

Renfrew makes no attempt to address any of the specific causes of action plead against her, instead citing generic case law for the unremarkable proposition that a corporate officer cannot be individually liable for corporate contracts. No one is attempting to hold her liable individually for Counter Brands' contracts. Instead, Plaintiffs seek to hold her liable for her own fraudulent and tortious conduct. "A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Mewawalla v. Middleman,* 601 F. Supp. 3d 574, 597 n.2 (N.D. Cal. 2022) (quoting *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999)) (citing *Frances T. v. Village Green Owners Assn.*, 723 P.2d 573, 583-585 (Cal. 1986) (this is independent of piercing the corporate veil)); *DeRosa v. McKenzie,* 936 N.W.2d 342, 345 (Minn. 2019) ("It is the universal rule that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor.") (citation omitted).

So here. Renfrew can be personally liable for her false statements and misrepresentations to Plaintiffs or for statements she directed or authorized. Plaintiffs allege many statements of those kinds. (SAC ¶¶459-66, 492-97, 510-15.) Defendants' cases stating the general rule that corporate officers are not ordinarily personally liable for corporate contracts does not come close to addressing the SAC's allegations against Renfrew. (See ECF 100 at 22-23.)

### C.   G2G Is Subject To Successor Liability.

Unlike Carlyle and Renfrew, G2G *is* liable for Counter Brands' debts: Plaintiffs have pleaded paradigm successor liability on its part, because G2G is a "mere continuation" of Counter Brands. (G2G also has successor lability because the transfer was fraudulent, but we discuss that in the next subsection.)

G2G's counterarguments boil down to its contention that Minnesota law applies and does not recognize "mere continuation" successor liability. That is mistaken: "mere continuation" liability applies to this case under California law.

This case is venued in Minnesota, but it involves a transfer under California law of California assets by business entities incorporated in Delaware but headquartered in, and operating out of, California. California and Delaware recognize a "mere continuation" theory of successor liability, while (as G2G correctly notes) Minnesota does not. *McClellan*, 89 Cal.App.4th at 753-54; *ResCap Liquidating Tr.*, 2020 WL 1317719, at *7. This presents a conflict.

The next step in the Minnesota choice-of-law inquiry is determining which States' laws may constitutionally apply, but Plaintiffs are not aware of any constitutional objections to applying any State's law. That leaves the third and final step, which is a multi-factor test: "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law." *Blake Marine Grp. v. CarVal Invs. LLC*, 829 F.3d 592, 595 (8th Cir. 2016). G2G apparently recognizes that it has no good arguments under this test, for it ignores it. Instead it simply argues that Minnesota law must apply because Plaintiffs sued here. (ECF 100 at 25). That is not the law.

Just as tellingly, G2G fails even to acknowledge that California law might govern the consequences of a California ABC transfer of California assets between California companies. In fact, Minnesota's choice-of-law factors point unambiguously to California. On all the first three factors—predictability, interstate order, and simplifying the judicial task—the overriding need is for a consistent rule as to whether Defendants' ABC transaction was valid or fraudulent. Minnesota law definitely cannot provide that: if it applied here just because Minnesota is the forum for this particular case, then presumably a different State's law would apply anytime Defendants are sued in some other State. The result would be the opposite of predictability, order, and simplicity.

That leaves the choice between Delaware and California. As noted, the successor-liability laws of these States appear to be similar, so no choice-of-law analysis likely is necessary. But if one were, California would be the clear winner. It is the location of practically everything relevant to the transfer: almost all the transferred assets, the transferor, and the transferee. *See Ronnoco Coffee, LLC v. Westfeldt Bros., Inc.*, 939 F.3d 914, 920 (8th Cir. 2019) (in a successor-liability dispute, "the district court's decision to apply Iowa law to a contract for the sale and delivery of assets located in Iowa is well-supported."). Moreover, the purported "ABC" took place under a unique provision of California law. Predictability, interstate order, and judicial simplification fully suggest that California law should determine its effects.

California holds that a successor owner "assume[s] liability for its predecessor's liability" if "the successor is a mere continuation of the predecessor." *Komaiko v. Baker Techs., Inc.*, 2020 WL 1915884, at *11 (N.D.Cal. Apr. 20, 2020); *accord*

*McClellan*, 89 Cal.App.4th at 753-54. The mere-continuation analysis assesses two factors: whether "adequate consideration for acquisition of the former corporation's assets [was] made available to creditors," and whether "one or more persons were officers, directors, or shareholders of both corporations." *Reno-Tahoe Specialty, Inc. v. Mungchi, Inc.*, 468 F. Supp. 3d 1236, 1241 (C.D.Cal. 2020). Here, not only do Plaintiffs plead both factors in spades, but G2G does not even dispute them. Defendants have prominently stated that ***no*** consideration from the ABC is available to compensate Plaintiffs or other similar creditors. Moreover, Defendant Renfrew is concededly the head of both the transferor (Counter Brands) and the transferee (G2G).

