UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| JENNIFER SHAWGO, an individual; JENNIFER SHAWGO BC LLC, a Minnesota limited liability company; MOLLY BJORNLIE, an individual; MOLLY BJORNLIE, LLC, a Minnesota limited liability company; AYESHA DAWLEY, an individual; DAWLEY, LLC, a Minnesota limited liability company; and CAITY PIKE, an individual; on behalf of themselves and all others similarly situated, | Case No. 24-CV-0556 (PJS/TNL) |
| Plaintiffs, | |
| v. | ORDER |
| COUNTER BRANDS, LLC, a California limited liability company doing business as Beautycounter; THE CARLYLE GROUP INC., a Delaware corporation; COUNTER BRANDS, INC., a Delaware corporation doing business as Beautycounter; G2G NEWCO, INC., a Delaware corporation doing business as Beautycounter; and SUSAN GREGG RENFREW, an individual, | |
| Defendants. | |

Pamela Abbate Dattilo, ECKLAND & BLANDO LLP; Nicholas J. Nelson, Aaron Mark Bostrom, Samuel W. Diehl, and Tara Kennedy, CROSSCASTLE PLLC, for plaintiffs.

Melanie Blunschi, Christina R. Gay, Andrew Brian Clubok, David J. Schindler, and Greg Swartz, LATHAM & WATKINS LLP; Amran Farah and Mark L. Johnson; GREENE ESPEL PLLP, for defendant The Carlyle Group Inc.

Diane Doolittle and Ryan Landes, QUINN EMANUEL URQUHART & SULLIVAN, LLP; Jessica J. Nelson, Donald G. Heeman, and Luke J. Wolf, SPENCER FANE LLP, for defendants Counter Brands, Inc.; G2G Newco, Inc.; and Susan Gregg Renfrew.

Plaintiffs Jennifer Shawgo, Mollie Bjornlie, Ayesha Dawley, Caity Pike, and their respective LLCs are independent contractors who sold Beautycounter products. Defendants Counter Brands, LLC ("LLC"), The Carlyle Group ("Carlyle"), Counter Brands, Inc. ("INC"), G2G Newco, Inc. ("G2G"), and Susan Gregg Renfrew ("Renfrew") each owned or operated the Beautycounter enterprise at one time or another. Plaintiffs filed this putative class action against defendants after plaintiffs' contracts to sell Beautycare products were terminated and disputes arose over the post-termination enforceability of non-solicitation clauses.

This matter is before the Court on motions brought by four of the five defendants. (One of the defendants—LLC—is defunct and in default.) Carlyle moves to compel arbitration or, alternatively, to dismiss the second amended complaint ("the complaint"). INC, G2G, and Renfrew move to compel arbitration and stay the proceedings or, alternatively, to dismiss, strike, or transfer.

For the reasons that follow, the Court dismisses all claims against all defendants (save LLC) for lack of personal jurisdiction.

I. BACKGROUND

A. *The Parties*

1. Plaintiffs

Beautycare is a multilevel-marketing enterprise in which independent contractors (called "consultants") sell cosmetics and skin-care products directly to consumers. Consultants earn commissions from their own sales and from the sales of other consultants whom they recruit into the enterprise.

Plaintiffs are former Beautycounter consultants who were based in Minnesota. SAC, ECF No. 45 at 5–6 ¶¶ 1–11.[1] Plaintiffs Shawgo, Bjornlie, and Dawley conducted their Beautycounter businesses through the plaintiff LLCs. *See* ECF Nos. 113 ¶ 12, 114 ¶ 13, 115 ¶ 12. Pike conducted her business personally.[2] The business relationships between plaintiffs and Beautycounter terminated at various times between August 2022 and March 2023. SAC at 5–6 ¶¶ 2–11.

_____

[1] When citing documents by ECF numbers, the Court cites to the electronically generated page numbers at the top of the pages.

[2] The Court notes that, although Pike and the LLCs appear to have standing to bring this action, Shawgo, Bjornlie, and Dawley do not. It appears that, at the time that the asserted claims accrued, it was the three LLCs—and not Shawgo, Bjornlie, and Dawley—who had contractual relationships with Beautycounter. *See* ECF Nos. 113 ¶ 12, 114 ¶ 13, 115 ¶ 12. In other words, to the extent that Beautycounter had legal obligations to anyone, those obligations ran to the LLCs and Pike, and not to the other individual plaintiffs.

-3-

### 2.  Defendant Counter Brands, LLC ("LLC")

LLC was organized under Delaware law and maintained its headquarters in

Santa Monica, California.  *Id.* at 7 ¶ 12.  From August 2022 until February 2024, LLC was

registered to do business in Minnesota and maintained an agent to accept service of

process in the state.  ECF No. 165-1.  In April 2024, however, LLC ceased operations

after its secured creditors initiated an assignment for the benefit of creditors ("ABC")

under California law.  Renfrew Decl., ECF No. 101 ¶ 29.  An ABC allows an insolvent

business to assign its assets to a third-party fiduciary, who then liquidates the assets

and distributes the proceeds to the business's creditors.  At that point, the insolvent

business is typically dissolved.  Renfrew Decl. ¶ 20.  Roughly speaking, then, an ABC

functions as a state-law version of a Chapter 7 bankruptcy proceeding.