Evidently for this reason, G2G places all its successor-liability eggs in the choice-of-law basket. It makes no real argument that Plaintiffs have failed to plead "mere continuation" liability under California (or Delaware) law. G2G states that Plaintiffs have failed to plead "any defect in the foreclosure sale" (ECF 100 24-25), but that is not an element of California mere-continuation liability—the elements are insufficient remedies for creditors and overlap of directors, officers or shareholders, and Plaintiffs have pleaded both of those. Since California law clearly applies, successor-liability is amply pleaded.

### D.   All Defendants Are Liable For Fraudulent Transfer.

Plaintiffs also plead four fraudulent-transfer claims against all Defendants. (Counts XIII-XVI.) Defendants argue that three of the four[30] fraudulent-transfer causes of action and indeaquately pleaded, but their arguments fail.

---

[30] Defendants G2G and Renfrew do not challenge Count XIII.

**1.  Plaintiffs Allege Substantive-Transfer Claims Against all Defendants.**

Here again, Defendants seem to have misunderstood that Plaintiffs allege fraudulent-transfer claims only against G2G. (*See* ECF 25-28.) That is not consistent with either the SAC or the law. As to G2G, fraudulent transfer is an alternative theory for successor liability. *In re: RFC & ResCap Liquidating Tr. Litig.*, 2017 WL 1483374, at *5 (D. Minn. Apr. 25, 2017). But as to ***all*** Defendants, fraudulent transfer also is a separate cause of action giving rise to independent liability.

Under both California and Minnesota law, a fraudulent transfer allows the transferor's creditors to "recover judgment" (capped at the value of the transfer) against both the transferees and any "person for whose benefit the transfer was made." Cal. Civ. C. 34349.08(b)(1)(A); Minn. Stat. 513.48(b)(1)(i). Under the statute, transferees and beneficiaries of the transfer "are not one and the same," and so the courts roundly reject the "contention that judgment … is limited to debtors and transferees." *Qwest Commc'ns Corp. v. Weisz*, 278 F. Supp. 2d 1188, 1191 (S.D. Cal. 2003); *accord Phillips v. Phillips*, 2014 WL 902683, at *4 n.4 (Minn. Ct. App. Mar. 10, 2014). Rather, corporate insiders who "would stand to benefit" from the transfer are also liable as beneficiaries. *Id.*

In addition, "[i]t is settled law that a person other than the debtor or transferee who conspires with others to effect a fraudulent transfer may be held jointly liable for the creditor's damages." *Cardinale v. Miller*, 2010 WL 1952423, at *4 (Cal.Ct.App. May 17, 2010); *accord Forum Ins. Co. v. Comparet*, 62 F.App'x 151, 153 (9th Cir. 2003) ("California allows for a cause of action for conspiracy to commit fraudulent transfers"); *Arch Ins. Co. v. Sierra Equip. Rental, Inc.*, 2015 WL 1814316, at *4 (E.D. Cal. Apr. 21, 2015); ("[A] claim under the UFTA can provide the

underlying tortious conduct for a conspiracy claim") *Logtale, Ltd. v. Canton*, 2020 WL 4464907, at *6 (N.D. Cal. Aug. 3, 2020); *New Horizon Ents. v. Contemporary Closet Design, Inc.*, 570 N.W.2d 12, 17 (Minn. Ct. App. 1997) (corporate officer liable for fraudulent transfer both as transferee and as participant in "the scheme").

Thus, "in the case of a closely held corporation, … the sole shareholders and officers of the corporation" likely are liable for a fraudulent transfer, whether or not they personally received any transferred assets, *Odyssey Reins. Co. v. Nagby,* 2017 WL 4432453, at *6 (S.D. Cal. Oct. 4, 2017), and "a principal of [the debtor] who allegedly executed the fraudulent transfers" likewise is liable. *Lehman Bros. Holdings Inc. v. Cafcalas*, 2018 WL 6074597, at *9 (C.D. Cal. Feb. 27, 2018); *accord, e.g., Oracle Am., Inc. v. Appleby,* 2016 WL 5339799, at *9 (N.D. Cal. Sept. 22, 2016); *accord RFC & ResCap*, 2017 WL 1483374, at *12 (key employees of transferee can be liable for fraudulent transfer as beneficiaries).