### 3.  Defendant The Carlyle Group Inc. ("Carlyle")

Carlyle is a global investment firm that is incorporated in Delaware and that

maintains its principal place of business in the District of Columbia.  SAC at 7 ¶ 16;

Dumican Decl., ECF No. 71 ¶ 5.  Carlyle does not have any offices, employees, or

business operations in Minnesota.  SAC at 7 ¶ 16; Dumican Decl. ¶¶ 4, 7–8.  At various

times, funds managed by Carlyle have acquired interests in various Minnesota-based

companies, including a disinfectant company, a data-center company, and an e-

discovery company.  Dumican Decl. ¶¶ 12–14.  Carlyle also has participated in financial

activities pertaining to two Minnesota-operated packaging and steel companies, and

Carlyle has engaged in discussions about helping to finance a potential purchase of the

Minnesota Timberwolves and Minnesota Lynx.  *Id.* ¶¶ 15–17.

Carlyle has been sued in this case because, in May 2021, funds managed by

Carlyle purchased a majority stake in LLC.  *Id.* ¶ 9; Renfrew Decl. ¶ 3.

### 4.  Defendant Counter Brands, Inc. ("INC")

INC is a Delaware holding company that maintains its principal place of

business in Santa Monica, California.  SAC at 7 ¶ 13; Renfrew Decl. ¶¶ 13–14.  INC

owned LLC before Carlyle bought a majority stake in the company in May 2021.

Renfrew Decl. ¶ 3.  After the sale, INC continued to hold a minority interest in LLC.  *Id.*

### 5.  Defendant G2G Newco, Inc. ("G2G")

G2G is a Delaware corporation that maintains its principal place of business in

Pacific Palisades, California.  *Id.* ¶¶ 21–22.  G2G purchased some of LLC's assets during

the ABC, including the right to do business as "Beautycounter."  *Id.* ¶ 29; SAC at 10

¶ 31.

### 6.  Defendant Susan Gregg Renfrew ("Renfrew")

Renfrew founded LLC and later G2G, and she is a shareholder of INC.  Renfrew

Decl. ¶¶ 2–3.  She served as Chief Executive Officer ("CEO") of LLC from 2011 until

approximately January 2022, and rejoined LLC as CEO in February 2024.  *Id.* ¶ 2; SAC at

9 ¶ 26.  She is now the CEO, Chief Financial Officer, and Secretary of G2G.  Renfrew

Decl. ¶ 4.  Renfrew is a citizen of California and has never lived in Minnesota.  *Id.* ¶ 6.

### B.  Beautycounter

As noted, Beautycounter[3] is a multilevel-marketing enterprise that sells cosmetics

and skin-care products.  SAC at 11 ¶ 44.  Rather than employ sales representatives,

Beautycounter uses independent contractors known as "consultants" to market and sell

its products directly to consumers.  *Id.* at 11 ¶ 44, 16 ¶¶ 77–78.  The individual plaintiffs

first entered into contracts to serve as Beautycounter consultants between 2014 and

2017.  *See id.* at 5–6 ¶¶ 2–11, 12 ¶¶ 47–48; ECF Nos. 14-3 at 1, 14-5 at 1; Hr'g Tr., ECF

No. 163 at 181.  Initially, INC was the contracting party, but LLC later replaced INC in

the contractual relationships.  *See* Hr'g Tr. at 181.

Beautycounter and plaintiffs appear to have enjoyed a harmonious relationship

until about May 2021, when Carlyle acquired a majority interest in LLC.  *See* SAC at 27

¶ 167; Renfrew Decl. ¶ 3.  Following that acquisition, the amount of money that

plaintiffs were able to earn as Beautycounter consultants decreased significantly,

leading to acrimony between Beautycounter and plaintiffs, and causing plaintiffs to

---

[3]The complaint variously alleges that LLC, INC, and G2G were or are doing business as "Beautycounter."  The complaint further alleges that LLC and INC "operated as one seamless business," SAC at 7 ¶ 14, and thereafter refers to LLC and INC collectively as "Beautycounter."  The Court will follow the complaint's lead for purposes of this section.

explore other business opportunities.  SAC at 32–40 ¶¶ 193–233.  In 2022, the individual

plaintiffs began selling products for a different multilevel-marketing company.  *Id.* at 40

¶ 234–38.

### C.  The Terminations and Ensuing Lawsuits

By March 2023, plaintiffs' relationships with Beautycounter had been terminated,

either by Beautycounter or by the plaintiff.  *Id.* at 44–50 ¶¶ 269–316.  Following the

terminations, Beautycounter told plaintiffs that it would enforce a non-solicitation

policy that was incorporated into their contracts and that purported to apply post-

termination.  *Id.* at 45 ¶¶ 270–274, 46–51 ¶¶ 288–319.  Plaintiffs then filed the original

complaint in this action in a Minnesota state court.  *See* ECF No. 1-1.  That action was

removed to this Court in February 2024.  ECF No. 1.