Here, Plaintiffs allege fraudulent-transfer liability against all Defendants. The SAC alleges—and indeed, there is no dispute—that (i) Counter Brands was the debtor, (ii) G2G was the transferee of the Beautycounter business, (iii) Renfrew was the CEO and an owner of both entities and the driving force behind the transfer, and (iv) Carlyle closely coordinated with all these entities in planning and executing its "sale back to Gregg." (SAC ¶347.) If Plaintiffs have alleged that the transfer was fraudulent, therefore, they have stated claims that all Defendants are liable for it.

### 2. Plaintiffs Have Easily Alleged that the Transfer was Fraudulent.

And Plaintiffs have alleged exactly that. Substantively, fraudulent-transfer law is relatively complex—but, fortunately, its application to this case is not.

Unlike with "mere continuation" liability, Minnesota, Delaware, and California have all enacted the Uniform Voidable Transfers Act (also known as the Uniform Fraudulent Transfer Act), and all recognize fraudulent-transfer liability. *ResCap Liquidating Tr.*, 2020 WL 1317719, at *7 (Delaware); *RFC & ResCap*, 2017 WL 1483374, at *6 (D.Minn. Apr. 25, 2017) (Minnesota); *McClellan v. Northridge Park Townhome Owners Ass'n, Inc.*, 89 Cal. App. 4th 746, 753-54 (Cal. Ct. App. 2001). Therefore, "there is no real conflict of laws" on this question, "and the Court can apply forum law." *See Rescap Liquidating Tr.*, 2020 WL 1317719, at *6.

Substantively, the statute enumerates "eleven badges" of fraudulent transfer:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*RFC Rescap Liquidating Tr.*, 2017 WL 1483374, at *8. Pleading even a few of these badges is enough to state a claim for fraudulent-transfer liability. *Id.*

Plaintiffs here have well exceeded that standard. They plead—and it is undisputed—that the transfer here (i) was to an insider (Renfrew, who was Beautycounter's founder, CEO, and major shareholder), (ii) was made not only after

14

this major litigation was instituted but after Defendants lost an injunction motion in California, (iii) was of substantially all Counter Brands's assets, and (iv) purportedly rendered Counter Brands insolvent. *See supra* Facts Pt. C. Moreover, Plaintiffs expressly plead that (v) Renfrew's and G2G's payment for the Beautycounter assets was not reasonably equivalent to their value. (SAC ¶¶529, 538, 548.)

Defendants offer little coherent attack on these pleadings. In challenging three of Plaintiffs' four fraudulent-transfer claims (Counts XIV, XV, and XVI), Defendants make no attempt even to identify the elements of any claim, let alone explain how Plaintiffs failed to plead them. Instead, Defendants argue without explanation that a California "ABC" transaction is "a lender-run foreclosure process" that somehow is incapable of being used "to hinder, delay, or defraud creditors," and so is immune to fraudulent-transfer claims. (ECF 100 at 27.) Both the law and common sense are squarely contrary.

Legally, Defendants cite not a single case suggesting that ABC transactions are exempt from fraudulent-transfer law. In fact, the courts have resoundingly rejected arguments "that [plaintiffs] cannot establish a fraudulent conveyance occurred because the [Uniform Fraudulent Transfer Act] does not apply to assignments for the benefit of creditors." *Tatung Co. v. Shu Tze Hsu*, 43 F. Supp. 3d 1036, 1069 (C.D.Cal. 2014). Although "the assignment for benefit of creditors process … in some circumstances is perfectly legitimate," courts do not hesitate to hold ABC purchasers liable when it is used "for the fraudulent purpose of escaping liability for … debts." *Uni-Splendor Corp., v. Remington Designs, LLC,* 2018 WL 6252444 (C.D.Cal. Oct. 23, 2018).

And as a matter of common sense, that is obviously correct. The **_whole point_** of an ABC evidently is to prevent collection by certain creditors. While most ABC transactions presumably do not involve fraudulent intent, it is not even plausible to argue (ECF 100 at 28) that such a transaction is somehow inconsistent "with the intent to hinder, delay, or defraud any creditor."