The attorneys who represent plaintiffs in this action also represent a group of

former Beautycounter consultants in a similar action in California.  SAC at 54 ¶ 332.  In

March 2024, the California court issued a temporary restraining order ("TRO")

restraining LLC from enforcing the non-solicitation provision.  *Id.* at 54 ¶ 333.

Following entry of the TRO, defense counsel warned plaintiffs' counsel that, if the

California litigation continued, "there could be a 'bankruptcy.'"  *Id.* at 58 ¶ 361.

### D.  The Assignment for the Benefit of Creditors ("ABC")

Renfrew founded G2G in April 2024, about three years after INC sold a majority stake in LLC to Carlyle.  *Id.* at 54–55 ¶¶ 338–39; Renfrew Decl. ¶ 4.  Days after founding G2G, Renfrew—who was serving as CEO of LLC (after being rehired by Carlyle)—sent an email to a group of consultants announcing that LLC would be winding down, that G2G would continue Beautycounter's business, and that the business arrangements between consultants and LLC would transfer to G2G.  SAC at 55–56 ¶¶ 343–45.  At about the same time, Carlyle announced that, in light of "significant near-term capital needs," Carlyle had decided to sell its interest in LLC back to Renfrew.  *Id.* at 56 ¶ 347.

At this point, LLC was insolvent; its secured debt alone exceeded the value of its assets.  Dumican Decl. ¶ 10.  In late April 2024, LLC's secured creditors arranged an ABC to liquidate LLC.  Renfrew Decl. ¶ 29.  LLC's assets were assigned to a third-party fiduciary, the fiduciary sold the assets, the proceeds were distributed among the secured creditors, and LLC was dissolved.  *Id.* ¶ 29; Dumican Decl. ¶ 10.  Some of LLC's assets were sold to G2G.  Renfrew Decl. ¶ 29.  Because the proceeds of the ABC were insufficient to pay the total amount that LLC owed to its secured creditors—much less any of the amount that LLC owed to its unsecured creditors—none of LLC's equity holders (including Carlyle and INC) recovered a penny in the ABC.  *Id.* ¶ 20; Dumican

Decl. ¶ 10.  In short, Carlyle's and INC's ownership interests in LLC were rendered worthless.  *Id.*

Following the liquidation of LLC's assets through the ABC, plaintiffs amended their complaint in this action to join INC, G2G, and Renfrew as defendants.  *See generally* SAC.  Plaintiffs allege that G2G is a mere continuation of LLC, and thus that G2G assumed the liabilities of LLC.  *See id.* at 57 ¶ 352.  Plaintiffs further allege that defendants orchestrated a fraudulent transfer of LLC's assets to G2G via the ABC in order to avoid liability to the plaintiffs in the Minnesota and California actions.  *Id.* at 59 ¶ 364, 63 ¶¶ 383-84, 388.  Based on these allegations, the complaint asserts numerous fraudulent-transfer, contract, tort, and other claims, mostly under California law.

## II.  ANALYSIS

### A. Whether to First Decide Arbitrability or Personal Jurisdiction

Defendants[4] urge the Court to decide whether this matter must be arbitrated before reaching any other issue.  Plaintiffs, by contrast, ask the Court to decide whether it has personal jurisdiction over defendants before reaching the issue of arbitrability.  Pl. Mem., ECF No. 155 at 21–22.[5]  All parties agree, though, that the Court *may* decide

---

[4]When referring to motions or arguments made by "defendants," the Court does not include LLC, which, as noted, has been dissolved and is in default.

[5]Plaintiffs contend that, when defendants asked the Court to first decide arbitrability, defendants waived their personal-jurisdiction defense.  Pl. Mem. at 23–25.
(continued...)

personal jurisdiction before turning to arbitrability.  And a review of the relevant case law reveals that, although some courts have addressed arbitrability before addressing personal jurisdiction, other courts have done the opposite.  *Compare Burch v. 1412 Lansdowne Operating, LLC*, No. 18-CV-3000 (RPK) (ST), 2021 WL 4443768, at *3 (E.D.N.Y. Sep. 29, 2021) ("A court may resolve a motion to compel arbitration before addressing a motion to dismiss based on lack of personal jurisdiction . . . ."); *with, e.g., Airtel Wireless, LLC v. Montana Elec. Co., Inc.*, 393 F. Supp. 2d 777, 785 (D. Minn 2005) (determining that the court had personal jurisdiction before addressing defendants' motion to compel arbitration); *Hines v. Stamos*, 111 F.4th 551, 565 (5th Cir. 2024) (stating that, "unlike other threshold issues, a court cannot rule on arbitrabiity without subject-matter and personal jurisdiction").[6]

_____

[5](...continued)
The Court disagrees.  Defendants moved to dismiss for lack of personal jurisdiction at the same time that they moved to compel arbitration, the two motions were explicitly brought in the alternative, and the two issues were addressed in the same briefs.  Under the circumstances, the Court declines to find that, by simply requesting that the Court address arbitrability before addressing personal jurisdiction, defendants intentionally and knowingly waived their right to object to personal jurisdiction.