Defendants are left, then, to contend that Plaintiffs have not pleaded direct, conclusive evidence of fraud. That is true but not remotely dispositive: "intent to defraud creditors is rarely susceptible of direct proof." *RFC & ResCap Liquidating Tr. Litig.*, 2017 WL 1483374, at *8. Plaintiffs have squarely pleaded the following, and indeed Defendants do not dispute most of it:

- Carlyle purchased Beautycounter in 2021 at a $1 billion valuation;

- There was no indication that Carlyle intended to sell, or Renfrew intended to buy, Beautycounter when this litigation commenced;

- This class litigation represents a major potential liability for the Beautycounter business;

- After Defendants were enjoined in this litigation, they abruptly announced and executed the "ABC transaction;"

- Defendants instantly and prominently announced that (i) the Beautycounter business would continue seamlessly except that (ii) the "ABC" made them judgment-proof in this litigation and would end it; and

- Far from reflecting the billion-dollar valuation of just three years ago, the "ABC" left Counter without enough money even to pay its attorneys.

(SAC ¶¶358-371.)

16

It is *conceivable* that this sequence of events was simply an innocent coincidence. But it is not likely. As this Court has observed, "[i]n reality, all evidence is 'circumstantial,' in the sense that all evidence requires the factfinder to make inferences. Even the most 'direct' of direct evidence requires the factfinder to make inferential leaps of some kind." *Darke v. Lurie Besikof Lapidus & Co.*, 550 F. Supp. 2d 1032, 1041 (D.Minn. 2008) (Schiltz, J.). So here. If these pleaded facts are not plausible enough to proceed to discovery, then the courts might as well retire the fraudulent-transfer doctrine: defendants could never be liable under such a theory unless they were foolish enough to publish their fraudulent intentions or the fraudulent terms of their deals.

The question here is not whether Plaintiffs have *proof* of a fraudulent transfer. It is whether they have plausibly *pleaded* one. They have. Defendants' arguments about the supposed fairness of the ABC should be raised on a full record, after discovery.

\*

For these reasons, Plaintiffs have amply pleaded successor liability against G2G (both fraudulent transfer and mere continuation). Plaintiffs further plead independent causes of action for fraudulent transfer against all Defendants. If, however, the Court were to find that the SAC is missing necessary facts for these theories, the proper remedy would be to allow Plaintiffs to amend it to add those facts.

## IV.  The SAC Is Easily Compatible With Common Questions, So Striking Class Allegations Is Badly Inappropriate.

"[A] motion to strike class-action allegations" is authorized by Rule 23(c), which "directs district courts to decide whether to certify a class '[a]t an early

practicable time.'" *Donelson v. Ameriprise Fin. Servs.*, 999 F.3d 1080, 1092 (8th Cir. 2021). Thus, such a motion can be granted only "if it is apparent from the pleadings that the class cannot be certified," such that "permitting such allegations to remain would … requir[e] the mounting of a defense against [class] claims that ultimately cannot be sustained." *Id.* (cleaned up). The question, therefore, is not whether plaintiffs have pleaded facts that satisfy all the Rule 23(b) factors, but rather whether they have avoided pleading facts showing that "class certification" is "clearly impossible." *Rouse v. H.B. Fuller Co.*, 694 F. Supp. 3d 1149, 1164 (D.Minn. 2023). "[U]nless it appears beyond doubt that plaintiffs cannot establish an actionable class action lawsuit, district courts regularly deny motions to strike class actions as premature." *Adams v. U.S. Bancorp*, 635 F. Supp. 3d 742, 758 (D.Minn. 2022) (cleaned up); *accord Chen v. Target Corp.*, 2022 WL 1597417, at *19 (D.Minn. May 19, 2022).

Defendants here cannot remotely meet that standard. They first contend that Plaintiffs are bound by "an express class action waiver" in the so-called "2022 Agreement" (ECF 100 at 29), but that is obviously contrary to the pleadings. Nowhere do Plaintiffs concede, or allege facts suggesting, that the "2022 Agreement" is valid or enforceable—as explained above, Plaintiffs' claims are that they never agreed to that document, and that their relationship with Beautycounter was governed by an implied-in-fact contract. Nothing suggests that the implied-in-fact contract contained any barrier to class litigation.

Defendants' only other argument (ECF 100 at 29-30) is that Plaintiffs have failed to plead facts consistent with "there [being] questions of law or fact common to the class" under Rule 23(a)(2). That is badly wrong. For purposes of Rule

23(a)(2), "even a single common question will do," as long as it is susceptible of a "common answer[] apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 359 (2011) (cleaned up; emphasis omitted). It would be a rare complaint that pleads facts *inconsistent* with their being even a single common question. And indeed, Defendants cite not a single case finding a lack of commonality, either at the pleadings stage or any other.