[6]*Cf., also, Pederson v. GoJetAirlines, LLC*, No. 20-696 (JRT/LIB), 2021 WL 981156, at *4 (D. Minn. Mar. 16, 2021) (finding court lacked personal jurisdiction over defendants and declining to consider defendants' motion to compel arbitration on that basis); *Cargill, Inc. v. Biodiesel of Las Vegas, Inc.*, No. 09-672 (DSD/AJB), 2009 WL 3164761, at *4 (D. Minn. Sep. 28, 2009) (same).

This Court believes that, before it decides whether to order a defendant to arbitrate a claim, the Court should first determine whether it has personal jurisdiction over that defendant—that is, the authority to determine the rights and obligations of the defendant under the contract that purportedly requires the defendant to arbitrate. Therefore, the Court begins by analyzing whether it may exercise personal jurisdiction over each of the defendants.

### B.  Standard of Review

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(2), a plaintiff must make a prima facie showing that the court may exercise personal jurisdiction over the defendants. *Brothers and Siters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 951 (8th Cir. 2022).  In determining whether a plaintiff has met her burden, a court may consider "affidavits and exhibits presented with the motions and in opposition thereto," in addition to the pleadings. *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 475 (8th Cir. 2012).  Where (as here) a court has not conducted an evidentiary hearing, the court must view the facts in the light most favorable to the nonmovant. *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 745 (8th Cir. 2011).  "[H]owever, the party seeking to establish the court's personal jurisdiction carries the burden of proof and that burden does not shift to the party challenging jurisdiction." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014).

### C. Personal Jurisdiction

A federal court sitting in diversity may exercise personal jurisdiction over a defendant only if doing so comports with both the long-arm statute of the state in which the federal court is located and the Due Process Clause of the Fourteenth Amendment. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 463 (1985).  Because Minnesota's long-arm statute (Minn. Stat. § 543.19) reaches as far as the Constitution allows, this Court need consider only whether exercising personal jurisdiction over defendants comports with due process.  *See Minn. Mining & Mfg. Co. v. Nippon Carbide Indus. Co.*, 63 F.3d 694, 697 (8th Cir. 1995); *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 410–11 (Minn. 1992).

Courts recognize two types of personal jurisdiction:  (1) general jurisdiction and (2) specific jurisdiction.

### 1. General Jurisdiction

A court that has general jurisdiction over a defendant may adjudicate any claim against that defendant, even if the claim has no connection to the forum state.  "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) (citation omitted).  As a general matter, a corporation is

"fairly regarded as at home" only in the state in which it is incorporated and the state in which it maintains its principal place of business.  *Id.*

That said, when an LLC registers with the Minnesota Secretary of State and appoints an agent for service of process under Minn. Stat. § 322C, that LLC consents to the jurisdiction of Minnesota courts over any lawsuit brought against the LLC, whether or not the lawsuit relates to the LLC's in-state activities.  *See Knowlton v. Allied Van Lines, Inc.*, 900 F.2d 1196, 1200 (8th Cir. 1990) (holding that "appointment of an agent for service of process under [Minn. Stat.] § 303.10 gives consent to the jurisdiction of Minnesota courts for any cause of action, whether or not arising out of activities within the state"); *ResCap Liquidating Tr. v. LendingTree, LLC*, No. 19-CV-2360 (SRN/HB), 2020 WL 1317719, at *5 (D. Minn. Mar. 20, 2020) (applying *Knowlton* to an LLC's appointment of an agent for service of process under Minn. Stat. § 332C.0116); *see also Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 134–36 (2023) (affirming the constitutionality of a similar Pennsylvania consent statute).

### 2.  Specific Jurisdiction

In the absence of general jurisdiction, a court may exercise specific jurisdiction over a defendant who "purposefully avails itself of the privilege of conducting activities within the forum State, such as directing its activities at the forum or targeting forum residents."  *Zazzle*, 42 F.4th at 953 (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,

592 U.S. 351, 359 (2021) (cleaned up) (other citation omitted)).  The claim of the plaintiff

against the defendant "must arise out of or relate to the defendant's contacts with the

forum."  *Ford*, 592 U.S. at 592 (internal quotation marks omitted).  "The contacts must be

the defendant's own choice and not random, isolated, or fortuitous."  *Id.*  In a multi-

defendant case, "[e]ach defendant's contacts with the forum State must be assessed

individually."  *Calder v. Jones*, 465 U.S. 783, 790 (1984) (citation omitted).

Under the "effects test" applied by the United States Supreme Court in its

decision in *Calder*, "personal jurisdiction can exist over a nonresident defendant who

commits an intentional tort when its effect is felt primarily within the forum state."

*Morningside Church, Inc. v. Rutledge*, 9 F.4th 615, 620 (8th Cir. 2021).  The test turns not on

where the plaintiff experienced a particular injury or effect but, rather, on whether the

defendant's allegedly tortious acts were "performed for the very purpose of having

their consequences felt in the forum state."  *Johnson v. Arden*, 614 F.3d 785, 796–97 (8th

Cir. 2010) (internal quotation marks omitted); *see also Walden v. Fiore*, 571 U.S. 277, 287

(2014) ("The crux of *Calder* was that the . . . 'effects' of the alleged [intentional tort]

connected the defendant to [the forum state], not just to the plaintiff.").