Indeed, the Complaint easily pleads facts consistent with there being common questions, and answers. Start with Plaintiffs' fraud claims. Plaintiffs plead that Defendants made representations to all Beautycounter consultants in general. (SAC ¶¶188, 464, 483, 484, 491, 492, 510.) At the barest minimum, these allegations are consistent with common questions (and answers) regarding whether those representations were actionably false.

The same is true of Plaintiffs' good-faith-and-fair-dealing and tortious-interference claims. Beautycounter was a large-scale business that plainly used form documents and other uniform methods of dealing with its consultants. The pleadings certainly are at least consistent with it having many standardized practices and procedures that applied to most or all consultants. Moreover, they are consistent with Defendants having harmed all class members through standard practices: for instance, by (i) cutting their compensation according to a companywide formula and (ii) terminating them based on a "non-solicitation policy" in a form contract that Defendants themselves claim applied to every Beautycounter consultant. The good-faith-and-fair-dealing and tortious-interference claims raise numerous potential common questions (and answers) about those companywide actions: did the earlier actions give rise to implied-in-fact contracts? On what terms?

19

Did Defendants' later companywide actions breach those contracts, or wrongfully interfere with consultants' business relationships? And so on.

In light of all these potential common questions, it does not help Defendants to point out (ECF 100 at 29-30) *other* individual questions that they think *might* arise. Even assuming Defendants are right about that, those potential individual questions would not eliminate the common questions identified above. Nor have Defendants argued that the pleadings make clear that any such common questions would predominate. That inquiry is for a full record and a class-certification motion, not for the pleadings.

## V.   Striking The Attorney-Fees Prayer Is Inappropriate.

Finally, all Defendants (except Carlyle) ask the Court to strike Plaintiffs' request for attorney fees in the SAC. Striking pleadings is an "extreme measure" and motions requesting such relief are "viewed with disfavor and are infrequently granted." *Id.* (citing *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir.1977)). Complaints routinely seek attorneys' fees as relief, and Defendants cite not a single case suggesting that a plaintiff must specify which cause of action supports such a prayer. To the contrary, "at this stage of the litigation, [parties] need not state the legal basis for recovery of fees," *Acosta v. Monsanto Co.*, 2020 WL 4049887, at *3 (D. Neb. July 20, 2020), and courts frequently reject such arguments as badly premature at the pleadings stage. *E.g., Ridings v. Stryker Sales Corp.*, 2010 WL 4963064, at *2 (D. Minn. Dec. 1, 2010); *Reis Robotics USA, Inc. v. Concept Indu*s., Inc., 462 F. Supp. 2d 897, 908 (N.D. Ill. 2006); *Setchfield v. St. Charles Cnty.*, 2022 WL 579248, at *10 (E.D. Mo. Feb. 25, 2022); *Williams v. Apple, Inc.*, 2021 WL 9181936, at *7–8 (N.D. Cal. June 17, 2021).

## CONCLUSION

We close with a procedural roadmap for the resolution of Defendants' complex motions:

*First,* the Court should hold that it has personal jurisdiction over all Defendants. (To any extent that the Court lacked personal jurisdiction over any Defendant, it could not decide any other issue as to that Defendant, but should sever the relevant claims and transfer them to the Central District of California.)

*Second,* the Court should deny Defendants' motions to compel arbitration.

*Third,* the Court should deny Defendants' motions to dismiss or strike Plaintiffs' claims. (To any extent that the Court were to find the Complaint lacking in factual detail needed to state a claim, or to support class allegations, it should grant Plaintiffs leave to amend to add those facts.)

*Fourth,* the Court should deny Defendants' transfer request.

Ultimately, for the reasons stated herein, the motions should be denied in full.


Respectfully submitted,

CROSSCASTLE PLLC

Dated: August 29, 2024

*/s/ Nicholas J. Nelson*
Pamela Abbate Dattilo (MN# 389889)
Samuel W. Diehl (MN# 0388371)
Nicholas J. Nelson (MN# 391984)
Tara Kennedy (MN# 0400320)
Aaron Bostrom (MN# 401773)
14525 Highway 7, Suite #345
Minnetonka, MN 55345

21

P: (612) 429-8100
F: (612) 234-4766
pamela.dattilo@crosscastle.com
sam.diehl@crosscastle.com
nicholas.nelson@crosscastle.com
tara.kennedy@crosscastle.com
aaron.bostrom@crosscastle.com

*ATTORNEYS FOR PLAINTIFFS*