### 3.  Individual Defendants

Plaintiffs argue that Carlyle is subject to general jurisdiction.  Plaintiffs further

argue that Carlyle is subject to specific jurisdiction because of its contacts with

Minnesota and because it participated in a fraudulent transfer of LLC's assets to G2G in order to deprive the plaintiffs in this Minnesota action of any means of recovering a judgment entered against LLC.

Plaintiffs further argue that LLC consented to the general jurisdiction of the Minnesota courts by appointing an agent to accept service of process in Minnesota, and that G2G and Renfrew "inherited" LLC's consent. Alternatively, plaintiffs argue that G2G and Renfrew are subject to specific jurisdiction because they "inherited" LLC's business contacts with Minnesota and because both participated in the same fraudulent transfer as Carlyle.

*a. LLC*

As noted, plaintiffs argue that this Court has both general and specific jurisdiction over LLC, and that G2G and Renfrew somehow "inherited" that jurisdiction from LLC. The Court agrees with the first point. At the time that plaintiffs commenced this action in October 2023, LLC was still a going concern, it had registered with the Minnesota Secretary of State under Minn. Stat. § 322C, and it had appointed an agent to accept service of process in Minnesota. ECF No. 165-1; *see* ECF No. 1-1. That gives this Court general jurisdiction over LLC.

Even if the Court did not have general jurisdiction over LLC, the Court could exercise specific jurisdiction over LLC. When Beautycounter was operated by LLC,

Beautycounter sent representatives to Minnesota to cultivate and maintain consultant and customer relationships in the state. These representatives met with plaintiffs in Minnesota and helped them to grow their Minnesota businesses. SAC at 24 ¶ 139–144, 31 ¶¶ 186–87. Moreover, Beautycounter shipped millions of dollars of Beautycounter products to Minnesota during the past decade. *See, e.g.*, ECF Nos. 113 ¶¶ 2, 16; 114 ¶¶ 2, 16; 115 ¶¶ 2, 15; 116 ¶¶ 2, 13. The claims brought in this action relate to Beautycounter's in-state activities, and thus this Court could exercise specific jurisdiction over LLC.

### b. INC

The complaint says almost nothing about INC, plaintiffs do not mention INC in their briefing regarding personal jurisdiction, and the information about INC in the record is limited: The individual plaintiffs originally entered into agreements with INC. *See* ECF Nos. 14-3 at 1, 14-5 at 1. LLC later stepped into INC's shoes. *See* SAC at 7 ¶ 14; Hr'g Tr. at 181. INC is a holding company (not an operating company) that owned LLC prior to the sale to Carlyle. Renfrew Decl. ¶ 20. After that sale, INC maintained a minority interest in LLC. *Id.* INC is incorporated in Delaware and headquartered in California. *Id.* ¶¶ 13–14. INC has never maintained an office, hired an employee, or conducted any business in Minnesota. *Id.* ¶¶ 15–19.

The complaint alleges (without specifics) that INC and LLC operated as "one seamless business," SAC at 7 ¶ 14, but "seamless" is not a legal concept, and the Supreme Court has been clear that "[e]ach defendant's contacts with the forum State must be assessed individually." *Calder*, 465 U.S. at 790. On this record, the Court cannot find that it has general or specific jurisdiction over INC. Accordingly, the Court dismisses all claims against defendant Counter Brands, Inc.

<em>c. Carlyle</em>

i. General Jurisdiction

Carlyle is neither incorporated nor headquartered in Minnesota, nor does it have any offices or employees in Minnesota. Dumican Decl. ¶¶ 4–8. Obviously, Carlyle is not "essentially at home" in Minnesota, and therefore this Court cannot exercise general jurisdiction over it.

ii. Specific Jurisdiction for Non-Fraudulent-Transfer Claims

In arguing that this Court has specific jurisdiction over the claims that do not arise out of the alleged fraudulent transfer, plaintiffs rely on the United States Supreme Court's decision in *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021). Plaintiffs allege, and the record reflects, that Carlyle or Carlyle-operated funds have owned (and, in some cases, continue to own) interests in various companies that operate, own property, or do business in Minnesota. SAC at 7–8 ¶¶ 18–24. Those

companies include an e-discovery company, a steel company, and a packaging company. *Id.* at 8 ¶¶ 20–22; Dumican Decl. ¶¶ 12–16. Plaintiffs also point to Carlyle's recent discussions about helping to finance a potential purchase of the Minnesota Timberwolves and Minnesota Lynx. SAC at 8 ¶ 22; Dumican Decl. ¶ 17. Plaintiffs argue that, just as Ford sells cars on a nationwide basis, Carlyle conducts corporate acquisitions on a nationwide basis. Pl. Mem. at 35. Therefore, plaintiffs argue, just as Minnesota courts can exercise specific jurisdiction over Ford in any lawsuit alleging a defect in a Ford vehicle (even those vehicles with no direct connection to Minnesota), Minnesota courts can exercise specific jurisdiction over Carlyle in any lawsuit alleging unlawful behavior in connection with a corporate acquisition (even those acquisitions with no direct connection to Minnesota).

*Ford* is inapposite. In *Ford*, the Supreme Court considered two lawsuits arising out of two car crashes that involved two different models of Ford cars and that occurred in two different states (Minnesota and Montana). Each plaintiff filed suit against Ford in the state in which the plaintiff's crash had occurred. Ford conceded that it had "purposefully availed itself" of the privileges of doing business in both Minnesota and Montana. Ford could hardly have argued otherwise, given that it had extensively advertised, marketed, and sold its cars in both states, and given that it had supported the resale markets for used Fords in both states. *Ford*, 592 U.S. at 362. Ford argued,

however, that it was not subject to specific jurisdiction in either lawsuit because it had not directly introduced the car that crashed in Minnesota into the Minnesota market, and because it had not directly introduced the car that crashed in Montana into the Montana market. *Id.* at 366–67. The two cars had initially been sold in other states, and made their way to Minnesota and Montana not because of anything that Ford did, but because of later decisions by the cars' owners to move to a different state or to resell their cars. Thus, Ford argued, the car crash in Minnesota did not arise out of Ford's contacts with Minnesota, and the car crash in Montana did not arise out of Ford's contacts with Montana.

The Court rejected Ford's argument, emphasizing that the Court's "most common formulation of the rule [for specific jurisdiction] demands that the suit 'arise out of *or relate to* the defendant's contacts with the forum.'" *Id.* at 362 (emphasis in original). Because Ford had not sold the car that crashed in Minnesota in Minnesota, or the car that crashed in Montana in Montana, the Court agreed with Ford that a "strict causal" link between Ford's in-forum activities and the two accidents was missing. *Id.* But the Court nevertheless found that the car crashes "relate[d] to" Ford's activities in the forum states. *Id.* Specifically, the plaintiffs' claims "relate[d] to" Ford's marketing and sales of new cars in both states, as well as to the company's support in both states of the resale market for its used cars (including the two models involved in the crashes).

*Id.* at 364–67.  Thus, the Court held, Minnesota and Montana could exercise specific jurisdiction over Ford in the respective lawsuits.

Here, plaintiffs rely on *Ford* in arguing that, because Carlyle acquired interests in *some* businesses in Minnesota, this Court can exercise specific jurisdiction over any lawsuit that relates to *any* business acquired by Carlyle.  But if the fact that a defendant conducts some activities in Minnesota means that the courts of Minnesota have specific jurisdiction over claims arising out of similar activities conducted by the defendant anywhere in the world, the distinction between general jurisdiction and specific jurisdiction would collapse.  Plaintiff's argument also ignores the requirement—reaffirmed by the Supreme Court in *Ford*—that a court cannot exercise specific jurisdiction over a defendant unless the claim against it "arise[s] out of or relate[s] to the defendant's contacts with the forum."  *Id.* at 362.  Carlyle's contacts with Minnesota—such as its involvement in discussions about buying the Minnesota Timberwolves and Minnesota Lynx—have no connection whatsoever with the alleged conduct that gave rise to this lawsuit.  Accordingly, plaintiffs have failed to make a prima facie showing that this Court can exercise specific jurisdiction on this basis.

iii.  Specific Jurisdiction:  Fraudulent Transfer

That leaves the fraudulent-transfer claims.  Plaintiffs argue that all of the defendants participated in the fraudulent transfer of LLC's assets to G2G and that the purpose of the fraudulent transfer was to render LLC judgment proof in this litigation.  Thus, say plaintiffs, this Court can exercise specific jurisdiction over the fraudulent-transfer claims, as the defendants' wrongful acts were "performed for the very purpose of having their consequences felt in [Minnesota]."  *Johnson*, 614 F.3d at 796.

The Court disagrees. The main problem for plaintiffs is the utter implausibility of their claim that defendants somehow engineered the transfer of LLC's assets to G2G through an ABC in order to render LLC judgment proof in this litigation.  All of the evidence in the record is to the contrary.

To begin with, the ABC was not initiated by Carlyle or any other equity holder, but by LLC's *secured creditors*, who foreclosed on their debt and forced LLC into the ABC.  Renfrew Decl. ¶ 29.  Obviously, the secured creditors were not acting to protect LLC; they were acting to protect themselves.  It was in the interests of *everyone*—LLC, its secured creditors, its unsecured creditors, and its equity holders—that LLC's assets be sold for the highest possible price.  And it was the fiduciary's legal duty to collect as much money as possible for LLC's assets.  Anyone who claimed that "Carlyle" was

selling LLC "back to Renfrew" or that the sale was orchestrated to "protect Renfrew" was either ignorant of the facts or inartful in describing those facts.

Moreover, according to Carlyle' sworn (and uncontradicted) affidavit, at the time of the ABC, "Beautycounter's secured debt substantially exceeded its assets." Dumican Decl. ¶ 10. In other words, the transfer of LLC's assets did not render it judgment proof; LLC was judgment proof *before* the ABC was initiated by its secure creditors. That Carlyle's counsel warned plaintiffs' counsel that "there might be a bankruptcy" if litigation continued following the issuance of the California TRO merely confirms that LLC was in terrible financial condition. Plaintiffs' claim that the ABC was initiated to *render* LLC judgment proof is unsupported by any evidence and simply makes no sense.

Equally unsupported—and equally nonsensical—are plaintiffs' allegations (made upon "information and belief") that Carlyle and LLC "did not receive a reasonably equivalent value for the transfer of [LLC's] assets to G2G . . . and Renfrew." SAC at 59 ¶ 364, 63 ¶ 388, 90–94 ¶¶ 519–48. Plaintiffs maintain that if G2G had paid adequate consideration to Carlyle and LLC, then LLC would have been left with "at least enough funds to pay its lawyers in this action." *Id.* at 63 ¶ 388. Again, though, LLC's assets belonged to *an insolvent entity*. They were not sold by Carlyle or LLC; they were sold by an independent fiduciary as part of an ABC initiated by LLC's secured creditors. That fiduciary was legally required to sell LLC's assets at the highest possible

price, and it was in everyone's interest—including Carlyle's and LLC's—that the fiduciary do just that.

It is also illogical to believe that *Carlyle* would participate in a scheme that would render one of its *co-defendants* judgment proof. Carlyle is at risk of being held jointly and severally liable with LLC. If that happens, and if LLC is judgment proof, then Carlyle (which is not judgment proof) will have to pay the entire judgment. What possible reason would Carlyle have for putting itself in such a position?

Finally, even setting aside the implausibility of plaintiffs' fraudulent-transfer claims, neither the allegations of the complaint nor the evidence in the record suggest that defendants "uniquely or expressly aimed [their actions] at [Minnesota]." If defendants had indeed fraudulently transferred LLC's assets to G2G, defendants would have harmed not only the plaintiffs to this action, but all of LLC's secured creditors, all of LLC's unsecured creditors (including the plaintiffs in the related California action), and all of LLC's equity holders (including Carlyle and INC). As far as the record reflects, none of these creditors or equity holders—save the plaintiffs in this action—are located in Minnesota. And that means that the impact of the alleged fraudulent transfers would have been felt almost entirely outside of Minnesota. Plaintiffs have thus failed to plead, let alone show, that the allegedly fraudulent transfers were "uniquely or expressly aimed" at Minnesota. *See Total Grain Mktg., LLC v. Ctr. Ethanol*

*Co., LLC*, No. 4:24 CV 73 RWS, 2024 WL 4345765, at * 3 (E.D. Mo. Sep. 30, 2024)

(interpreting *Arden*); *see also Walden*, 571 U.S. at 290 ("*Calder* made clear that mere injury

to a forum resident is not a sufficient connection to the forum").

For these reasons, the Court finds that it lacks personal jurisdiction over Carlyle

and dismisses all of the claims against it.

### d. Renfrew

Plaintiffs appear to argue that both Renfrew and G2G "inherited" LLC's consent

to general jurisdiction in Minnesota in the form of its now-lapsed registration with the

Minnesota Secretary of State, even though LLC's Minnesota registration was revoked

several months before either Renfrew or G2G were added as defendants to this lawsuit.

*See* Pl. Mem. at 27–28; ECF No. 165-1; ECF No. 47.  Plaintiffs also appear to argue that

Renfrew and G2G "inherited" LLC's *contacts* with Minnesota, so that, if those contacts

give this Court specific jurisdiction over LLC, they necessarily give this Court specific

jurisdiction over Renfrew and G2G.

Unsurprisingly, plaintiffs cite no authority supporting their theories of

"inherited" jurisdiction.  Generally speaking, one party cannot "inherit" another party's

consent or contacts with only narrow exceptions, such as a purchaser's express or

implied assumption of a seller's liabilities, a merger, or a fraudulent transfer.  *See, e.g.,*

*Panther Pumps & Equip. Co. v. Hydrocraft, Inc.*, 566 F.2d 8, 24–25 (7th Cir. 1977) (citations

-24-

omitted) (summarizing successor liability). The Court accordingly rejects these theories of "inherited" personal jurisdiction over Renfrew or G2G.

Plaintiffs also argue that Renfrew, like Carlyle, participated in a fraudulent transfer of LLC's assets to G2G in order to render LLC judgment proof in this Minnesota action. This argument is implausible as to Renfrew for the same reasons that it is implausible as to Carlyle.

For these reasons, the Court finds that it lacks personal jurisdiction over Renfrew and dismisses all of the claims against her.

### e. G2G

Plaintiffs argue that G2G participated in the fraudulent transfer of LLC's assets from LLC to G2G and therefore this Court has personal jurisdiction over the fraudulent-transfer claims. For reasons the Court has already explained, this argument is implausible. The record reflects merely that "G2G purchased some of . . . LLC's assets in [the ABC] arranged and directed by the secured creditors of . . . LLC." Renfrew Decl. ¶ 29. None of the evidence in the record suggests that G2G in any way "facilitated" the ABC, or that the consideration G2G paid for some of LLC's assets was inadequate.

Plaintiffs also argue that G2G is a "mere continuation" of "Beautycounter" (by which plaintiffs presumably mean LLC) and therefore Minnesota courts have personal jurisdiction over G2G for the same reasons that they have personal jurisdiction over

LLC. Pl. Mem. at 64–66; SAC 10 ¶ 31, 57 ¶ 352. The parties dispute whether Minnesota or California law governs this issue. The Court believes that, under Minnesota choice-of-law principles, Minnesota law applies, but it doesn't matter. The ultimate result is the same under both Minnesota and California law.

Minnesota does not recognize the "mere continuation" theory of successor liability. *See Stoebner v. Opportunity Fin., LLC*, 562 B.R. 368, 381 (D. Minn. 2016), *aff'd*, 909 F.3d 219 (8th Cir. 2018) (noting Minnesota "follow[s] the traditional corporate law rule that a purchaser-successor does not ordinarily assume the seller-predecessor's liabilities simply by purchasing the predecessor's assets," unless the purchaser-successor contractually assumes liability or liability is permitted by statute) (collecting cases)). Plaintiffs do not plead that G2G contractually assumed LLC's liabilities, nor do they point to a statute or judicial decision that imposes LLC's liability on G2G. Hence, plaintiffs fail to show that, under Minnesota law, G2G is subject to personal jurisdiction as a mere continuation of LLC.

Although California does recognize the "mere continuation" theory of liability, plaintiffs fare no better under California law. Under California law, "[t]o be a mere continuation . . . courts require evidence of one or both of the following factual elements: (1) a lack of consideration for acquisition of the former corporation's assets to be made available to creditors, or (2) one or more persons were officers, directors, or

shareholders of both corporations." *Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1150 (9th Cir. 2004). "Inadequate consideration is an 'essential ingredient' to a finding that one entity is a mere continuation of another." *Id*. California courts routinely hold that "common officers and shareholders alone are insufficient to establish mere continuation." *Reno-Tahoe Specialty, Inc. v. Mungchi, Inc.*, 468 F. Supp. 3d 1236, 1241 (C.D. Cal. 2020).

Plaintiffs have pleaded, and the record reflects, that LLC and G2G have officers and shareholders in common. *See* SAC at 9 ¶ 25, 57 ¶ 351, 57 ¶ 351; Renfrew Decl. ¶¶ 2–4. As discussed above, however, the limited evidence in the record provides no reason to believe that G2G tendered inadequate consideration in exchange for LLC's assets. Accordingly, on this record, plaintiffs have failed to make a prima facie showing that G2G is subject to personal jurisdiction as the "mere continuation" of LLC.

For these reasons, the Court finds that it lacks personal jurisdiction over G2G and dismisses all of the claims against it.

* * * * *

The Court has found that it cannot exercise personal jurisdiction over any of the defendants, save the now-defunct and in-default LLC. The Court was inclined to transfer this action to California. As plaintiffs say, "[t]his case . . . involves a transfer under California law of California assets of business entities . . . headquartered in, and

-27-

operating out of, California." Pl. Mem. at 64. But not all defendants agree that they are

subject to the jurisdiction of the California courts, and thus this Court opts to dismiss all

claims against the defendants (save LLC) without prejudice. If plaintiffs refile their

claims in California, a California court can determine to what extent it has jurisdiction

over those claims.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.    The motion of defendant The Carlyle Group Inc. to compel arbitration, or

to dismiss plaintiffs' second amended complaint [ECF No. 68] is

GRANTED IN PART:

a.    Defendant's motion to dismiss the complaint pursuant to Fed. R.

Civ. P. 12(b)(2) for lack of personal jurisdiction [ECF No. 68] is

GRANTED.

b.    Defendant's motion to compel arbitration under the Federal

Arbitration Act, 9 U.S.C. § 1 et seq., [ECF No. 68] is DENIED AS

MOOT.

c.    Defendant's motion to dismiss the complaint pursuant to Fed. R.

Civ. P. 12(b)(1) [ECF No. 68] is DENIED AS MOOT.

      d.      Defendant's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) [ECF No. 68] is DENIED AS MOOT.

2.      The motion of defendants Counter Brands, Inc.; G2G Newco, Inc.; and Susan Gregg Renfrew to compel arbitration and stay proceedings, or to dismiss, strike, or transfer [ECF No. 98], is GRANTED IN PART:

      a.      Defendants' motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction [ECF No. 98] is GRANTED.

      b.      Defendants' motion to compel arbitration and stay proceedings pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq., [ECF No. 98] is DENIED AS MOOT.

      c.      Defendants' motion to transfer pursuant to Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1404(b) [ECF No. 98] is DENIED AS MOOT.

      d.      Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) [ECF No. 98] is DENIED AS MOOT.

      e.      Defendants' motion to strike pursuant to Fed. R. Civ. P. 12(f) [ECF No. 98] is DENIED AS MOOT.

3.    The second amended complaint [ECF No. 45] is DISMISSED WITHOUT

PREJUDICE as to defendants The Carlyle Group Inc.; Counter Brands,

Inc.; G2G Newco, Inc.; and Susan Gregg Renfrew.

Dated:  March 31, 2025                     s/Patrick J. Schiltz
                                           Patrick J. Schiltz, Chief Judge
                                           United States District Court

-30-